UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

BOSTON DIVISION

| | |
|---|---|
| Musket Research Associates, Inc.<br><br>   Plaintiff,<br><br> v.<br><br>Ovion, Inc., William S. Tremulis, and Jeffrey P. Callister.<br><br>   Defendants. | No. 05 10416 MEL<br><br>FIRST AMENDED COMPLAINT FOR BREACH OF CONTRACT, BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING, PROMISSORY ESTOPPEL, QUANTUM MERUIT, CONVERSION, FRAUD, NEGLIGENT MISREPRESENTATION, CONCEALMENT AND VIOLATION OF MASSACHUSETTS GENERAL LAW CH. 93A<br><br>JURY TRIAL DEMANDED |

FIRST AMENDED COMPLAINT

3879364v1

Plaintiff Musket Research Associates, Inc. alleges as follows:

## THE PARTIES

1. Plaintiff Musket Research Associates ("MRA") is a Massachusetts corporation having its principal place of business in Cambridge, Massachusetts.

2. On information and belief, Defendant Ovion, Inc. ("Ovion" or "Company") is a corporation organized and operating under the laws of the State of Delaware, with its principal place of business in San Mateo, California.

3. Defendant William S. Tremulis is an individual who, MRA is informed and believes, resides in San Mateo County, California. Tremulis is one of the founders of Ovion.

4. Defendant Jeffrey P. Callister is an individual who, MRA is informed and believes, resides in San Mateo County, California. Callister is one of the founders of Ovion.

## JURISDICTION AND VENUE

5. This Court has jurisdiction over this action pursuant to 28 U.S.C. §1332 because it is between citizens of different States and the matter in controversy exceeds the sum of $75,000.

6. Venue lies with this Court pursuant to 28 U.S.C. §1391 because a substantial part of the events and omissions giving rise to the action occurred in this judicial district.

## BACKGROUND

7. Ovion is a start-up company that holds multiple patents for medical devices in the area of female permanent birth control. On several occasions prior to June 2004, Robert Hess, a director and major shareholder of Ovion, discussed his interest in having MRA, an investment banking firm, consider assisting Ovion in its financing activities. In

a series of meetings and conversations starting on or about June 6, 2004, Ovion requested MRA's assistance in soliciting investors in the Company culminating in a formal banking agreement dated July 21, 2004 and executed on July 29, 2004 between the two firms (the "Engagement Letter"). Ovion repeatedly highlighted its interest in utilizing MRA's extensive experience in medical device transactions and negotiating skills regarding financial structures, comments it reiterated multiple times during the course of MRA's engagement. A key part of MRA's decision to accept this assignment was Ovion's expressed view that its preferred financing method was a private placement of preferred stock. MRA made it clear to Ovion in their early discussions that it had no interest in being used as a "stalking horse" for a corporate transaction. Ovion represented that it had established communications with a small number of potential corporate partners but that it wanted to use the funds from the contemplated financing to build up its business before any such discussions would likely become serious. Language was added to the Engagement Letter to compensate MRA should "lightning strike" during the term of MRA's efforts.

8. The Engagement Letter provided that, among other things, MRA would analyze the Company's market potential, would assist in the development of presentation and due diligence materials for solicitation of investors in the proposed private placement and would contact and manage relationships with qualified potential investors. In exchange, the Engagement Letter provided that Ovion would pay MRA as "finder's fees" seven percent of the cash proceeds of any private placement to newly introduced investors solicited by MRA and a lesser amount to a small number of investors with whom Ovion's founders had already had extensive discussions. Despite the preexisting relationships with these latter funds, MRA insisted on at least a partial fee structure as it expected its work product and negotiation skills to be integral to the process and the Company readily agreed.

9. Neither the terms of the Engagement letter nor any other agreement by the

parties allowed Ovion to use MRA's research, presentation materials or other work product to solicit potential investors other than private placement investors, such as potential corporate partners.

10. The Engagement Letter did state that Ovion might decide to pursue a merger, or acquisition with a corporate partner instead of a private placement and provided for the payment to MRA of an "advisory fee" if Ovion did so. However, the provision for the payment of the advisory fee was conditioned on the parties' understanding that MRA's work product would not be used as part of any effort by Ovion to solicit corporate partners. In other words, the advisory fee was in the nature of a "kill fee" to compensate MRA for work done on the private placement if that placement did not go forward, not a substitute for the finder's fee that MRA would have expected to be entitled to if its work product were used to solicit corporate partners.

11. After the Engagement Letter was signed, MRA did substantial work for the Ovion venture. In particular, MRA prepared budgets and forecasts, prepared extensive presentation and due diligence materials for use with potential private placement investors and developed numerous investor leads. During this process, MRA repeatedly asked Ovion if private placement continued to be its main strategy. At no time prior to or following the signing of the Engagement Letter did Ovion ever respond to any of these direct inquiries in a manner that suggested it was actively pursuing a corporate financing or acquisition path as an alternative to a traditional venture-type financing. Ovion's representations to MRA about its intention to pursue financing by means of a private placement rather than a corporate partnership include, but are not limited to, the following:

- On or about June 8, 2004, Sue Ann Latterman—a principal of MRA who created much of MRA's work product for the Ovion engagement—met with Tremulis, Callister and Hess at the Ovion offices in San Mateo. Tremulis and Callister assured Latterman that they wanted to do a venture financing because

they wanted to grow the company themselves;

- On or about June 15, 2004, Latterman, Tremulis and Callister had a meeting at the Ovion offices in San Mateo, in which MRA founder David Musket also participated by phone. Musket raised the issue of the different valuations that Ovion could get with a venture financing versus a corporate financing. Again, Tremulis and Callister stated that they wanted to develop Ovion's technology themselves and therefore wanted to do a venture financing;

- On or about August 3, 2004, Musket met with Callister, Tremulis, Dr. Keith Isaacson, one of Ovion's principal medical/scientific advisors, and a salesperson from Storz, a medical device company, in Newton, Massachusetts. At the meeting, the parties discussed the comparative merits of Ovion's technology, its competitive position, and the amount of clinical data required to validate the efficacy of Ovion's product. Callister and Tremulis gave no indication that they were interested in seeking a corporate partner prior to completing the clinical trials under discussion;

- On or about November 10, 2004 at the American Association of Gynecologic Laproscopists ("AAGL") conference held in San Francisco, Latterman asked Tremulis and Callister about a meeting they were going to have during the AAGL with Storz, a medical device company that could have been a potential corporate partner for Ovion. Tremulis and Callister assured Latterman that the only purpose of their meeting with Storz was to obtain equipment for Ovion's upcoming clinical trial and that they were not considering Storz as a corporate partner;

- On or about November 11, 2004, Musket met with Ovion during a Scientific Advisory Board dinner in San Francisco during which he specifically inquired if there had been any corporate activity during the AAGL meeting. Ovion's responses provided no indication that anything other than general informational

FIRST AMENDED COMPLAINT
-4-

meetings had taken place or were being scheduled;

- On or about November 18, 2004, Musket and Latterman participated in a phone conference with Tremulis, Callister and Hess in which they discussed financing by means of private placement versus corporate partnership. Tremulis and Callister again assured Musket and Latterman that they wanted to do a private placement;

- On or about December 7, 2004, Latterman met with Tremulis, Callister and two venture capitalists for USVP at the USVP offices in Menlo Park, California. Musket participated by phone. Immediately after that meeting, Latterman, Tremulis, Callister and Hess had a further telephone call with Musket in which they discussed USVP's offer. Tremulis and Callister reiterated that they wanted to pursue a venture financing and not a corporate deal;

- On or about February 4, 2004, Latterman met with Tremulis, Callister and Hess at Ovion's offices in San Mateo to discuss a smaller round of venture financing. Tremulis and Callister reiterated to Latterman that they were committed to doing a venture financing-based deal.

12.  During the course of its engagement, MRA presented Ovion with several viable venture financing opportunities. Ovion received a term sheet from one venture firm and numerous other venture firms conducted extensive due diligence and, on information and belief, were contemplating making offers to Ovion. Both MRA and the venture firms in question expended considerable effort in pursuit of the venture financing opportunity with Ovion. Ovion chose not to pursue any of these deals. MRA's ability to do business with venture capitalists is highly dependent on the personal credibility of its principals. Ovion's refusal to pursue the venture deals that MRA was trying to facilitate has injured MRA's reputation within the venture capitalist community and negatively affected MRA's good will.

13.  MRA is informed, believes and thereupon alleges that Ovion was never

intending to genuinely pursue private placement opportunities but was using the possibility of a private placement as a stalking horse to lure MRA into conducting analyses and creating presentation and due diligence materials that Ovion could then use to pursue corporate partners. MRA is informed, believes and thereupon alleges that, unbeknownst to MRA, Ovion was actively pursuing corporate partners throughout the period when MRA believed that private placement was Ovion's preferred financing option and that Ovion concealed this fact from MRA knowing that MRA's interest in working on the financing was predicated on this being the only active financing effort. MRA is informed, believes and thereupon alleges that the venture financing options made available to Ovion during its discussions with potential corporate partners allowed it to improve its negotiating position with those potential partners. MRA is informed, believes and thereupon alleges that Ovion intentionally delayed the progress of venture financing efforts to advance its corporate discussions and/or circumvent the payment provisions of the Engagement Letter. Furthermore, MRA is informed, believes and thereupon alleges that Ovion used MRA's budgets, forecasts, presentation materials and other work product as an integral part of, and critical support for, its solicitation of corporate partners.

14. On or about February 17, 2005, slightly more than six months after the Engagement Letter was signed, Ovion announced to MRA that it was entering into a merger and acquisition deal with an unnamed corporate partner. Subsequently, Ovion told MRA that the Engagement Letter was terminated and that it owed MRA nothing under the terms of the Engagement Letter. In addition, despite the fact that MRA is operating under a valid non-disclosure agreement with Ovion—has refused to reveal the identity of its corporate partner (who, on information and belief, could confirm MRA's suspicion that MRA's work product was a critical part of Ovion's solicitation of and/or negotiations with them) or provide any details of the proposed transaction.

-6-

3879364v1

## FIRST CAUSE OF ACTION
### (Breach of Contract, against Defendant Ovion)

15. MRA realleges and incorporates by reference herein each and every allegation of Paragraphs 1 through 14, as if fully set out herein.

16. MRA's agreements with Ovion, including the Engagement Letter and oral agreements reached between the parties did not permit Ovion to use MRA's work product to solicit non-private placement investors.

17. Ovion has breached the terms of its agreements with MRA because it used MRA's work product to solicit and/or improve its ability to negotiate with a merger and acquisition partner.

18. As a result of Ovion's breaches, MRA has suffered damages in an amount to be proven at trial.

## SECOND CAUSE OF ACTION
### (Breach of the Covenant Of Good Faith and Fair Dealing, against Defendant Ovion)

19. MRA realleges and incorporates by reference herein each and every allegation of Paragraphs 1 through 18, as if fully set out herein.

20. The agreements between MRA and Ovion, including the Engagement Letter and oral agreements, contain implied covenants of good faith and fair dealing that obligated Ovion to perform the terms of those agreements fairly and in good faith and to refrain from any act that would deprive MRA of the benefits of those agreements.

21. Ovion has breached the implied covenant of good faith and fair dealing by, among other things: (1) using MRA's work product to pursue a merger and acquisition deal instead of a private placement, and concealing the fact that it was doing so; (2) turning down and/or intentionally delaying viable private placement deals in order to pursue corporate partnership deals after it had represented to MRA that its preferred avenue of investment was venture financing; (3) refusing to pay MRA a finder's or advisory fee in relation to Ovion's proposed merger and acquisition deal; and (4) denying

that it has any obligation to pay the above-described fees under the terms of its agreements with MRA.

### THIRD CAUSE OF ACTION
### (Promissory Estoppel, against Defendant Ovion)

22. MRA realleges and incorporates by reference herein each and every allegation of Paragraphs 1 through 21, as if fully set out herein.

23. Ovion promised MRA that it would be compensated for its efforts in helping Ovion attract investors.

24. MRA reasonably relied on the foregoing promises and decided to dedicate resources to assisting Ovion.

25. As a result of its reliance, MRA has suffered damages in an amount to be proven at trial.

### FOURTH CAUSE OF ACTION
### (Quantum Meruit, against Defendant Ovion)

26. MRA realleges and incorporates by reference herein each and every allegation of Paragraphs 1 through 25, as if fully set out herein.

27. MRA performed services at Ovion's request, including but not limited to preparing market analyses, budgets, forecasts, and presentation and due diligence materials for potential private placement investors.

28. Ovion has not paid MRA for those services.

29. As a result of Ovion's failure to pay, MRA has been damaged in an amount equal to the reasonable value of those services.

### FIFTH CAUSE OF ACTION
### (Conversion, against Ovion)

30. MRA realleges and incorporates by reference herein each and every allegation

of Paragraphs 1 through 29, as if fully set out herein.

31. At all times, MRA was the owner of the work product described in Paragraphs 8 and 11 above. As described in Paragraph 9 above, the agreement between MRA and Ovion did not permit Ovion to use MRA's work product to solicit investors other than private placement investors. Nonetheless, in or about October 2004, on information and belief, Ovion wrongfully converted MRA's work product by using it to solicit potential corporate partners.

32. As a proximate result of Ovion's conversion, MRA has suffered damages in an amount to be proven at trial

33. The above-described conduct of Ovion was willful, oppressive, fraudulent and malicious, and was intended to cause injury to MRA. MRA is therefore entitled to an award of exemplary or punitive damages according to proof at trial.

### SIXTH CAUSE OF ACTION
### (Fraud, against all Defendants)

34. MRA realleges and incorporates by reference herein each and every allegation of Paragraphs 1 through 33, as if fully set out herein.

35. As set forth in Paragraph 11, on numerous occasions Ovion, Tremulis and Callister represented to MRA that Ovion was not actively pursuing a corporate partner. Said representations were false when made or without a reasonable basis for believing them to be true in that, on information and belief, Ovion intended to or was actively pursuing corporate partners at the time of the representations.

36. Ovion, Tremulis and Callister's representations were made with the intent of inducing MRA to prepare analyses, presentation materials and work product that could be used by Ovion to solicit corporate partners.

37. MRA reasonably relied on Ovion, Tremulis and Callister's representations to prepare the analyses and presentation materials described above and to turn them over to

Ovion.

38. As a proximate result of Ovion, Tremulis and Callister's misrepresentations, MRA has suffered damage in an amount to be proven at trial

39. The above-described conduct of Ovion, Tremulis and Callister was willful, oppressive, fraudulent and malicious, and was intended to cause injury to MRA. MRA is therefore entitled to an award of exemplary or punitive damages according to proof at trial.

### SEVENTH CAUSE OF ACTION
### (Negligent Misrepresentation, against all Defendants)

40. MRA realleges and incorporates by reference herein each and every allegation of Paragraphs 1 through 39, as if fully set out herein.

41. Ovion, Tremulis and Callister negligently made the representations set forth in Paragraph 11 above.

42. As a proximate result of Ovion, Tremulis and Callister's false representations, MRA has suffered damage in an amount to be proved at trial.

### EIGHTH CAUSE OF ACTION
### (Concealment, against all Defendants)

43. MRA realleges and incorporates by reference herein each and every allegation of Paragraphs 1 through 42, as if fully set out herein.

44. As set forth in Paragraph 12, Ovion, Tremulis and Callister concealed from MRA the fact that Ovion was actively pursuing corporate partners and, on information and belief, that it was using MRA's work product as a critical part of the solicitation of those potential corporate partners.

45. This information was material to MRA because, if MRA had known it, it would have pursued other ventures or would have demanded—as a condition for providing Ovion with its work product—that Ovion agree to pay MRA an advisory or

finder's fee with regard to investment in Ovion by corporate partners solicited with MRA's work product that was commensurate with the fees it expected to earn on the intended venture financing.

46. As a proximate result of Ovion, Tremulis and Callister's misrepresentations, MRA has suffered damages in an amount to be proven at trial.

47. The above-described conduct of Ovion, Tremulis and Callister was willful, oppressive, fraudulent and malicious, and was intended to cause injury to MRA. MRA is therefore entitled to an award of exemplary or punitive damages according to proof at trial.

## NINTH CAUSE OF ACTION
### (Mass. Gen. L. ch. 93A, against Ovion)

48. MRA realleges and incorporates by reference herein each and every allegation of Paragraphs 1 through 47, as if fully set out herein.

49. At all times relevant hereto, MRA and Ovion were engaged in trade or commerce.

50. Ovion's actions towards MRA, including but not limited to (1) using MRA's work product to pursue a merger and acquisition deal instead of a private placement, and concealing the fact that it was doing so; (2) turning down and/or intentionally delaying viable private placement deals in order to pursue corporate partnership deals after it had represented to MRA that its preferred avenue of investment was venture financing; (3) refusing to pay MRA a finder's or advisory fee in relation to Ovion's proposed merger and acquisition deal; and (4) denying that it has any obligation to pay the above-described fees under the terms of its agreements with MRA constitute unfair and deceptive acts or practices that occurred primarily and substantially in Massachusetts in violation of Mass. Gen. Laws ch. 93A, §§2 and 11.

WHEREFORE, Musket Research Associates, Inc. prays for judgment as follows

1. For damages in a sum to be proved at trial;

2. For punitive damages;

3. For treble damages and reasonable attorneys' fees in connection with Defendants' violation(s) of Mass. Gen. Laws ch. 93A;

4. For Musket Research Associates, Inc.'s costs of suit;

5. For Musket Research Associates, Inc.'s reasonable attorney's fees; and

6. For such other and further relief and the Court may deem just and proper.

Respectfully submitted,

MUSKET RESEARCH ASSOCIATES, INC.

By Its Attorneys,

_____
ERIC J. MARANDETT (BBO No. 561730)
LISA GAULIN (BBO No. 654655)
CHOATE, HALL & STEWART LLP
Exchange Place
53 State Street
Boston, MA 02109-2804
Telephone:   617/248-5000
Facsimile:   617/248-4000

ARTHUR S. BEEMAN (*pro hac vice pending*)
PAMELA K. FULMER (*pro hac vice pending*)
MICHAEL L. GALLO (*pro hac vice pending*)
HOWARD RICE NEMEROVSKI CANADY
FALK & RABKIN
A Professional Corporation
Three Embarcadero Center, 7th Floor
San Francisco, California 94111-4024
Telephone:   415/434-1600
Facsimile:   415/217-5910

DATED: March 16, 2005