# IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS
## BOSTON DIVISION

| | |
|---|---|
| Musket Research Associates, Inc., <br><br> Plaintiff, <br><br> v. <br><br> Ovion, Inc., <br> William S. Tremulis, and <br> Jeffrey P. Callister, <br><br> Defendants. <br><br> Ovion, Inc., <br><br> Counterclaimant, <br><br> v. <br><br> Musket Research Associates, Inc., <br> David B. Musket, and <br> Sue Ann Latterman, <br><br> Counterdefendants. | **Case No. 05-10416 MEL** |

## DEFENDANTS' MEMORANDUM IN SUPPORT OF
## MOTION TO COMPEL THE MRA PARTIES TO (1) ANSWER
## INTERROGATORIES AND (2) PRODUCE DOCUMENTS AND THINGS

# TABLE OF CONTENTS

I.  INTRODUCTION ................................................................................................1

    A.  The Written Agreement Between Ovion And MRA ..............................1

    B.  MRA's Performance Was Unsatisfactory, Untimely, And Adverse
        To Ovion's Interests..............................................................................2

    C.  MRA's Present Attempts To Extort Ovion Are Consistent With
        MRA's Pattern Of Extorting Its Clients By Threatening Litigation
        Based On Unfounded Claims.................................................................3

    D.  The MRA Parties Have Refused To Provide Discovery Relating
        To Their Unfounded Claims ..................................................................4

II.  BACKGROUND ...............................................................................................4

    A.  Pursuant To A Written Engagement Letter, Ovion Retained MRA
        As A "Nonexclusive Finder/Advisor" ..................................................4

        1.  Nothing In The Engagement Letter Limits Ovion's Use Of
            MRA's Work Product..................................................................5

        2.  MRA Agreed That It Would Be Compensated For Its
            Services Only In The Event Of Certain Contingencies ..............5

            a.  First Form Of Contingent Compensation: A
                "Finder's Fee" ..................................................................6

            b.  Second Form Of Contingent Compensation: A
                "Success Fee"...................................................................6

            c.  Third Form Of Contingent Compensation: An
                "Advisory Fee" .................................................................7

    B.  MRA's Performance Was Unsatisfactory, Untimely, And Adverse
        To Ovion's Interests..............................................................................7

    C.  Ovion's Merger With And Acquisition By American Medical
        Systems ................................................................................................8

    D.  Pursuant To The Parties' Written Agreement, MRA Is Not Entitled
        To Any Compensation ...........................................................................9

III.  THE MRA PARTIES SHOULD BE COMPELLED TO ANSWER
     INTERROGATORIES AND PRODUCE DOCUMENTS AND THINGS .........9

    A.  The MRA Parties Should Be Compelled To Answer Ovion's
        Interrogatories And Identify Facts Relating To Alleged
        Agreements Between The Parties And The Alleged Improper Use
        Of MRA's "Work Product" ...................................................................9

1.    The MRA Parties Have Not Properly Answered Ovion's Interrogatory No. 1...............................................................10

2.    The MRA Parties Have Not Properly Answered Ovion's Interrogatory No. 2...............................................................11

3.    The MRA Parties Have Refused To Correct The Deficiencies In Their Interrogatory Answers .............................13

4.    MRA's Reliance On Rule 33(d) Is Misplaced............................15

B.    The MRA Parties Should Be Compelled To Produce Documents And Things Relating To The Claims, Counterclaims, And Defenses At Issue In The Case ...............................................................16

1.    The MRA Parties Should Be Compelled To Produce Documents  And Things Relating To Provisions In Its Client Contracts Relating To "Advisory Fees" And "Corporate Transactions" (Request Nos. 2-4) .............................16

2.    The MRA Parties Should Be Compelled To Produce Documents And Things Relating To Its Disputes With And Attempts To Extort Other Clients (Request No. 9)....................................18

3.    The MRA Parties Should Be Compelled To Produce Documents Relating To Their Pattern Of Setting Up Their Clients So That MRA And Its Allied Interests Can Invest In MRA's Clients On Terms Unfavorable To The Clients (Request Nos. 16 & 18) .............................................................19

C.    The Court Should Disregard The Boilerplate Objections Made By The MRA Parties .................................................................................19

IV.    CONCLUSION.....................................................................................................20

## I.     INTRODUCTION

In this action, the Defendants are Ovion, Inc. ("Ovion"), William S. Tremulis ("Mr. Tremulis"), and Jeffrey P. Callister ("Mr. Callister") (collectively the "Ovion Parties").  Mr. Tremulis and Mr. Callister founded Ovion in 1996 as a start-up medical device company with a focus on minimally invasive alternatives to surgical sterilization.

The Plaintiff is Musket Research Associates, Inc. ("MRA").  Ovion has counterclaimed against MRA, David B. Musket ("Mr. Musket"), and Sue Ann Latterman ("Ms. Latterman") (collectively the "MRA Parties").  Mr. Musket is the president and founder of MRA.  Ms. Latterman is its principal employee.  MRA allegedly operates as a finder/advisor for "emerging healthcare companies" looking for investors.  (*See* Ovion Ex. F.)

Pursuant to Rule 37 of the Federal Rules of Civil Procedure, the Ovion Parties have filed herewith a motion to compel the MRA Parties to answer interrogatories and produce documents and things.  In summary, the MRA Parties have refused to answer interrogatories and to produce documents and things relating to issues raised by the pleadings in this case.  Counsel for the parties met and conferred regarding the deficiencies in the MRA discovery responses.  (*See* Ovion Exs. G and H.)  For the most part, the MRA Parties refused to correct the deficiencies.  Moreover, to the extent that the MRA Parties agreed to supplement their responses, they have failed to follow through as promised.

### A.     The Written Agreement Between Ovion And MRA

The fundamental issues in this case relate to a written agreement between Ovion and MRA.  Specifically, in July, 2004, Ovion retained MRA "as a nonexclusive finder/advisor" on terms set forth in a written agreement (the "Engagement Letter").  (*See* Ovion Ex. A.)  MRA agreed to provide certain services.  (*Id.*, ¶ 2(a).)  Nothing in the Engagement Letter limited how Ovion could use MRA's work product.  MRA agreed that it would be compensated only if

1

certain contingencies were realized. (*Id.*, ¶ 3.) Outside these contingencies, MRA would receive no compensation, regardless of the services it provided or how its work product was used.

In the Engagement Letter, one of the contingencies expressly contemplated was a merger and acquisition involving a corporate partner. (*Id.*, ¶ 3(d).) If such a merger and acquisition were consummated less than 180 days after the date of the Engagement Letter, then MRA would be entitled to an "Advisory Fee" not to exceed $225,000. (*Id.*) However, as of the 180th day following the date of the Engagement Letter, MRA was no longer entitled to any Advisory Fee. (*Id.*) Amazingly, although the Engagement Letter expressly contemplates a corporate merger and acquisition, MRA now contends that it somehow was unaware that Ovion might pursue such a transaction.

**B.    MRA's Performance Was Unsatisfactory, Untimely, And Adverse To Ovion's Interests**

Before Ovion retained MRA, Ovion was engaged in discussions with a number of potential investors and business partners. Ovion had prepared presentations, budgets, forecasts, and other materials for purposes of these discussions. MRA represented that it would devote substantial resources to this effort and that Ovion should expect positive results within a short time frame. MRA further acknowledged that time was of the essence. MRA also represented that it had extensive experience in the medical device arena. Despite MRA's representations, its services were untimely and unsatisfactory. In large measure, MRA relied on Ovion and others to perform the services that MRA had agreed to provide in exchange for contingent compensation.

After more than six months (and more than 180 days), Ovion had received <u>no</u> offers, let alone an actual investment, from any of MRA's supposedly vast network of contacts. Indeed, the only offer that Ovion had received was from US Venture Partners, a venture capital firm with which Ovion had commenced discussions long before retaining MRA. The MRA Parties recommended that Ovion should decline the offer from US Venture Partners. On present

2

information and belief, it appears that the MRA Parties, by delaying and deterring potential investors in Ovion, were attempting to position Ovion so that the MRA Parties themselves could invest in Ovion on terms favorable to them and their allied interests and unfavorable to Ovion.

**C.    MRA's Present Attempts To Extort Ovion Are Consistent With MRA's Pattern Of Extorting Its Clients By Threatening Litigation Based On Unfounded Claims**

More than 180 days after the date of the Engagement Letter, Ovion executed a letter of intent with American Medical Systems, Inc. ("AMS"), agreeing to negotiate exclusively with AMS toward a possible merger and acquisition. Ovion promptly informed MRA that it had agreed to negotiate exclusively with a potential corporate partner. Ovion also terminated its agreement with MRA. In June, 2005, <u>more than 300 days</u> after the date of the Engagement Letter, Ovion and AMS consummated a merger and acquisition. Pursuant to the terms of the Engagement Letter, MRA is not entitled to any compensation because none of the contingencies contemplated in the Engagement Letter were ever realized.

Nevertheless, MRA began attempting to extort money from Ovion shortly after Ovion informed MRA that Ovion had executed a letter of intent with a potential corporate partner. Specifically, MRA began threatening to sue for compensation to which it is not entitled. This threat had at least three inherent aspects: (1) the expense, distraction, and uncertainty inherent in litigation; (2) the risk that highly confidential information would be publicly disclosed or disclosed to parties such as MRA during the course of litigation; and (3) the specter that litigation would disrupt the ongoing negotiations between Ovion and AMS.

On information and belief, the MRA Parties have used the same strategy to extort other clients. More specifically, after MRA has entered written agreements with its clients that limit MRA's compensation to certain contingencies, the MRA Parties nevertheless have demanded compensation when those contingencies were not realized. To persuade clients to acquiesce to

3

these unwarranted demands, the MRA Parties have threatened litigation based on unfounded claims.

### D.    The MRA Parties Have Refused To Provide Discovery Relating To Their Unfounded Claims

MRA initiated the present litigation based on unfounded claims and contentions that contradict the express terms of the Engagement Letter.  In preparation for filing a motion for summary judgment against MRA's specious claims, the Ovion Parties have sought discovery relating to MRA's unfounded claims and contentions.  As explained in greater detail below, the MRA Parties have refused to provide this discovery.  For example, the MRA Parties have refused to identify their alleged work product and their basis for asserting that Ovion improperly used their work product.  Likewise, MRA has refused to identify evidence supporting its contention that the parties' written agreement was premised on unwritten "understandings" that contradict the terms of the written agreement.  In addition, the MRA Parties have refused to produce evidence relating to their attempts to (a) set up MRA's clients as favorable investments vehicles for the MRA parties and their allied interests and (b) extort their clients, including threats of unfounded litigation.  The deficiencies in the discovery responses of the MRA Parties are discussed more fully below.

## II.    BACKGROUND

### A.    Pursuant To A Written Engagement Letter, Ovion Retained MRA As A "Nonexclusive Finder/Advisor"

In July, 2004, Ovion retained MRA "as a nonexclusive finder/advisor" on the terms set forth in a written agreement (the "Engagement Letter").  (*See* Ovion Ex. A.)  MRA essentially ignores the terms of the Engagement Letter, principally because its contentions contradict the express language of the parties' written agreement.

### 1.   Nothing In The Engagement Letter Limits Ovion's Use Of MRA's Work Product

Contrary to MRA's contentions, nothing in the Engagement Letter limits how Ovion could use MRA's work product.  As a nonexclusive finder/advisor, MRA agreed to provide the following services:

> MRA shall (i) analyze the financial performance and projections of the Company and provide advice regarding the appropriate valuation range for the new equity capital; (ii) assist in the development of presentation materials for investor solicitations; (iii) contact qualified investors and, if acceptable to you or your representative, send the necessary documents ourselves or through your office . . . ; (iv) after appropriate screening, set up and accompany you to meetings with interested parties as often as scheduling allows; and (v) manage ongoing discussions and coordinate the closings with investors solicited, or caused to be solicited by MRA.

(Ovion Ex. A, Engagement Letter, ¶ 2(a).)  Contrary to MRA's representations, the Engagement Letter specifically contemplates a corporate transaction, such as a merger and acquisition.  (*Id.*, ¶ 3(d).)  Nothing in the Engagement Letter even suggests that Ovion was not at liberty to use MRA's "work product" in conjunction with such a corporate transaction.

### 2.   MRA Agreed That It Would Be Compensated For Its Services Only In The Event Of Certain Contingencies

Regarding compensation, MRA agreed that it would be compensated for its services "as a nonexclusive finder/advisor" by payment of a "Finder's Fee," an "Advisory Fee," or a "Success Fee," but only under limited contingencies as set forth in the parties' written agreement.  (Ovion Ex. A, Engagement Letter, ¶¶ 3(a), 3(c)-(d).)  Outside of these limited contingencies, the parties' written agreement provided for no compensation to MRA, regardless of the services provided by MRA or how MRA's work product was used.  (*Id.*, ¶ 3.)

### a.    First Form Of Contingent Compensation: A "Finder's Fee"

Pursuant to the Engagement Letter, the first form of contingent compensation contemplated for MRA's services was a "Finder's Fee." MRA agreed that it would be entitled to a "Finder's Fee" only in the event of the following contingencies:

- seven percent (7%) of the aggregate cash proceeds received by OVION from . . . "MRA Contacts"
- three percent (3%) of the aggregate cash proceeds received by OVION from . . . "OVION VC Contacts"
- two [percent] (2%) of the aggregate cash proceeds received by OIVON from . . . US Venture Partners.

(Ovion Ex. A, Engagement Letter, ¶ 3(a).) Indeed, the parties' agreement provided: "MRA shall receive no fees for any entity that is not either an MRA Contact or an Ovion VC Contact." (*Id.*) Moreover, absent a countersignature from Ovion evidencing its consent, MRA was precluded from adding potential investors to the list of "MRA Contacts." (*Id.*)

### b.    Second Form Of Contingent Compensation: A "Success Fee"

Pursuant to the Engagement Letter, the second form of contingent compensation contemplated for MRA's services was a "Success Fee." MRA agreed that it would be entitled to a "Success Fee" of no more than $225,000 (minus any Finder's Fees) only in the event of the following contingency:

> If, during the term of this Agreement, OVION consummates a Placement other than a Placement involving a corporate partner, and the [Finder's Fees] payable to MRA . . . are less than $225,000 . . .

(Ovion Ex. A, Engagement Letter, ¶ 3(c).) The "Success Fee" provision expressly expired upon termination of the agreement. (*Id.*)

6

**c.    Third Form Of Contingent Compensation: An "Advisory Fee"**

Pursuant to the Engagement Letter, the third form of contingent compensation contemplated for MRA's services was an "Advisory Fee." MRA further agreed that it would be entitled to an "Advisory Fee" of no more than $225,000 (minus any Finder's Fees) in the event of the following contingency:

> If, during the term of this Agreement, OVION consummates a merger, acquisition or Placement involving a corporate partner . . . [before] the 180th day following the date [of the Engagement Letter].

(Ovion Ex. A, Engagement Letter, ¶ 3(d).) The "Advisory Fee" provision expressly expired on the earlier of (1) the180th day following the date of the Engagement Letter or (2) termination of the Agreement. (*Id.*) Accordingly, as of either the 180th day or termination of the Agreement, MRA was no longer entitled to an Advisory Fee for any of its services in the event that Ovion consummated a merger or acquisition involving a corporate partner. (*Id.*, ¶¶ 3(d).)

**B.    MRA's Performance Was Unsatisfactory, Untimely, And Adverse To Ovion's Interests**

Before Ovion retained MRA, Ovion was engaged in discussions with a number of potential investors and business partners. Ovion had prepared presentations, budgets, forecasts, and other materials for purposes of these discussions. MRA represented that it would devote substantial resources to this effort. Despite MRA's representations, its services were untimely and unsatisfactory. In large measure, MRA relied on Ovion and others to perform the services that MRA had agreed to provide in exchange for contingent compensation. After more than six months, Ovion had received <u>no</u> offers from any of the "MRA Contacts." Indeed, the only offer that Ovion had received was an offer from US Venture Partners ("USVP"), a venture capital firm with which Ovion had commenced discussions long before Ovion retained MRA. MRA recommended that Ovion decline the offer from USVP.

Ovion is now aware that Mr. Musket is a member and the managing director of ProMed Partners, L.P., which holds itself out as a "healthcare investment fund." (*See* Ovion Ex. F.) On present information and belief, it appears that the MRA Parties, by delaying and deterring potential investors in Ovion, were attempting to position Ovion so that they and their allied interests could invest in Ovion on terms favorable to them and unfavorable to Ovion. The MRA Parties were privy to Ovion's cash position and were well aware that, if MRA did not produce positive results in a timely fashion, Ovion's position would become less and less tenable. On information and belief, the MRA Parties have employed this same tactic with other clients, acting contrary to the clients' interests while purporting to represent them.

### C.    Ovion's Merger With And Acquisition By American Medical Systems

On June 3, 2005, Ovion merged with and was acquired by American Medical Systems, Inc. ("AMS"). On February 16, 2005, Ovion had signed a letter of intent, agreeing to negotiate exclusively with AMS. Ovion promptly informed MRA that it had agreed to negotiate exclusively with a potential corporate partner. Ovion also terminated its agreement with MRA.

The MRA Parties admit that they, individually and collectively, did <u>not</u> do any of the following:

"communicate with AMS on behalf of Ovion"

"set up any meetings between AMS and Ovion"

"accompany Ovion or its representatives to any meeting with AMS or its representatives"

"manage any discussions between Ovion and AMS"

"coordinate the closing between Ovion and AMS"

(Ovion Ex. E, MRA Responses to Requests to Admit, at 2-3.)

**D.    Pursuant To The Parties' Written Agreement, MRA Is Not Entitled To Any Compensation**

As discussed above, the Engagement Letter provided that MRA would receive compensation for its services only if certain contingencies were realized.  None of those contingencies were realized.  Accordingly, pursuant to the express terms of the Engagement Letter, MRA is not entitled to any compensation.  More specifically, because the contingencies were not realized, MRA is not entitled to a Finder's Fee, or a Success Fee, or an Advisory Fee, which are the only forms of compensation contemplated by the parties' agreement.

**III.    THE MRA PARTIES SHOULD BE COMPELLED TO ANSWER INTERROGATORIES AND PRODUCE DOCUMENTS AND THINGS**

Ovion has served discovery requests asking, *inter alia,* that the MRA Parties (1) identify their alleged work product and their bases for contending that Ovion improperly used their alleged work product; (2) produce documents and things relating to MRA's contentions that, despite the express terms of the Engagement Letter, MRA allegedly was unaware that Ovion might pursue a corporate transaction and might use presentation materials similar to those used with other potential investors; (3) produce documents and things relating to prior instances where MRA has extorted its clients; and (4) produce documents and things relating to prior instances where the MRA parties and their allied interests have invested in MRA clients.  As explained in detail below, MRA either has flatly refused to provide the requested discovery or has responded in an inadequate fashion.

**A.    The MRA Parties Should Be Compelled To Answer Ovion's Interrogatories And Identify Facts Relating To Alleged Agreements Between The Parties And The Alleged Improper Use Of MRA's "Work Product"**

As discussed above, the Engagement Letter specifically contemplates a corporate transaction such as a merger and acquisition and does not limit in any way how or when Ovion

could use MRA's services (or "work product") in pursuit of such a corporate transaction. Nevertheless, MRA asserts the following unfounded allegations:

> [T]he provision for the payment of the advisory fee [in the event of a corporate merger and acquisition before the 180th day following the date of the Engagement Letter] was conditioned on the parties' understanding that MRA's work product would not be used as part of any effort by Ovion to solicit corporate partners. * * * [Ovion violated this alleged "understanding" by using] MRA's budgets, forecasts, presentation materials and other work product as an integral part of, and critical support for, its solicitation of corporate partners.

(Docket No. 11, First Am. Compl., ¶¶ 10, 13.)  At the time that MRA filed its First Amended Complaint, MRA and its attorneys had an obligation to ensure that these unsupported allegations passed Rule 11 muster.

### 1.    The MRA Parties Have Not Properly Answered Ovion's Interrogatory No. 1

On July 29, 2005, Ovion served the MRA Parties with the following Interrogatory No. 1:

Identify and describe in detail:

a.    all agreements and understandings between any of Ovion, Mr. Tremulis and Mr. Callister on the one hand and any of MRA, Mr. Musket and Ms. Latterman on the other hand;

b.    all documents and things relating to such agreements and understandings; and

c.    all persons with knowledge of such agreements and understandings.

(Ovion Ex. C at 2.)

With respect to part a, the MRA Parties acknowledged the Engagement Letter.  (*Id.*) They failed, however, to acknowledge the nondisclosure agreement between Ovion and MRA. (*Id.*; Ovion Ex. B (Nondisclosure Agreement).)  When counsel for the parties met and conferred, the MRA Parties agreed to supplement their "response to Interrogatory 1.a to identify the non-disclosure agreement as an agreement between the parties."  (Ovion Ex. H, 10/06/05 Carani Letter, at 2.)    After more than two months, however, the MRA Parties still have not supplemented their answer to Interrogatory No. 1.

Likewise, Ovion properly requested that the MRA Parties "identify and describe in detail . . . all documents and things relating to [any] agreements and understandings" between the parties. (Ovion Ex. C at 2.) The only documents and things identified by the MRA Parties are the Engagement Letter (Ovion Ex. A) and the Nondisclosure Agreement (Ovion Ex. B). (*Id.* at 3.) These documents refute, not support, the contentions of the MRA Parties. The MRA Parties should be compelled to either (a) identify all documents and things that relate to any alleged agreement or understanding between the parties or (b) acknowledge that no documentary evidence supports their unfounded contentions.

## 2.    The MRA Parties Have Not Properly Answered Ovion's Interrogatory No. 2

On July 29, 2005, Ovion served the MRA Parties with the following Interrogatory No. 2:

Identify and describe in detail:

a.    all work product produced for or on behalf of Ovion including each person and the contribution of each person who contributed to the work product;

b.    all work product that you contend has been used improperly or without authorization by Ovion and how it was used improperly;

c.    all work product that you contend was used by Ovion in communications or negotiations with AMS or was used by Ovion in relation to the merger between Ovion and AMS;

d.    your bases for contending that any of Ovion, Mr. Tremulis, and Mr. Callister has used your work product improperly or without authorization; and

e.    all persons with knowledge of work product produced for or on behalf of Ovion and all documents and things relating to such work product.

(Ovion Ex. C at 4.)

In response to Ovion's Interrogatory No. 2, the MRA Parties provided <u>no</u> substantive information, except that "Sue Ann Latterman was the MRA employee primarily involved in developing this work product." (*Id.*) Otherwise, the entire answer provided by the MRA Parties consisted solely of attorney boilerplate, as explained in greater detail below. (*Id.* at 4-5.)

11

For example, before Ovion retained MRA, Ovion was engaged in discussions with a number of potential investors and business partners, as discussed above. Ovion had prepared presentations, budgets, forecasts, and other materials for purposes of these discussions. After Ovion retained MRA, MRA in large measure relied on Ovion and others to perform the services that MRA had agreed to provide in exchange for contingent compensation. Now, in response to Ovion's interrogatory requesting that the MRA Parties "identify and describe in detail . . . all work product produced for or on behalf of Ovion including each person and the contribution of each person who contributed to the work product," the MRA Parties provided a non-answer, stating: "MRA prepared budgets, forecasts, plans, due diligence materials, and presentation materials on behalf of Ovion." The MRA Parties utterly failed to identify any specific document or information as MRA's alleged work product.

Similarly, in the First Amended Complaint, MRA alleges that Ovion improperly used "MRA's budgets, forecasts, presentation materials, and other work product as an integral part of, and critical support for, its solicitation of corporate partners." (Docket No. 11, First Am. Compl., ¶ 13.) In view of Rule 11 of the Federal Rules of Civil Procedure, MRA presumably had some basis for making such an allegation. Nevertheless, when Ovion requested that the MRA Parties "identify and describe in detail . . . . all work product that you contend has been used improperly or without authorization by Ovion and how it was used improperly" the MRA Parties provided a non-answer, stating: "MRA contends that all of MRA's work product that was used by Ovion to solicit or negotiate with American Medical Systems, Inc. ("AMS") or any other potential corporate partner was used improperly and without authorization." (Ovion Ex. C at 4.) Again, despite MRA's allegations in the complaint, the MRA Parties utterly failed to identify any specific document or information as MRA's work product allegedly used improperly by Ovion.

Similarly, when Ovion requested that the MRA Parties "identify and describe in detail . . . . all work product that you contend was used by Ovion in communications or negotiations with AMS or was used by Ovion in relation to the merger between Ovion and AMS," the MRA Parties provided another non-answer, stating: "Such information is uniquely within the knowledge of Ovion and AMS." (*Id.* at 5.) And, when Ovion requested that the MRA Parties "identify and describe in detail . . . . your bases for contending that any of Ovion, Mr. Tremulis, and Mr. Callister has used your work product improperly or without authorization," the MRA Parties provide yet another non-answer, stating: "If any work product was used to solicit potential corporate partners, it was done improperly and without authorization." (*Id.*) Again, the MRA Parties utterly failed to identify either any alleged MRA work product used in communications or negotiations with AMS or any factual basis for contending that MRA work product allegedly was used improperly or without authorization.

### 3.    The MRA Parties Have Refused To Correct The Deficiencies In Their Interrogatory Answers

On September 26, 2005, and again on October 5, 2005, counsel for the parties met and conferred regarding the deficiencies in the answers provided by the MRA Parties to Ovion's interrogatories. In large measure, the MRA Parties flatly refused to correct the deficiencies. For instance, the MRA Parties expressly stated that they would not identify any work product that was not embodied in a document. (Ovion Ex. G, 10/05/05 Ames Letter, at 1 ("MRA will not attempt to create a log of undocumented work product.").)

Moreover, to the extent that MRA contends that its work product is embodied in a document, the MRA Parties flatly refuse to identify the person or persons who contributed to the document and to identify their contribution. (*Id.*) As discussed above, Ovion had prepared budgets, forecasts, presentations, and the like long before MRA became involved, and, after MRA was retained, MRA relied in large measure on Ovion and others to perform the services

13

that MRA had agreed to provide in exchange for contingent compensation.  Accordingly, it is not sufficient, for example, for the MRA Parties only to identify documents that allegedly contain MRA's work product.  Rather, the MRA Parties should be compelled to identify their specific contribution to the document.  In any event, the MRA Parties have not even identified any documents that allegedly contain MRA's work product.

Likewise, although MRA asserted in the First Amended Complaint that Ovion allegedly improperly used "MRA's budgets, forecasts, presentation materials and other work product as an integral part of, and critical support for, its solicitation of corporate partners," nevertheless the MRA Parties refused to identify any such work product, stating that "MRA will do so once it has completed discovery as Ovion and AMS possess the relevant information."   (Ovion Ex. G, 10/05/05 Ames Letter, at 2.)  <u>To the contrary, the MRA Parties are not entitled to wait until they have completed their discovery to provide discovery to Ovion</u>.

Indeed, before the MRA Parties take discovery from Ovion, the MRA Parties should be required to specifically identify, *inter alia*, (a) their alleged work product, (b) the subpart of their work product that allegedly was used without authorization, and (c) the subpart that allegedly was used with AMS or any other potential corporate partner.  The MRA Parties should be required to provide this discovery based on the information available to them when the interrogatory answers were due, regardless of the obligation to supplement based on any additional information that they may later learn.  The MRA Parties' bases, or lack thereof, for their allegations in the First Amended Complaint should shed substantial light on the issue of whether the MRA Parties were surprised, as they contend, that Ovion engaged in discussions with potential corporate partners.

Furthermore, the MRA Parties should be required to provide this discovery without access to the confidential information produced by Ovion to date.  Otherwise, the MRA Parties

will use Ovion's confidential information as a road map for deciding what to claim as MRA's work product.  The same principle applies in a trade secret case.[1]

### 4.    MRA's Reliance On Rule 33(d) Is Misplaced

After counsel for the parties met and conferred, the MRA Parties stated:  "MRA will identify, by Bates ranges, the documents that contain its work product within 30 days of production."  (Ovion Ex. G, 10/05/05 Ames Letter, at 1.)  More than 60 days have elapsed, however, since the MRA Parties last produced any documents in this case, and the MRA Parties have not identified a single document as allegedly containing MRA's work product.

Moreover, simply identifying documents by Bates ranges likely will not be sufficient in this instance to answer Ovion's interrogatories.  For instance, the MRA Parties have placed their alleged work product at issue in this case and should be required to identify it with specificity as called for by Ovion's Interrogatory No. 2.  If, for example, the MRA Parties contend that a document contains MRA work product, then the MRA Parties should be compelled to identify their specific contribution to the document, separate from Ovion's contribution and the contribution of others.

Identifying documents under Rule 33(d) is sufficient only where "the burden of deriving or ascertaining the answer is substantially the same for the party serving the interrogatory as for the party served."  Fed. R. Civ. P. 33(d); *see also* L.R. 33.1.  Here, the MRA Parties, not Ovion,

---

[1] *See, e.g.*, *Staffbridge, Inc. v. Gary D. Nelson Assoc.*, No. 02-4912, 2004 Mass. Super. LEXIS 215, at *10 (Super. Ct. Mass. June 11, 2004) (attached as Ovion Ex. I) ("[Discovery] cannot be at the risk of the defendants' entitlement to know with precision what is claimed as a trade secret before any discovery of the defendants' allegedly infringing materials."); *AutoMed Techs., Inc. v. Eller*, 160 F. Supp.2d 915, 926 (N.D. Ill. 2001) ("[P]laintiff will normally be required first to identify with reasonable particularity the matter which it claims constitutes a trade secret, before it will be allowed (given a proper showing of need) to compel discovery of its adversary's trade secrets. . . . It is not enough to claim that defendants will be able to learn the details through discovery.  Plaintiff must provide them now so we can evaluate the relevance of plaintiff's discovery and address any objections.").

should be required to identify the documents, things, and information that MRA contends is its work product. Ovion should not be burdened with attempting to ascertain what MRA will contend is its work product.

As discussed above, the MRA Parties did not contribute much, relying instead on Ovion and others to perform the services that MRA had agreed to perform. To the extent that the MRA Parties contend otherwise, they should be compelled to specifically identify their alleged work product. The MRA Parties cannot adequately answer Ovion's interrogatory by doing nothing more than pointing to a document or a group of documents and then asserting that MRA's work product is in there somewhere. To date, the MRA Parties have not done even that much.

**B.    The MRA Parties Should Be Compelled To Produce Documents And Things Relating To The Claims, Counterclaims, And Defenses At Issue In The Case**

**1.    The MRA Parties Should Be Compelled To Produce Documents And Things Relating To Provisions In Its Client Contracts Relating To "Advisory Fees" And "Corporate Transactions" (Request Nos. 2-4)**

As discussed above, the agreement between Ovion and MRA as set forth in the Engagement Letter specifically contemplated that MRA could receive an "Advisory Fee" in the event of a corporate merger or acquisition before the 180th day following the date of the Engagement Letter. (*See* Ovion Ex. A, Engagement Letter, ¶ 3(d).) Nevertheless, MRA contends that it was somehow misled about the likelihood of a merger or acquisition.

Ovion believes that discovery relating to MRA's contracts with its other clients will refute MRA's contentions. For example, an engagement letter for another MRA client ("Somnus") is attached as Exhibit J. Unlike the Ovion Engagement Letter, the Somnus engagement letter does not contain a provision for an advisory fee. (Ovion Ex. J.) Likewise, the Somnus engagement letter does not expressly contemplate a corporate merger or acquisition. (*Id.*) These facts beg a question:

> In view of MRA's allegations that MRA was unaware that a merger and acquisition was a distinct possibility, why did MRA include a "corporate transaction" provision in the Ovion Engagement Letter that contemplated exactly such an event, particularly where MRA has not included such a provision in some agreements with other clients?

On the other hand, on information and belief, MRA does include a "corporate transaction" or "advisory fee" provision in its client contracts under certain circumstances, e.g., when MRA is aware that a merger and acquisition is a distinct likelihood. For these reasons, Ovion believes that discovery relating to MRA's agreements with other clients (1) will refute MRA's allegations in this case and (2) will lay bare the extent to which MRA's claims are utterly unfounded and extortive in nature. These issues are central to the claims, counterclaims, and defenses in this action.

> To this end, Ovion propounded the following document requests:
>
> [Request No. 2.]  Produce all documents and things relating to any and all agreements, contracts, or engagement letters with a provision for an advisory fee payable to any of MRA, Musket, and Latterman.
>
> [Request No. 3.]  Produce all documents and things relating to any and all agreements, contracts, and  engagement letters, from January 2000 to the present, whereby any of MRA, Musket, and Latterman was engaged, retained, or hired in connection with any proposed private placement of stock or any other financing effort.
>
> [Request No. 4.]   Produce documents and things relating to any and all agreements, contracts, or engagement letters whereby any of MRA, Musket, and Latterman was engaged, retained, or hired in connection with any proposed placement, merger, acquisition or other financing effort involving a corporate partner.

(Ovion Ex. D at 2-3.)  The MRA Parties flatly refused to produce any of the requested documents and things, asserting boilerplate objections. (*Id.*)  As counsel for the parties met and conferred, the MRA Parties maintained their outright refusal to produce the requested documents and things. (Ovion Ex. G, 10/05/05 Ames Letter, at 2; Ovion Ex. H, 10/06/06 Carani Letter, at 2.)  The MRA Parties should be compelled to fully comply with Ovion's requests for production.

**2.    The MRA Parties Should Be Compelled To Produce Documents And Things Relating To Its Disputes With And Attempts To Extort Other Clients (Request No. 9)**

As discussed above, Ovion believes, on information and belief, that the MRA Parties have an established pattern of extorting their clients.  Specifically, after agreeing that MRA's compensation will depend on the realization of certain contingencies, the MRA Parties use the threat of litigation to extort money from their clients when the contingencies are not realized.  On information and belief, the MRA Parties have used this tactic to secure funds from clients that simply have opted to pay MRA rather than pay legal fees to litigate.

Ovion propounded the following request for production:

[Request No. 9.]  Produce all documents and things related to any and all disputes regarding agreements, contracts, or engagement letters relating to services provided by any of MRA, Musket, and Latterman.

(Ovion Ex. D at 5.)  The MRA Parties flatly refused to produce any of the requested documents and things, asserting boilerplate objections.  (*Id.*)  As counsel for the parties met and conferred, the MRA Parties maintained their outright refusal to produce the requested documents and things.  (Ovion Ex. G, 10/05/05 Ames Letter, at 2; Ovion Ex. H, 10/06/06 Carani Letter, at 2.) As Ovion explained to the MRA Parties, Ovion believes that this discovery:

(1) will contradict [MRA's] contentions regarding (a) the engagement letter, (b) other alleged understandings between the parties, (c) standard industry practice and (d) [MRA's] knowledge that Ovion was pursuing corporate transactions; and (2) will establish [MRA's] pattern of using litigation, or the threat of litigation, to extort money from [its] clients when [MRA has] failed to secure financing for [its] clients who find financing through other means.

(Ovion Ex. H, 10/06/05 Carani Letter, at 2.)

3.    **The MRA Parties Should Be Compelled To Produce Documents Relating To Their Pattern Of Setting Up Their Clients So That MRA And Its Allied Interests Can Invest In MRA's Clients On Terms Unfavorable To The Clients (Request Nos. 16 & 18)**

As discussed above, it appears that the MRA Parties, by delaying and deterring potential investors in Ovion, were attempting to position Ovion so that the MRA Parties themselves could invest in Ovion on terms favorable to them and their allied interests (such as ProMed) and unfavorable to Ovion.  On information and belief, the MRA Parties have an established pattern of such conduct.

Ovion propounded the following requests for production:

[Request No. 16.]  Produce all documents and things relating to any and all transactions involving ProMed and any party represented, engaged, retained, or hired by any of MRA, Musket, and Latterman.

[Request No. 18.]  Produce all documents and things relating to any transactions involving both MRA and ProMed.

(Ovion Ex. D at 7.)  The MRA Parties flatly refused to produce any of the requested documents and things, asserting boilerplate objections.  (*Id.*)  As counsel for the parties met and conferred, the MRA Parties maintained their outright refusal to produce the requested documents and things.  (Ovion Ex. G, 10/05/05 Ames Letter, at 2; Ovion Ex. H, 10/06/06 Carani Letter, at 2.)

C.    **The Court Should Disregard The Boilerplate Objections Made By The MRA Parties**

In large measure, the MRA Parties have objected to Ovion's discovery requests with attorney boilerplate.  (*See* Ovion Exs. C & D.)  Ovion's counsel addressed this issue with counsel for the MRA Parties, stating for example:

Your clients have objected to certain interrogatories and document requests on the grounds that providing responsive information would be unduly burdensome.  As we previously explained during our telephone conference on September 26, 2005, and again during our telephone conference yesterday, we are willing to consider such concerns if you will provide specific reasons as to why gathering, searching

for or providing such information would be unduly burdensome. We are not satisfied by your boilerplate objections in this regard.

(Ovion Ex. H, 10/06/05 Carani Letter, at 1.) Ovion's counsel also stated that, if the MRA Parties would provide specific reasons behind their boilerplate objections, Ovion would consider limiting the scope of MRA's initial response to certain discovery requests. (*Id.* at 2-3.) The MRA Parties have never responded. The Court should disregard the boilerplate objections made by the MRA Parties.

## IV.    CONCLUSION

For all the foregoing reasons, the Court should grant *Defendants' Motion To Compel The MRA Parties To (1) Answer Interrogatories And (2) Produce Documents And Things*, submitted herewith. A *[Proposed] Order Granting Defendants' Motion To Compel The MRA Parties To (1) Answer Interrogatories And (2) Produce Documents And Things* is attached as Exhibit 1 to Defendants' motion.

Respectfully submitted,

Dated:  December 16, 2005

By _Leland G. Hansen_

Leland G. Hansen
Christopher V. Carani
McANDREWS, HELD & MALLOY, LTD.
500 W. Madison Street, 34th Floor
Chicago, Illinois 60661
(312) 775-8000 (telephone)
(312) 775-8100 (facsimile)

*Attorneys for Defendant and Counterclaimant Ovion, Inc. and Defendants William S. Tremulis and Jeffrey P. Callister.*

## Certificate of Service

I hereby certify that a true copy of the above document was served upon the attorney of record for each other party by mail on December 16, 2005.

_Leland G. Hansen_

Leland G. Hansen

OVION EXHIBIT A

# MRA

## MUSKET RESEARCH ASSOCIATES INC.

July 21, 2004

**CONFIDENTIAL**

Jeff Callister
President
Ovion Inc.
1900 O'Farrell Street
San Mateo, CA 94403

Dear Jeff:

This letter will confirm the agreement under which Musket Research Associates, Inc. ("MRA") is engaged by Ovion Inc., or any affiliate of Ovion, Inc. (collectively "OVION" or the "Company") to assist the Company as described below.

### 1. Engagement

OVION hereby engages and retains Musket Research Associates, Inc. as a nonexclusive finder/advisor in connection with a proposed private placement of Convertible Preferred Stock of Ovion Inc., including any other debt or equity instrument arising out of this financing effort (the "Placement"), which involves investors solicited by MRA during that effort. The specific services to be provided by MRA and fees to be received will be:

### 2. Services

(a) MRA shall (i) analyze the financial performance and projections of the Company and provide advice regarding the appropriate valuation range for the new equity capital; (ii) assist in the development of presentation materials for investor solicitations; (iii) contact qualified investors and, if acceptable to you or your representative, send the necessary documents ourselves or through your office. Documents sent by the Company at MRA's request should be accompanied by a cover letter and/or business card from MRA, or, if these are not available, a specific reference to our introduction; (iv) after appropriate screening, set up and accompany you to meetings with interested parties as often as scheduling allows; and (v) manage ongoing discussions and coordinate the closings with the investors solicited, or caused to be solicited by MRA.

(b) MRA acknowledges that the offering will be made pursuant to the private offering exemption from registration under Section 4(2) of the Securities Act of 1933 and Rule 506 promulgated thereunder, and that OVION securities are to be offered and sold only to "accredited investors" (as defined in the SEC's Regulation D) who also satisfy any applicable securities laws. Before each closing, OVION will validate these "accredited investors" via a customary suitability questionnaire, copies of which will be provided to MRA upon request.

(c) Prior to sending any descriptive materials to potential investors, MRA will provide OVION a list of these investors so that OVION can make the appropriate securities law filings, if any, in such jurisdictions. MRA will send materials previously approved by OVION when cleared to do so by an OVION representative and will not be responsible for assuring that such jurisdictional

125 CAMBRIDGEPARK DRIVE · 1ST FLOOR · CAMBRIDGE, MA 02140  617-441-8800 FAX 617-441-0858

MRA20844

filings have been made beforehand. MRA will not make any general solicitation in connection with this financing and will conduct its obligations hereunder in a manner consistent with the requirements of Rule 506.

(d) The potential investors contacted by MRA are subject to acceptance by OVION in its sole and absolute discretion, and OVION is under no obligation to sell any of its capital stock to such parties. MRA shall be deemed to be an independent contractor and shall have no right, power or authority to create any obligations on behalf of OVION.

## 3. Cash Fees

(a) OVION agrees to pay MRA Finder's Fees of seven percent (7%) of the aggregate cash proceeds received by OVION from the Placement to parties solicited by or caused to be solicited by MRA ("MRA Contacts"). "MRA Contacts" shall be those entitles set forth on Schedule A of this contract, as updated from time to time, and accepted, as evidenced solely by a countersignature thereto on Schedule A, by the Company. OVION agrees to pay MRA an additional fee of three percent (3%) of the aggregate cash proceeds received by OVION from the Placement to "OVION VC Contacts" and two (2%) of the aggregate cash proceeds received by OVION from the Placement to US Venture Partners. "OVION VC Contacts" shall be those entities designated as "OVION VC Contact" on Schedule B of this contract. Schedule B may be updated from time to time by Ovion in its sole discretion; provided, however, that once an entity is designated as an "OVION VC Contact" on schedule B, such designation may not be removed without the consent of MRA. MRA shall receive no fees for any entity that is not either an MRA Contact or an Ovion VC Contact.

(b) MRA Contacts shall not include (i) current OVION investors and (ii) parties being actively solicited directly by OVION. A complete listing of these two exclusion groups will be provided to MRA by OVION as soon as possible but not later than the signing of this contract and will be attached hereto as Schedule B. At OVION's sole discretion, it may authorize a switch of an investor listed on Schedule B to Schedule A, carrying with it the obligation to pay the fees outlined in Section 3(a) above or a mutually agreeable amount to be specifically listed on both Schedules A and B.

(c) If, during the term of this Agreement, OVION consummates a Placement other than a Placement involving a corporate partner, and the aggregate fees payable to MRA pursuant to Section 3(a) are less than $225,000, then OVION shall pay to MRA a "Success Fee" equal to $225,000 less any fees payable to MRA pursuant to Section 3(a).

(d) If, during the term of this Agreement, OVION consummates a merger, acquisition or Placement involving a corporate partner (a "Corporate Transaction") within 90 days of the date hereof and the aggregate fees payable to MRA pursuant to Section 3(a) are less than $125,000, then OVION shall pay MRA an "Advisory Fee" equal to $125,000 less any fees payable to MRA pursuant to Section 3(a). If, during the term of this Agreement, OVION consummates a Corporate Transaction between the 90th and the 180th day following the date hereof and the aggregate fees payable to MRA pursuant to Section 3(a) are less than $225,000, then OVION shall pay MRA an "Advisory Fee" equal to $225,000 less any fees payable to MRA pursuant to Section 3(a). This Advisory Fee will be payable at the time of the initial closing of whatever financial event OVION does consummate.

MRA20845

(e)  OVION will be obligated to pay MRA the same cash fees outlined in Sections 3(a) and 3(b) on any debt or equity related financing entered into with an MRA Contact within the earlier of eighteen (18) months following the final closing of the current Placement or within eighteen (18) months after the termination of this contract.

(f)  All payments due to MRA will be made within 10 days of the closing of the financing for which they are payable. Cash or equity will be made out directly to Musket Research Associates, Inc. unless otherwise specified.

(g)  The Company will inform MRA immediately if, during the term of this agreement, it engages any additional finders on this Placement, including in such notice a complete description of any fee agreement with such additional finder. If, during the term of this agreement, the Company agrees to pay finders fees in excess of those described in this contract, the fees payable to MRA will be increased to the same level, at the sole discretion of MRA.

## 4. Expenses

Whether or not the financing contemplated herein is consummated, the Company will reimburse MRA for its reasonable out-of-pocket expenses incurred from this financing, provided such expenses have been approved in advance by OVION, such approval to not be unreasonably withheld. An initial non-refundable payment of $10,000 as an advance against these expenses will be paid to MRA upon the execution of this contract. OVION-approved expenses incurred by MRA prior to closing will be submitted for reimbursement by OVION and should be paid within two weeks of receipt.

## 5. Equity Participation/ Fee Substitution

MRA will be allowed, in its sole discretion, to substitute not less than 25% of the cash fees owed to it by OVION, as per Section 3 above for equity or debt instruments in OVION, in whatever form and at whatever value as was paid by the investors contacted by MRA and for which the fees are payable; provided that MRA shall be bound be similar terms and conditions as such investors and provided further that such issuance to MRA or its designee(s) shall comply with applicable state securities laws and shall not preclude OVION's reliance on Rule 506 with respect to the financing. MRA hereby represents that it is an "accredited investor" as defined by Regulation D.

## 6. Press Releases

OVION will list MRA as participating placement agent in any description of this financing it issues directly (i.e., press release) and will use its own discretion to list MRA similarly in any further communications to the investment community regarding this financing.

## 7. Termination

This engagement may be terminated by OVION or MRA at any time without cause, upon 10 days written notice to that effect by the other party. However, MRA shall be entitled to the fees described in Sections 3, 4, and 5 above, in the event that, at any time prior to the expiration of 18 months after either the termination of this agreement or the final closing of the current Placement,

MRA20846

whichever is applicable, a loan, credit facility, or other investment is consummated by OVION with an MRA Contact at the time of termination.

**8. Indemnification**

The Company agrees to indemnify MRA under the terms set forth in Exhibit 1, which is included herein by reference.

Sincerely,

David B. Musket    7/22/04

David B. Musket
President
Musket Research Associates

Agreed and Accepted:

Jeff Callister    7/29/04
President    Date
Ovion Inc.

MRA20847

## SCHEDULE A

Approved by _____
Date         7/29/04

**OVION Investors Eligible for Full MRA Fees**

**[MRA will add names to this list as we screen applicable parties]**

**OVION VC Contacts – Partial Fees as Indicated**

| | |
|---|---|
| De Novo | 3% Fee |
| Interwest | 3% Fee |
| Medventures | 3% Fee |
| Sprout | 3% Fee |
| USVP | 2% Fee |
| Versant | 3% Fee |
| Vertical Group | 3% Fee |

and all parties and entities affiliated with any group listed above

MRA20848

## SCHEDULE  B

**OVION Investors NOT Eligible fo Full MRA Fees**

**All existing OVION Investors**

**OVION VC Contacts – 2% Placement Fee to MRA**

| OVION VC Contact (including affiliates thereof) | OVION  Approval | MRA Approval |
|---|---|---|
| US Venture Partners | _WST_ | _DN_ |

**OVION VC Contacts – 3% Placement Fee to MRA**

| OVION VC Contact (including affiliates thereof) | OVION  Approval | MRA Approval |
|---|---|---|
| De Novo | _WST_ | _DN_ |
| Interwest | _WST_ | _DN_ |
| Sprout | _WST_ | _DN_ |
| Versant | _WST_ | _DN_ |
| Vertical Group | _WST_ | _DN_ |

MRA20849

## EXHIBIT 1

Ovion Inc. ("OVION") agrees to indemnify and hold harmless Musket Research Associates, Inc. ("MRA") and each of MRA's officers, directors, agents, employees and controlling persons (within the meaning of each of Section 20 of the Securities Exchange Act of 1934, as amended, and Section 15 of the Securities Act of 1933, as amended)(each of the foregoing, including MRA, being hereinafter referred to as an "Indemnified Person") to the fullest extent permitted by law from and against any and all losses, claims, damages, expenses (including reasonable fees and disbursements for counsel), actions (including shareholder derivative actions), proceedings, investigations (whether formal or informal, or in tort, contract or otherwise), inquiries or threats thereof (all of the foregoing being hereinafter referred to as "Liabilities"), based upon, relating to or arising out of MRA's engagement hereunder or any Indemnified Person's role therein including, without limitation, any liabilities relating to or arising out of the engagement by OVION of any other financial advisor or investment banker: provided, however, that OVION shall not be liable under this paragraph to the extent that it is finally judicially determined by a court of competent jurisdiction that such Liabilities resulted from the willful misconduct or gross negligence of the Indemnified Person seeking indemnification. In connection with OVION's obligation to indemnify for expenses as set forth above, OVION further agrees to advance or reimburse each Indemnified Person for such expenses (including reasonable fees for counsel) as they are incurred by such Indemnified Person: provided, however, that if any Indemnified Person is reimbursed hereunder for any expenses, such reimbursement of expenses shall be refunded by the Indemnified Person who received such expenses to the extent it is finally judicially determined by a court of competent jurisdiction that the Liabilities in question resulted from the willful misconduct or gross negligence of such Indemnified Person.

Each Indemnified Party shall, upon the service of a summons or other initial legal process upon it in any action or suit instituted against it or upon its receipt of written notification of the commencement of any investigation or inquiry of, or proceeding against, it or upon its receipt of other written notification of the the assertion against it of any Liabilities, such Indemnified Party will promptly give written notice (hereinafter the "Notice") thereof to OVION (provided that delay in giving such notice shall not relieve OVION of its indemnification obligations hereunder except to the extent, if at all, that it shall have been prejudiced thereby). OVION shall be entitled, if it so elects within fifteen days after receipt of the Notice, by giving written notice (hereinafter the "Defense Notice") to the Indemnified Party, to assume the entire defense of such Liabilities, in which event such defense shall be conducted at the expense of OVION by counsel chosen by it and reasonably satisfactory to the Indemnified Party; provided, however, that if the Indemnified Party reasonably determines (i) that there may be conflict between the positions of OVION and the Indemnified Party in conducting the defense of such Liabilities or (ii) that there may be legal defenses available to the Indemnified Party different from or in addition to those available to OVION, then counsel for the Indemnified Party shall be entitled to participate in such defenses, or conduct the defense to the extent reasonably determined by such counsel to be necessary to protect the interests of the Indemnified Party, and such participation in or separate conduct of such defense shall be covered by the indemnification by OVION hereunder. In any event, any Indemnified Party shall retain the right to participate in the defense of any Liabilities with separate counsel, where the defense of such Liabilities has been assumed by OVION in accordance with the provisions hereof and the circumstances described in clauses (i) or (ii) of the above proviso are not present, but the Indemnified Party shall bear and be solely responsible for its own costs and expenses in connection with any such participation.

If the indemnification or reimbursement provided for hereunder is finally judicially determined by a court of competent jurisdiction to be unavailable to an Indemnified Person in respect to any Liabilities (other than as a consequence of a final judicial determination by such a court of willful misconduct or gross negligence of such Indemnified Person), then OVION agrees, in lieu of indemnifying such Indemnified Person, to contribute to the amount paid or payable by such Indemnified Person as a result of such Liabilities (i) in such proportion as is appropriate to reflect the relative benefits received, or sought to be received, by OVION on the one hand and by such Indemnified Person on the other from the transaction in connection with which MRA has been engaged, or (ii) if (but only if) the allocation provided in clause (i) of this sentence is not permitted by applicable law, in such proportion as is appropriate to reflect not only the relative benefits referred to in such clause (i) but also the relative fault of OVION and of such Indemnified Person: provided, however, that in no event shall the aggregate amount contributed by the

MRA20850

Indemnified Person exceed the amount of fees actually received by his or its affiliate or employer pursuant to such engagement. The relative benefits received or sought to be received by OVION on the one hand and by MRA on the other shall be deemed to be in the same proportion as (i) the gross proceeds raised in the transactions subject to this Agreement bears to (ii) the fees paid or payable to MRA hereunder.

MRA20851

OVION EXHIBIT B



**VION INC.**
Intra-Fallopian Tube Storilization Devices

# FAX Sheet

To: _Dave Mustet_   Date: _6/18/04_

Company: _MRA_

From: _Jeff Culheter_   Fax #: _441-0855 (617)_

Subject: _Signed NDA_   Pages: _14 C_

Notes:

This Fax and any attachments thereto may contain private, confidential, and privileged material for the sole use of the intended recipient. Any review, copying, or distribution of this Fax (or any attachments thereto) by others is strictly prohibited. If you are not the intended recipient, please contact the sender immediately and permanently delete the original and any copies of this Fax and any attachments thereto.

1900 O'Farrell  •  Suite 210  •  San Mateo, CA 94403

MRA20686

# OVION, INC.

## NONDISCLOSURE AGREEMENT

This Nondisclosure Agreement (this "Agreement") is made and entered into as of
JUNE 17, 2004 by and between Ovion, Inc., a Delaware corporation ("Ovion"), and
MUSKET RESEARCH INC, a ___MASSACHUSETTS___ corporation (the "Recipient"). Ovion and
Recipient agree as follows:

1.    Purpose. The parties wish to explore a business opportunity of mutual interest and in
connection with this opportunity, Ovion may disclose to Recipient certain confidential technical and
business information which Ovion desires Recipient to treat as confidential.

2.    "Confidential Information" means any information, including, but not limited to, any
technical data or know-how, including, but not limited to, that which relates to research, product
plans, products, services, customers, markets, software, developments, inventions, processes, designs,
drawings, engineering, hardware configuration information, marketing or finances, disclosed by Ovion
to Recipient, either directly or indirectly, in writing, orally or by inspection of tangible objects
(including without limitation documents, prototypes, samples, plant and equipment). Confidential
Information may also include information disclosed to Recipient by third parties. Confidential
Information shall not, however, include any information which: (i) was publicly known and made
generally available in the public domain prior to the time of disclosure by Ovion to Recipient; (ii)
becomes publicly known and made generally available after disclosure by Ovion to Recipient through
no action or inaction of Recipient; or (iii) is already in the possession of Recipient, without
confidentiality restrictions, at the time of disclosure by Ovion as shown by Recipient's files and
records immediately prior to the time of disclosure.

3.    Non-use and Non-disclosure. Recipient agrees not to use any Confidential
Information for any purpose except to evaluate and engage in discussions concerning a potential
business relationship between Recipient and Ovion. Recipient agrees not to disclose any Confidential
Information to third parties or to employees of Recipient, except to those employees who are
required to have the information in order to evaluate or engage in discussions concerning the
contemplated business relationship. Recipient shall not reverse engineer, disassemble or decompile
any prototypes, software or other tangible objects which embody Confidential Information.

4.    Maintenance of Confidentiality. Recipient agrees that it shall take all reasonable
measures to protect the secrecy of and avoid disclosure and unauthorized use of the Confidential
Information. Without limiting the foregoing, Recipient shall take at least those measures that
Recipient takes to protect its own most highly confidential information and shall ensure that its
employees who have access to Confidential Information sign a non-use and non-disclosure agreement
in content substantially similar to the provisions hereof, prior to any disclosure of Confidential
Information to such employees. Recipient shall not make any copies of Confidential Information
unless the same are previously approved in writing by Ovion. Recipient shall reproduce Ovion's
proprietary rights notices on any such approved copies, in the same manner in which such notices
were set forth in or on the original. Recipient shall immediately notify Ovion in the event of any
unauthorized use or disclosure of Confidential Information.

CMG::C:\Documents and Settings\David Musket\My Documents\Sue Ann\Ovion\nda.doc

MRA20687

5.  Mandatory Disclosure.  In the event that Recipient or its directors, officers, employees, consultants or agents are requested or required by legal process to disclose any of the Confidential Information, Recipient shall give prompt notice so that *that* Ovion may seek a protective order or other appropriate relief.  In the event that such protective order is not obtained, Recipient shall disclose only that portion of the Confidential Information which its counsel advises that Recipient is legally required to disclose.

6.  No License Granted.  Nothing in this Agreement is intended to grant any rights to Recipient under any patent, copyright, trade secret or other intellectual property right nor shall this Agreement grant Recipient any rights in or to the Confidential Information, except the limited right to review such Confidential Information solely for the purposes of determining whether to enter into the proposed business relationship between the parties.

7.  No Obligation.  Nothing herein shall obligate either party to proceed with any transaction between them, and each party reserves the right, in its sole discretion, to terminate the discussions contemplated by this Agreement concerning the business opportunity.

8.  No Warranty.  ALL CONFIDENTIAL INFORMATION IS PROVIDED "AS IS". EACH PARTY MAKES NO WARRANTIES, EXPRESS, IMPLIED OR OTHERWISE, REGARDING ITS ACCURACY, COMPLETENESS OR PERFORMANCE.

9.  Return of Materials.  All documents and other tangible objects containing or representing Confidential Information, and all copies thereof which are in the possession of Recipient, shall be and remain the property of Ovion and shall be promptly returned to Ovion upon request but in any event immediately after the business possibility has been rejected or concluded.

10.  Term.  The obligations of Recipient party hereunder shall survive *for a period of 3 (three) years or* until such time as all Confidential Information becomes publicly known and made generally available through no action or inaction of Recipient., *whichever is shorter*.   *JPC 6/18/04*

11.  Remedies.  Recipient agrees that its obligations hereunder are necessary and reasonable in order to protect Ovion and Ovion's business, and expressly agrees that monetary damages would be inadequate to compensate Ovion for any breach by Recipient of any covenants and agreements set forth herein. Accordingly, Recipient agrees and acknowledges that any such violation or threatened violation will cause irreparable injury to Ovion, and that, in addition to any other remedies that may be available, in law, in equity or otherwise, Ovion shall be entitled to obtain injunctive relief against the threatened breach of this Agreement or the continuation of any such breach, without the necessity of proving actual damages.

12.  Miscellaneous.  This Agreement may be executed in one or more counterparts, each of which shall be an original and all of which together shall constitute one instrument.  This Agreement shall bind and inure to the benefit of the parties hereto and their successors and assigns. This Agreement shall be governed by the laws of the State of California, without reference to conflict of laws principles. This document contains the entire agreement between the parties with respect to the subject matter hereof, and neither party shall have any obligation, express or implied by law, with respect to trade secret or proprietary information of the other party except as set forth herein.  Any

MRA20688

PROSKAUER PARTNERS

failure to enforce any provision of this Agreement shall not constitute a waiver thereof or of any other provision. This Agreement may not be amended, nor any obligation waived, except by a writing signed by both parties hereto.

IN WITNESS WHEREOF, the parties have caused this Agreement to be executed by their duly authorized representatives as of the date first written above.

**OVION, INC.**

By: _Jeff A. Callister_     4/13/04

Name: _Jeff Callister_

Title: _President_

**[RECIPIENT]**

By: _David B. Musket_

Name: _DAVID B. MUSKET_

Title: _____

( as amended on p 2 )

MRA20689

OVION EXHIBIT C

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| MUSKET RESEARCH ASSOCIATES, INC., ) <br><br> Plaintiff, ) <br><br> v. ) <br><br> OVION, INC., WILLIAM S. TREMULIS, ) and JEFFREY P. CALLISTER, ) <br><br> Defendants. ) | No. 05 10416 MEL |

|  |
|---|
| OVION, INC., ) <br><br> Counterclaimant, ) <br><br> v. ) <br><br> MUSKET RESEARCH ASSOCIATES, INC., ) DAVID B. MUSKET, and ) SUE ANN LATTERMAN, ) <br><br> Counterdefendants. ) |

**MUSKET RESEARCH ASSOCIATES, INC.,
DAVID B. MUSKET AND SUE ANN LATTERMAN'S
ANSWER TO OVION, INC.'S FIRST SET OF INTERROGATORIES (1-2)**

Pursuant to Federal Rule of Civil Procedure 33, Musket Research Associates, Inc., David

B. Musket and Sue Ann Latterman (collectively "MRA") hereby respond to Ovion, Inc.'s First

Set of Interrogatories (1-2) as follows:

GENERAL OBJECTIONS

1.      MRA objects to each of the interrogatories to the extent that they seek

information protected from discovery by the attorney/client privilege, the work-product doctrine,

or other privilege.  This General Objection is incorporated into each of the following responses

to Ovion, Inc.'s interrogatories, and the General Objection shall be deemed continuing as to each interrogatory and is not waived, nor in any way limited, by the responses.

2.       MRA objects to the Definitions and Instructions to the extent they seek to impose upon MRA obligations that exceed those specified by the Federal Rules of Civil Procedure. MRA will respond to the interrogatories as required by the Federal Rules of Civil Procedure.

RESPONSES TO INTERROGATORIES

Subject to and without waiving the foregoing General Objections, MRA responds to the individual interrogatories as follows:

Interrogatory No. 1

Identify and describe in detail:

a.       all agreements and understandings between any of Ovion, Mr. Tremulis and Mr. Callister on the one hand and any of MRA, Mr. Musket and Ms. Latterman on the other hand;

b.       All documents and things relating to such agreements and understandings; and

c.       All person (sic) with knowledge of such agreements and understandings.

Answer to Interrogatory No. 1

a.       Musket Research Associates, Inc. ("MRA") and Ovion, Inc. ("Ovion") entered into an agreement dated July 21, 2004 and executed July 29, 2004 (the "Engagement Letter"). The Engagement Letter speaks for itself.

MRA executed the Engagement Letter based on the following agreements and understandings with Ovion:

    •    Ovion would not pursue a potential corporate partner until after it had made a good faith effort to obtain venture financing.

- 2 -

- Ovion would not use MRA as a "stalking horse" for a corporate transaction.

- Ovion would not use MRA's research, presentation materials, or other work product to solicit or negotiate with potential corporate partners.

- Ovion would inform MRA if a corporation offered to acquire, fund, or partner with Ovion to assist in the negotiation and financial analysis of any offer.

- Ovion would compensate MRA, commensurate with standard industry practice, to the extent that Ovion used MRA's research, presentation materials, or other work product to consummate a transaction with a corporate partner.

    b.    Objection: This interrogatory is overly broad, unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence. Without waiving this objection, MRA responds as follows:

        The Engagement Letter

        The Nondisclosure Agreement

    c.    Robert Hess

        Jeffrey P. Callister

        William S. Tremulis

        David B Musket

        Sue Ann Latterman

Interrogatory No. 2

       Identify and describe in detail:

     a.     all work product on (sic) produced for or on behalf of Ovion including each person and the contribution of each person who contributed to the work product;

     b.     all work product that you contend has been used improperly or without authorization by Ovion and how it was improperly used;

     c.     all work product that you contend was used by Ovion in communications or negotiations with AMS or was used by Ovion in relation to the merger between Ovion and AMS;

     d.     your bases for contending that any of Ovion, Mr. Tremulis, and Mr. Callister has used your work product improperly or without authorization; and

     e.     all persons with knowledge of work product produced for or on behalf of Ovion and all documents and things relating to such work product.

Answer to Interrogatory No. 2

       Objection:  This interrogatory is overly broad, unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence.  Without waiving this objection, MRA responds as follows:

     a.     MRA prepared budgets, forecasts, plans, due diligence materials, and presentation materials on behalf of Ovion.  Sue Ann Latterman was the MRA employee primarily involved in developing this work product.  Pursuant to Fed. R. Civ. P. 33(d), MRA will produce documents containing the work product it developed on behalf of Ovion.

     b.     MRA contends that all of MRA's work product that was used by Ovion to solicit or negotiate with American Medical Systems, Inc ("AMS") or any other potential corporate partner was used improperly and without authorization.  MRA will supplement this response once it has completed discovery.

c.    Such information is uniquely within the knowledge of Ovion and AMS. MRA will supplement this response once it has completed discovery.

d.    If any work product was used to solicit potential corporate partners, it was done improperly and without authorization. MRA will supplement this response once it has completed discovery.

e.    Pursuant to Fed. R. Civ. P. 33(d), MRA will produce (a) documents containing the work product it developed on behalf of Ovion, and (b) documents identifying the individuals who received this work product and who have knowledge thereof.

Signed under the pains and penalties of perjury this 22n day of September, 2005.

MUSKET RESEARCH ASSOCIATES, INC.

*[signature]*    9/22/05

Name: DAVID B. MUSKET
Title: PRESIDENT

*[signature]*    9/22/05

DAVID B. MUSKET

_____

SUE ANN LATTERMAN

  c. Such information is uniquely within the knowledge of Ovion and AMS. MRA will supplement this response once it has completed discovery.

  d. If any work product was used to solicit potential corporate partners, it was done improperly and without authorization. MRA will supplement this response once it has completed discovery.

  e. Pursuant to Fed. R. Civ. P. 33(d), MRA will produce (a) documents containing the work product it developed on behalf of Ovion, and (b) documents identifying the individuals who received this work product and who have knowledge thereof.

  Signed under the pains and penalties of perjury this 22 day of September, 2005.

      MUSKET RESEARCH ASSOCIATES, INC.

      _____
      Name:
      Title:

      _____
      DAVID B. MUSKET

      _____
      SUE ANN LATTERMAN

- 5 -

AS TO OBJECTIONS:

_____

Brooks A. Ames (BBO #641192)
DLA Piper Rudnick Gray Cary US LLP
One International Place, 21st Floor
100 Oliver Street
Boston, MA  02110-2613
(617) 406-6000 (*telephone*)
(617) 406-6100 (*fax*)

Arthur S. Beeman (admitted pro hac vice)
Pamela K. Fulmer (admitted pro hac vice)
DLA Piper Rudnick Gray Cary US LLP
153 Townsend Street, Suite 800
San Francisco, CA  94107
(415) 836-2541 (*telephone*)
(415) 836-2501 (*fax*)

Dated:  September 22, 2005

CERTIFICATION OF SERVICE
I hereby certify that a true copy of the above
document was served upon the attorney of record
for each other party by mail (by hand) on 9/22/05

- 6 -

OVION EXHIBIT D

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| MUSKET RESEARCH ASSOCIATES, INC., | ) | No. 05 10416 MEL |
| Plaintiff, | ) |  |
| v. | ) |  |
| OVION, INC., WILLIAM S. TREMULIS, and JEFFREY P. CALLISTER, | ) |  |
| Defendants. | ) |  |
| OVION, INC., | ) |  |
| Counterclaimant, | ) |  |
| v. | ) |  |
| MUSKET RESEARCH ASSOCIATES, INC., DAVID B. MUSKET, and SUE ANN LATTERMAN, | ) |  |
| Counterdefendants. | ) |  |

## MUSKET RESEARCH ASSOCIATE, INC., DAVID B. MUSKET AND SUE ANN LATTERMAN'S RESPONSE TO OVION, INC.'S FIRST SET OF DOCUMENT REQUESTS (1-18)

Pursuant to Federal Rule of Civil Procedure 34, Musket Research Associates, Inc.,

David B. Musket and Sue Ann Latterman (collectively "MRA") respond to Ovion, Inc.'s

("Ovion") First Set of Document Requests (1-18) as follows:

### GENERAL OBJECTIONS

A.    MRA objects to the "Definitions and Instructions" to the extent they purport to impose obligations beyond those contained within the Federal Rules of Civil Procedure.

B.    MRA objects to the production of any documents protected by the attorney-client privilege and/or the work product doctrine or any other privilege.

C.     MRA objects to Ovion's Requests to the extent that they are not reasonably limited in time.  MRA will not produce documents predating January 1, 2004 or which were generated or acquired after MRA commenced this action on March 4, 2005.

D.     The statement that MRA will produce responsive documents is not a representation that such documents exist.

E.     MRA objects to producing documents which are not subject to a mutually agreed upon protective order.

## RESPONSES TO SPECIFIC REQUESTS

Subject to and without waiving the foregoing General Objections, MRA responds to the specific request for production of documents as follows.

Request No. 1

Produce all documents and things relating to the Engagement Letter, including all drafts and all correspondence relating thereto.

Response to Request No. 1

Objection:  This request seeks information that is protected by the attorney-client privilege or work product doctrine.  Without waiving this objection, MRA responds as follows:

MRA will produce all non-privileged responsive documents in its possession or control.

Request No. 2

Produce all documents and things relating to any and all agreements, contracts, or engagement letters with a provision for an advisory fee payable to any of MRA, Musket, and Latterman.

<u>Response to Request No. 2</u>

Objection: This request is overbroad, unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence. This request seeks information that is protected by the attorney-client privilege or work product doctrine.

<u>Request No. 3</u>

Produce all documents and things relating to any and all agreements, contracts, and engagement letters, from January 2000 to the present, whereby any of MRA, Musket, and Latterman was engaged, retained, or hired in connection with any proposed private placement of stock or any other financing effort.

<u>Response to Request No. 3</u>

Objection: This request is overbroad, unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence. This request seeks information that is protected by the attorney-client privilege or work product doctrine.

<u>Request No. 4</u>

Produce documents and things relating to any and all agreements, contracts, or engagement letters whereby any of MRA, Musket, and Latterman was engaged, retained, or hired in connection with any proposed placement, merger, acquisition or other financing effort involving a corporate partner.

<u>Response to Request No. 4</u>

Objection: This request is overbroad, unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence. This request seeks information that is protected by the attorney-client privilege or work product doctrine.

- 3 -

<u>Request No. 5</u>

Produce all documents relating to any of Ovion, Mr. Tremulis and Mr. Callister.

<u>Response to Request No. 5</u>

Objection: This request seeks information that is protected by the attorney-client privilege or work product doctrine. Without waiving this objection, MRA responds as follows:

MRA will produce all non-privileged responsive documents in its possession or control.

<u>Request No. 6</u>

Produce all documents and things relating to AMS.

<u>Response to Request No. 6</u>

Objection: This request seeks information that is protected by the attorney-client privilege or work product doctrine. Without waiving this objection, MRA responds as follows:

MRA will produce all non-privileged responsive documents in its possession or control.

<u>Request No. 7</u>

Produce all documents and things relating to USVP.

<u>Response to Request No. 7</u>

Objection: This request is overly broad, unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence. This request seeks information that is protected by the attorney-client privilege or work product doctrine.

<u>Request No. 8</u>

Produce all documents and things relating to Storz.

<u>Response to Request No. 8</u>

MRA will produce all responsive documents in its possession or control.

- 4 -

Request No. 9

Produce all documents and things related to any and all disputes regarding agreements, contracts, or engagement letters relating to services provided by any of MRA, Musket, and Latterman.

Response to Request No. 9

Objection: This request is overbroad, unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence. This request seeks information that is protected by the attorney-client privilege or work product doctrine.

Request No. 10

Produce and any all documents and things related to John Harris.

Response to Request No. 10

Objection: This request seeks information that is protected by the attorney-client privilege or work product doctrine. Without waiving this objection, MRA responds as follows:

MRA will produce all non-privileged responsive documents in its possession or control.

Request No. 11

Produce all documents and things relating to any work performed by MRA, Musket, or Latterman for or on behalf of Ovion, including but not limited to any budgets, forecasts, presentation materials, due diligence materials and other work product as referred to in Paragraph 11 and 12 of the First Amended Complaint.

Response to Request No. 11

MRA will produce all responsive documents in its possession or control.

Request No. 12

Produce any and all terms sheets that were provided to Ovion, including but not limited

to the term sheet referred to in Paragraph 12 of the First Amended Complaint.

<u>Response to Request No. 12</u>

MRA will produce all responsive documents in its possession or control.

<u>Request No. 13</u>

Produce all documents and things related to MRA's allegations and claims for relief in the First Amended Complaint.

<u>Response to Request No. 13</u>

Objection:  This request seeks information that is protected by the attorney-client privilege or work product doctrine.  Without waiving this objection MRA responds as follows:

MRA will produce all non-privileged responsive documents in its possession or control.

<u>Request No. 14</u>

Produce all documents and things related to the allegations in the Answer to Ovion, Inc.'s Counterclaims.

<u>Response to Request No. 14</u>

Objection:  This request seeks information that is protected by the attorney-client privilege or work product doctrine.  Without waiving this objection MRA responds as follows:

MRA will produce all non-privileged responsive documents in its possession or control.

<u>Request No. 15</u>

Produce all documents and things relating to any work performed for or on behalf of Ovion by any of MRA, Musket, and Latterman.

<u>Response to Request No. 15</u>

Objection:  This request seeks information that is protected by the attorney-client

privilege or work product doctrine. Without waiving this objection MRA responds as follows:

MRA will produce all non-privileged responsive documents in its possession or control.

Request No. 16

Produce all documents and things relating to any and all transactions involving ProMed and any party represented, engaged, retained, or hired by any of MRA, Musket, and Latterman.

Response to Request No. 16

Objection: This request is overbroad, unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence. This request seeks information that is protected by the attorney-client privilege or work product doctrine.

Request No. 17

Produce all documents and things relating to communications regarding any of Ovion, Mr. Tremulis, and Mr. Callister.

Response to Request No. 17

Objection: This request seeks information that is protected by the attorney-client privilege or work product doctrine. Without waiving this objection, MRA responds as follows:

MRA will produce all non-privileged responsive documents in its possession or control.

Request No. 18

Produce all documents and things relating to any transactions involving both MRA and ProMed.

Response to Request No. 18

Objection: This request is overbroad, unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence. This request seeks information that is protected by the attorney-client privilege or work product doctrine.

Respectfully submitted,

MUSKET RESEARCH ASSOCIATES, INC.,
DAVID B. MUSKET and
SUE ANN LATTERMAN
By their attorneys,

Brooks A. Ames (BBO #641192)
DLA PIPER RUDNICK GRAY CARY US LLP
One International Place, 21st Floor
100 Oliver Street
Boston, MA 02110-2613
(617) 406-6000 (*telephone*)
(617) 406-6100 (*fax*)

Arthur S. Beeman (admitted pro hac vice)
Pamela K. Fulmer (admitted pro hac vice)
DLA PIPER RUDNICK GRAY CARY US LLP
153 Townsend Street, Suite 800
San Francisco, CA 94107
(415) 836-2541 (*telephone*)
(415) 836-2501 (*fax*)

Dated: September 2, 2005

CERTIFICATION OF SERVICE
I hereby certify that a true copy of the above
document was served upon the attorney of record
for each other party by mail (by hand) on 9/22/05

- 8 -

OVION EXHIBIT E

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| MUSKET RESEARCH ASSOCIATES, INC., | ) | **No. 05 10416 MEL** |
|  | ) |  |
| Plaintiff, | ) |  |
|  | ) |  |
| v. | ) |  |
|  | ) |  |
| OVION, INC., WILLIAM S. TREMULIS, and JEFFREY P. CALLISTER, | ) |  |
|  | ) |  |
| Defendants. | ) |  |
|  | ) |  |
| OVION, INC., | ) |  |
|  | ) |  |
| Counterclaimant, | ) |  |
|  | ) |  |
| v. | ) |  |
|  | ) |  |
| MUSKET RESEARCH ASSOCIATES, INC., DAVID B. MUSKET, and SUE ANN LATTERMAN, | ) |  |
|  | ) |  |
| Counterdefendants. | ) |  |

**MUSKET RESEARCH ASSOCIATES, INC.,
DAVID B. MUSKET AND SUE ANN LATTERMAN'S
RESPONSE TO OVION, INC.'S FIRST SET OF REQUESTS TO ADMIT (1-12)**

Pursuant to Federal Rules of Civil Procedure 36, Musket Research Associates, Inc.,

David B. Musket and Sue Ann Latterman (collectively "MRA") respond to Ovion, Inc.'s First

Set of Requests to Admit (1-12) as follows:

Request No. 1

Admit that MRA, Musket, and Latterman, individually and collectively, did not contact

or solicit AMS on behalf of Ovion or cause AMS to be contacted or solicited on behalf of Ovion.

Response to Request No. 1

     Admitted.

Request No. 2

     Admit that MRA, Musket, and Latterman, individually and collectively, did not communicate with AMS on behalf of Ovion.

Response to Request No. 2

     Admitted.

Request No. 3

     Admit that MRA, Musket, and Latterman, individually and collectively, did not set up any meetings between AMS and Ovion.

Response to Request No. 3

     Admitted.

Request No. 4

     Admit that MRA, Musket, and Latterman, individually and collectively, did not accompany Ovion or its representatives to any meeting with AMS or its representatives.

Response to Request No. 4

     Admitted.

Request No. 5

     Admit that MRA, Musket, and Latterman, individually and collectively, did not manage any discussions between Ovion and AMS.

Response to Request No. 5

     Admitted.

Request No. 6

Admit that MRA, Musket, and Latterman, individually and collectively, did not coordinate the closing between Ovion and AMS.

Response to Request No. 6

Admitted.

Request No. 7

Admit that, as of the dates of the Complaint and the First Amended Complaint, MRA, Musket, and Latterman had no knowledge that Ovion was negotiating with AMS.

Response to Request No. 7

Admitted.

Request No. 8

Admit that, as of the dates of the Complaint and the Amended Complaint, MRA, Musket, and Latterman had no knowledge of the content or substance of any communications between Ovion and AMS.

Response to Request No. 8

Admitted.

Request No. 9

Admit that MRA, Musket, and Latterman, individually and collectively, did not prepare any budgets, forecasts, due diligence materials, presentation materials, or other work product for discussions, communications, or negotiations between Ovion and AMS.

Response to Request No. 9

Objection: This request is vague and ambiguous to the extent it fails to define what is meant by "for discussions, communications, or negotiations between Ovion and AMS." Without

waiving this objection, Musket Research Associates, Inc., David B. Musket, and Sue Ann Latterman (collectively "MRA") state as follows:

MRA admits that it did not prepare any budgets, forecasts, due diligence materials, presentation material, or other work product, with the intent or knowledge that Ovion would use these materials in discussions, communications, or negotiations between Ovion and AMS.

Request No. 10

Admit that MRA, Musket, and Latterman, individually and collectively, publicly disclosed by March 4, 2005 that Ovion was engaged in negotiations to merge with a corporate partner.

Response to Request No. 10

Objection: This request is vague and ambiguous to the extent that it fails to define what is meant by "publicly disclosed." Without waiving this objection, MRA states as follows:

MRA admits that on March 4, 2005 it filed a complaint in the United States District Court, District of Massachusetts, which alleges, among other things, that:

> On or about February 17, 2005, slightly more than six months after the Engagement Letter was signed, Ovion announced to MRA that it was entering into a merger and acquisition deal with an unnamed corporate partner.

Request No. 11

Admit that, if Ovion did not use your work product in relation to its communications negotiations, and merger with AMS, you are not entitled to compensation pursuant to the Engagement Letter.

Response to Request No. 11

Denied.

Request No. 12

Admit that, if Ovion did not use your work product in relation to its communications

negotiations, and merger with AMS, you are not entitled to compensation pursuant to any

agreement or understanding with any of Ovion, Mr. Tremulis, and Mr. Callister.

Response to Request No. 12

Denied.

Signed under the pains and penalties of perjury this 22nd day of September, 2005.

MUSKET RESEARCH ASSOCIATES, INC.

_____  9/22/05

Name:  DAVID B. MUSKET

Title:  PRESIDENT

_____  9/22/05

DAVID B. MUSKET

_____

SUE ANN LATTERMAN

<u>Request No. 12</u>

Admit that, if Ovion did not use your work product in relation to its communications negotiations, and merger with AMS, you are not entitled to compensation pursuant to any agreement or understanding with any of Ovion, Mr. Tremulis, and Mr. Callister.

<u>Response to Request No. 12</u>

Denied.

Signed under the pains and penalties of perjury this 2 2 day of September, 2005.

MUSKET RESEARCH ASSOCIATES, INC.

Name: _____
Title:

DAVID B. MUSKET

SUE ANN LATTERMAN

- 5 -

AS TO OBJECTIONS:

_____

Brooks A. Ames (BBO #641192)
DLA Piper Rudnick Gray Cary US LLP
One International Place, 21st Floor
100 Oliver Street
Boston, MA  02110-2613
(617) 406-6000 (*telephone*)
(617) 406-6100 (*fax*)

Arthur S. Beeman (admitted pro hac vice)
Pamela K. Fulmer (admitted pro hac vice)
DLA Piper Rudnick Gray Cary US LLP
153 Townsend Street, Suite 800
San Francisco, CA  94107
(415) 836-2541 (*telephone*)
(415) 836-2501 (*fax*)

Dated:  September 22, 2005

CERTIFICATION OF SERVICE
I hereby certify that a true copy of the above
document was served upon the attorney of record
for each other party by mail (by hand) on 9/22/05
_____

OVION EXHIBIT F



**Action canceled**

Internet Explorer was unable to link to the Web page you requested.
The page might be temporarily unavailable.



**Jump** | Free Trial Issue           ⊙ Search ○ Quote

Select Section ▼        [                    ]  Go

U.S. | EUROPE | ASIA    HOME PAGE FOR THE WORLD'S BUSINESS LEADERS

HOME   **BUSINESS**   TECHNOLOGY   MARKETS   ENTREPRENEURS   WORK   PERSONAL FINANCE   LIFESTYLE

Home > Business > David B Musket

# David B Musket

HEMSC☉TT

**Director at**
**Conor Medsystems, Incorporated**
Menlo Park, California
HEALTHCARE / MEDICAL INSTRUMENTS
& SUPPLIES                                    Track This
Director since November 1999                  Person

47 years old

David B  Musket, age 47, has been a member of Conor
Medsystems' Board of Directors since November 1999
Since 1996, Mr  Musket has been Managing Director of
ProMed Partners, L P., a healthcare investment fund. Since
1991, Mr  Musket has also been President of Musket
Research Associates, Inc , an investment banking firm
focused on emerging healthcare companies. Since 1991, Mr
Musket has also been President of DBM Corporate
Consulting, Ltd  From 1984 to 1989, Mr  Musket served as a
pharmaceutical analyst at Goldman Sachs & Co  Mr  Musket
is a member of the Harvard-M I T  Health Sciences and
Technology Advisory Council  Mr  Musket holds a B.A. in
Biology/Psychology from Boston College and spent four
years in a doctoral program in Pharmacology and
Neurobiology at Cornell University Medical College

**People Search**
1  Enter last name.
[                    ]
2  And/or stock symbol.
[              ]  Go

**E-Mail Alerts**
Get new stories by email as
they are published    *FREE*

**Company**
☐  Conor Medsystems,
Incorporated
**Enter E-Mail Address:**
[                    ]

[              ]

FAQ                Privacy Policy

**Act**

Internet Exp
The page mi

Please try th

• Click
• If yo
  what
  click
• For ii
  click

Internet Exp

**Cash Compensation (FY December 2004)**

| | |
|---|---|
| Salary | n/a |
| Bonus | n/a |
| O T H E R  Latest FY other short-term comp | n/a |
| Latest FY other long-term comp | n/a |
| Latest FY long-term incentive payout | n/a |
| **Total** | n/a |

**Stock Options (FY December 2004)**

**Related quotes**

CONR        20.27    + 0 10

[         Get quotes         ]

**Related Links**

More top executives at
CONR



OVION EXHIBIT G



**DLA Piper Rudnick Gray Cary US LLP**
One International Place, 21st Floor
Boston, Massachusetts 02110-2613
T 617.406.6000
F 617.406.6100
W www.dlapiper.com

BROOKS A. AMES
brooks.ames@dlapiper.com
T 617.406.6045  F 617.406.6145

October 5, 2005

**BY FAX AND MAIL**

Leland G. Hansen, Esq.
McAndrews, Held & Malloy, Ltd.
500 W. Madison Street, 34th Floor
Chicago, IL  60661

> Re:   *Musket Research Associates, Inc. v. Ovion, Inc., et al.;*
> *Ovion, Inc. v. Musket Research Associates, Inc., et al.*
> Civil Action No. 05 10416 MEL

Dear Mr. Hansen:

This letter sets forth MRA's response to the discovery issues you raised on behalf of Ovion in our September 26, 2005 meet and confer.

Interrogatories

With respect to Interrogatory No. 2(a) of Ovion, Inc.'s First Set of Interrogatories, Ovion has requested that, in its production, MRA identify by Bates number all documents that constitute MRA's work product.  Ovion has also asked that MRA identify any work product that was not memorialized in writing, by a separate log setting forth a written description.  Ovion has further requested that, for each item of work product so identified, MRA state the person or persons responsible for the work product and describe in detail their contribution to the work product.

MRA's response is as follows.  MRA will identify, by Bates ranges, the documents that contain its work product within 30 days of production.  However, MRA will not attempt to create a log of undocumented work product.  Nor will MRA review each document produced and identify the person or persons who contributed and the specific nature of their contribution. Requiring that MRA undertake such an effort is unreasonable and unduly burdensome.  The documents produced by MRA, many of which are doubtlessly already in Ovion's possession, will include drafts, notes, and email correspondence concerning the work product developed by MRA.  These documents provide the provenance of the work product, and the burden of reviewing them is substantially the same for Ovion as it is for MRA.  Moreover, Ovion is better

**Serving clients globally**


PIPER RUDNICK
GRAY CARY

Leland G. Hansen, Esq.
October 5, 2005
Page 2

situated than MRA to identify the key word product at issue in this litigation (i.e. work product Ovion shared with AMS).

With respect to Interrogatory No. 2(b)-(c), Ovion has requested that MRA identify particular subsets of work product identified in response to Interrogatory No. 2(a). MRA will do so once it has completed discovery as Ovion and AMS possess the relevant information. With respect to Interrogatory No. 2(d), Ovion has indicated that MRA's response is not responsive. MRA respectfully disagrees.

Document Production

With respect to Request Nos. 2, 3, and 4 of Ovion, Inc.'s First Set of Document Requests, Ovion has requested that MRA produce various engagement letters, including but not limited to engagement letters containing an advisory fee provision or concerning a corporate partner. Ovion has further requested that MRA produce, among other things, all documents related to these engagement letters, including all documents related to their negotiation.

MRA will not produce any such documents for the reasons stated in Musket Research Associates, Inc., David B. Musket and Sue Ann Latterman's Response to Ovion, Inc.'s First Set of Requests to Ovion Inc.'s First Set of Document Requests ("MRA's Responses"). MRA further notes that Ovion has not set forth a theory of relevance that would justify the burden of identifying and producing such documents.

With respect to Request No. 7, Ovion has requested that MRA produce documents relating to USVP even if they do not concern Ovion. MRA will not produce any such documents for the reasons stated in MRA's Responses. MRA further notes that it has no objection to producing, and will produce, all documents relating to USVP that concern Ovion.

With respect to Request No. 9, Ovion has requested that MRA produce all documents relating to any disputes regarding engagement letters related to services provided by MRA. MRA will not produce any such documents for the reasons stated in MRA's Responses. MRA notes that this is the first legal action that has ever been taken concerning a dispute over payment under an MRA engagement letter. Moreover, MRA notes that Ovion has not set forth a theory of relevance that would justify the burden of identifying and producing responsive documents.

With respect to Request Nos. 16 and 18, Ovion asks that MRA produce all documents relating to any transactions involving ProMed and a party engaged by MRA and all documents relating to any transactions involving both ProMed and MRA. MRA will not produce any such documents for the reasons stated in MRA's Responses. As the remainder of MRA's document production will make clear, ProMed was not involved in the Ovion engagement, and thus there is no justification for requiring MRA to identify and produce responsive documents.

~BOST1 393154 v1



Leland G. Hansen, Esq.
October 5, 2005
Page 2

Please contact me should you have any questions.

Sincerely,

Brooks A. Ames

BAA/lnf

OVION EXHIBIT H

Law Offices

# McAndrews, Held & Malloy, Ltd.

34TH FLOOR
500 WEST MADISON STREET
CHICAGO, ILLINOIS 60661

Telephone: (312) 775-8000
Facsimile: (312) 775-8100
www.mhmlaw.com

GEORGE P. McANDREWS
JOHN J. HELD
TIMOTHY J. MALLOY
WILLIAM H. WESLEY
LAWRENCE M. JARVIS
GREGORY J. VOGLER
JEAN DUDEK KUELPER
HERBERT D. HART III
ROBERT W. FIESELER
THOMAS J. WIMBISCUS
STEVEN J. HAMPTON
PRISCILLA F. GALLAGHER
STEPHEN F. SHERRY
PATRICK J. ARNOLD JR
GEORGE F. WHEELER
JANET H. MCNICHOLAS
CHRISTOPHER C. WINSLADE
EDWARD A. MAS II
GREGORY C. SCHODDE
EDWARD W. REMUS
DONALD J. POCHOPIEN

SHARON A. HWANG
DAVID D. HEADRICK
ALEJANDRO MENCHACA
KIRK A. VANDER LEEST
RICHARD T. McCAULLEY JR
PETER J. McANDREWS
LELAND G. HANSEN
JAMES M. HAFERTEPE
JONATHAN M. SICK
ELIGIO C. PIMENTEL
JAMES P. MURPHY
DEAN A. PELLETIER
MICHAEL B. HARLIN
JAMES R NUTTALL
ROBERT A. SURRETTE
JOSEPH M. BARICH
SCOTT P. McBRIDE
PATRICIA J MCGRATH
TROY A. GROETKEN
GERALD C. WILLIS
JOHN A. WIBERG

WILHELM L. RAO
SANDRA A. FRANTZEN
RONALD H. SPUHLER
CHRISTOPHER V. CARANI
RONALD A. DICERBO
JENNIFER E. LACROIX
JOSEPH F. HARDING
JOSEPH M. BUTSCHER
SARA J. BARTOS
JOHN L. ABRAMIC
MICHAEL J. FITZPATRICK
DAVID Z. PETTY
MICHAEL T. CRUZ*
MIRUT P. DALAL
CHRISTOPHER N. GEORGE
MATTHEW A. ANDERSON
YUFENG MA
DENNIS H JASKOVIAK
DEBORAH A. LAUGHTON
WILLIAM B GONT
DENNIS P. HACKETT

HOPETON S. WALKER
SHAWN L. PETERSON
OGNYAN I BERENSKI
PHILIP H. SHERIDAN
CHRISTOPHER R CARROLL
CHRISTOPHER M. SCHARFF
CONSUELO O. ERWIN
PETER J PROHMER
MERLE S. ELLIOTT
BRIAN C BIANCO
PAUL W. McANDREWS
LAURA M. PERSONICK
ANDREW B. KARP
JONATHAN M. RUSHMAN
JEREMY N. GAYED
CHRISTOPHER J BUCHKO

———
OF COUNSEL
S JACK SAUER

*ADMITTED TO PRACTICE IN CA

October 6, 2005

Via E-mail
Confirmation by U.S Mail

Brooks A. Ames
DLA Piper Rudnick Gray Cary US LLP
One International Place, 21st Floor
Boston, Massachusetts 02110-2613

>       Re:     *Musket Research Associates, Inc. v. Ovion, Inc., et al.;*
>               *Ovion, Inc. v. Musket Research Associates, Inc., et al.*
>               Civil Action No. 05 10416 MEL

Dear Brooks:

I am writing in response to your letter of yesterday and our subsequent telephone conference. My partner Leland Hansen also participated in the telephone conference yesterday.

Your clients have objected to certain interrogatories and document requests on the grounds that providing responsive information would be unduly burdensome. As we previously explained during our telephone conference on September 26, 2005, and again during our telephone conference yesterday, we are willing to consider such concerns if you will provide specific reasons as to why gathering, searching for or providing such information would be unduly burdensome. We are not satisfied by your boilerplate objections in this regard.

We also discussed during both telephone conferences the temporal limitations that you have imposed on your clients' responses to requests for production. Specifically, in the General Objections, your clients state that they will only produce documents dated between January 1, 2004 and March 4, 2005. During our telephone conference yesterday, you stated that your clients are not willing to reconsider or modify these temporal limitations.

<h1 style="text-align:center">McANDREWS, HELD & MALLOY, LTD.</h1>

Brooks A. Ames
October 6, 2005
Page 2

With respect to your clients' interrogatory responses, you agreed to supplement your clients' response to Interrogatory 1.a to identify the non-disclosure agreement as an agreement between the parties.

With respect to the interrogatories generally, we repeat our request that you confirm that your answers to the interrogatories are complete. Specifically, with respect to your response to Interrogatory 2(b) and 2(d), if your clients presently do not have any information to support their contentions at issue, we again ask that your clients supplement their response accordingly. The present response is insufficient and non-responsive. We remind you that you are required to respond to the interrogatory based upon information presently known and available, regardless of your obligation to supplement in the future.

With respect to Requests for Production Nos. 2, 3 and 4, we explained again that the requested information is relevant to the claims, defenses and counterclaims in this action. For example, we explained again that a comparison of the engagement letter to other MRA contracts will refute your clients' contentions regarding (a) the engagement letter, (b) other alleged understandings between the parties, (c) standard industry practice and (d) your clients' knowledge that Ovion was pursuing corporate transactions. As we previously told you, we are willing to consider limiting the scope of your clients' initial production in response to this request to the final agreements, contracts, engagement letters, drafts, correspondence, and other negotiation documents relating to the same.

With respect to Request for Production No. 9, we explained again that the requested information is relevant to the claims, defenses and counterclaims in this action. For example, we explained again that information related to disputes between your clients and their other clients is relevant in that such information (1) will contradict your clients' contentions regarding (a) the engagement letter, (b) other alleged understandings between the parties, (c) standard industry practice and (d) your clients' knowledge that Ovion was pursuing corporate transactions; and (2) will establish your clients' pattern of using litigation, or the threat of litigation, to extort money from their clients when your clients have failed to secure financing for their clients who find financing through other means.

With respect to Requests for Production Nos. 16 and 18, we explained again that the requested information is relevant to the claims, defenses and counterclaims in this action. For example, we explained again that the requested information will show that your clients have established a pattern of setting up their clients in a vulnerable position so that your clients, or other entities in which they are involved (such as ProMed), can invest in their clients on favorable terms. We previously stated that we would consider limiting the scope of your clients' initial production in response to these requests to final agreements.

McANDREWS, HELD & MALLOY, LTD.

Brooks A. Ames
October 6, 2005
Page 3

With respect to Request for Production No. 7, we reiterated that we are willing to consider your concerns if you will provide specific reasons as to why gathering, searching for or providing such information would be unduly burdensome.

Finally, we are waiting for your response regarding the proposed stipulated protective order that we previously sent to you.

Very truly yours,

Christopher V. Carani

CVC/jls

OVION EXHIBIT I

1 of 1 DOCUMENT

**Staffbridge, Inc. et al. n1 v. Gary D. Nelson Associates, Inc. d/b/a Nelson Human Resources Solutions et al. n2**

n1 Scott Nieh, Laura Yao-Nieh and Nigel Lui
n2 Gary D. Nelson

**02-4912 BLS**

**SUPERIOR COURT OF MASSACHUSETTS, AT SUFFOLK**

*2004 Mass. Super. LEXIS 215*

**June 11, 2004, Decided**

**DISPOSITION:** [*1] Order issued regarding pretrial motions.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff software developers sued defendants, a corporation and shareholder, for misappropriation of trade secrets, breach of contract, and breach of fiduciary duty by a shareholder in a closely held corporation. The developers moved to continue the pretrial conference and to modify the scheduling order so they could have more time for discovery. Defendants moved for reconsideration and allowance of their motion for summary judgment.

**OVERVIEW:** The developers claimed that defendants created workforce management software by misappropriating the trade secrets contained in the developers' software. Non-expert discovery was to have been completed almost a year earlier, and expert discovery was to have been completed over six months earlier. The court held that, in order for defendants to respond to the charges, and for the court to make appropriate findings and rulings, there had to be a clear designation that distinguished unique or proprietary material from the vast body of the developers' program and source code, so as to apprise a person what trade secrets in the developers software they claimed was to be found in defendants' software. On the present record, not even a software expert could distinguish what it was in the developers' software that was actually protectable from that which was not. The developers were obliged to explain precisely what they claimed as trade secrets before they would be allowed any discovery of defendants' allegedly infringing materials.

**OUTCOME:** The developers were ordered to provide a second designation of what they claimed constituted the trade secrets allegedly misappropriated. If they did not, the court would grant defendants summary judgment on the first count, misappropriation of trade secrets. The adequacy of the second designation would dictate whether the case proceeded on all three counts or just on the latter two.

**LexisNexis(R) Headnotes**

*Constitutional Law > Procedural Due Process > Scope of Protection*
*Civil Procedure > Disclosure & Discovery*
[HN1] The judicial system is not a mere game of skill or chance in which the judge is merely an "umpire." A court will not permit the rules to subvert a just result. Due process requirements may affect the appropriateness of any response by a court for a request for additional time to complete discovery. To achieve justice, judges are expected to provide litigants with an opportunity for a trial when that is appropriate. A Massachusetts superior court is a tribunal of superior and general jurisdiction. Inherently it has wide power to do justice and to adopt procedure to that end.

**JUDGES:** Allan van Gestel, Justice of the Superior Court.

**OPINIONBY:** Allan Van Gestel

**OPINION:** *MEMORANDUM AND ORDER ON PLAINTIFFS' EMERGENCY MOTION TO CONTINUE*

*THE PRETRIAL CONFERENCE AND RENEWED REQUEST FOR MODIFICATION OF SCHEDULING ORDER AND DEFENDANTS' CROSS MOTION*

This matter is before the Court literally on the eve of trial. There are two motions: an emergency motion by the plaintiffs seeking to continue the pretrial conference and a renewed request for a modification of the scheduling order governing this case; and an emergency cross motion by the defendants for fees and costs. The Court heard the parties orally on June 9, 2004.

BACKGROUND

The following procedural history provides some background

The Tracking Order that issued on December 17, 2002, at the request and with the concurrence of the parties, called for all non-expert discovery to be completed almost a year ago, by July 30, 2003, and all expert discovery to be completed over six months ago, by December 1, 2003. In fact discovery was not only not completed in a timely fashion, it has barely begun

The complaint presents three counts: misappropriation of trade secrets; breach of [*2] contract for software licensing; and breach of fiduciary duty by a shareholder in a closely held corporation.

The plaintiffs are developers of workforce management software which they call StaffFind. The corporate defendant is a provider of temporary staffing. In May 2000, the parties entered into a license agreement under which the plaintiff would "do all work necessary to permit" the defendant to offer its customers a version of StaffFind that would manage certain information generated in the staff recruitment process. The plaintiff retained ownership in StaffFind, and the defendants agreed not to disassemble, de-compile or reverse engineer the software

Allegedly because of dissatisfaction with StaffFind, the corporate defendant, with assistance from an independent company, created its own software product for the same purpose as StaffFind. The defendant's product is called WorkForceLogic ("WFL")

A prominent feature of the plaintiffs' claims is the charge that WFL was created by the misappropriation of the trade secrets contained in StaffFind.

In a December 1, 2003 letter from plaintiffs' counsel to defendants' counsel, the plaintiffs attempted to define or describe their trade [*3] secrets In response to what the plaintiffs proffered, the defendants responded with a detailed affidavit from Mark Crovella, an Associate Professor of Computer Science at Boston University, that asserted that the information presented by the plaintiffs

was insufficient to enable anyone to understand, identify and distinguish what trade secrets, if any, are in the StaffFind product. This Court examined the proffer and expressed its basic, albeit untrained, agreement with Professor Crovella. In part, the Court's reaction was sparked by its own recent experience in a remarkably similar case--*Softscape, Inc v. Cambia Consulting, Inc*, Suffolk Superior Court, No. 03-2824 BLS. n3

> n3 In *Softscape*, a jury found for the plaintiffs on their claim that Cambria misappropriated its computer software trade secrets in violation of a licensing agreement This Court, however, in ruling separately on a *G L c 93A* count, found that no trade secrets were proved. *Softscape* is now believed to be on appeal, with the jury and the judge on opposite sides of the trade secret issue.

[*4]

This Court noted in its earlier Order in this case:

Both for the defendants to respond to the charges against them, and for the Court to make appropriate findings and rulings on the case, there must be a clear designation that distinguishes unique or proprietary material from the vast body of the StaffFind program and source code, and apprises a person what trade secrets in StaffFind the plaintiffs claim to be found in WFL That cannot be done on the present record.

Recently, on June 2, 2004, this Court denied the defendants' motion for summary judgment and, treating the plaintiffs' earlier motion mentioned above as a Rule 56(f) motion seeking further discovery, denied it as well

Once again, the same issues have arisen. The plaintiffs want more time for discovery and the defendants want reconsideration and allowance of their motion for summary judgment

DISCUSSION

On the record before it--which has not effectively changed since last January--this Court should be disinclined to grant additional time for further discovery See, e.g., *Greenleaf v MBTA, 22 Mass App Ct 426, 429-30, 494 N E 2d 402 (1986)*. At the same time, and admittedly arriving under a different circumstance, [*5] this Court takes to heart Justice Dreben's admonition in *O'Connor v City Manager of Medford, 7 Mass App.Ct 615, 619, 389 N E 2d 440 (1979)*:

[HN1] Our judicial system is not "a mere game of skill or chance" in which the judge is merely an "um-

pire " *In re Barnett, 124 F 2d 1005, 1010-11* We will not permit the rules to subvert a just result . .

Further, due process requirements may affect the appropriateness of any response by this Court to the present situation See *Gos v Brownstein, 403 Mass 252, 255-57, 526 N E 2d 1267 (1988)*

To achieve justice, judges are expected to provide litigants with an opportunity for a trial when that is appropriate. "The Superior Court is a tribunal of superior and general jurisdiction. Inherently it has wide power to do justice and to adopt procedure to that end." *Fanciullo v B G &S Theatre Corp, 297 Mass 44, 51, 8 N E 2d 174 (1937)* For that reason, and one other, this Court will attempt here to craft an Order that is fair to both sides. The other reason is that this is not just a suit over the misappropriation of what are alleged to be trade secrets. Count II of the complaint seeks relief for breach of the licensing agreement, [*6] a claim that does not necessarily require a trade-secret underpinning. Nor does Count III, which is against the individual defendant for breach of his fiduciary duties as a shareholder in a close corporation.

Before any discovery relating to trade secrets themselves is permitted, however, this Court must revisit the issue of the plaintiffs' designation of what it is that they claim are trade secrets. This effort has caused a careful re-reading of the Affidavit of Professor Crovella (Paper # 21) and the Affidavit of Michael Stonebraker (Paper # 30) submitted by the plaintiffs

Attached to the Crovella Affidavit as Exhibit 2 is the December 1, 2003, letter from plaintiffs' counsel to defendants' counsel enclosing what is characterized as "the designation of trade secret material . . . with respect to StaffFind and its components." Enclosed with the letter are 11 pages of description, with three multi-page exhibits. Almost all of the foregoing is not understandable to a lay reader like the Court, not because it is unreadable, but because it is presented in un-understandable software jargon.

Professor Crovella's background and curriculum vitae demonstrate that he is immensely qualified [*7] to speak with authority on the subject at hand As noted above, he is an Associate Professor in the Department of Computer Science at Boston University. He holds a B S from Cornell University, an M S. from the State University of New York at Buffalo, and an M S. and a Ph.D. in Computer Science from the University of Rochester.

In his Affidavit, Professor Crovella explains and states that "it is impossible to identify what trade secrets, if any, are present in the StaffFind product" from a review of what was provided to him He goes on to say that this "deficiency would prevent anyone comparing the two programs [StaffFind and WFL] from vetting WFL for trade secrets supposedly found in StaffFind " This is because "the Designation includes functional characteristics that would be present in any similar software program; fails to separate claimed secrets from the vast body of source code designated; and fails to distinguish between data dictated by user-visible requirements and actual trade secrets "

At oral argument on the present motions, counsel for the plaintiffs stated that there were three matters that constituted his clients' trade secrets: the source code as a whole; the database [*8] schema; and the customer databases.

Professor Crovella summarized his comments as to each of those three matters in the following ways

1. The source code designation "fails to separate the claimed secrets from the vast body of source code designated; and without this, it is impossible to determine whether such claimed trade secrets are present in the WFL software, and whether those claimed trade secrets are in fact generally know to the trade";

2. The database schema designation "makes no distinction between the portions of the database tables, field definitions, and formats that would be naturally dictated by user-visible requirements, and those portions (if any) that represent trade secrets, the posited similarity would tell nothing"; and

3. The customer databases designation "does not distinguish unique or proprietary material from the vast body of the StaffFind program and source code (including its patently generic portions), and does not apprise a person what trade secrets StaffBridge claims are to be found in WFL "

Professor Michael Stonebraker, who submitted an affidavit on behalf of the plaintiffs, possesses a similarly impressive curriculum vitae. He is a retired [*9] professor at both the University of California at Berkeley and at its Graduate School He holds a B S E E from Princeton University and a Ph.D. in Computer Information and Control Engineering from the University of Michigan.

Professor Stonebraker, in his Affidavit mentions that he has reviewed Professor Crovella's Affidavit, however, Professor Stonebraker makes no effort in his own Affidavit to address the problems and concerns raised by Professor Crovella. Rather, in general and conclusory language, Professor Stonebraker opines that "StaffBridge is entitled to claim as a trade secret the data in the customer databases for Veritas, Brocade and Barclays Global Investors" and that "StaffBridge is also entitled to consider its database schema a trade secret, not because it is novel, in and of itself, but because access to the da-

2004 Mass Super LEXIS 215, *

tabase schema would enable a software programmer to develop WorkForceLogic in such a way as to enable an expeditious conversion of StaffBridge customer databases to the WorkForceLogic platform."

Aside from conceding that he "finds the StaffBridge program not particularly novel," Professor Stonebraker otherwise engages mostly in speculation about how WFL was [*10] created and that it must have been copied from StaffFind. Nothing in Professor Stonebraker's Affidavit would permit even a person with Professor Crovella's expertise, let alone a person with this Court's limited lack of expertise, to know and be able to distinguish what it is in the StaffFind software that is actually protectable from that which is not.

While perhaps rewarding the lackadaisical and the less than diligent pursuit of discovery, the interests of justice warrant giving the plaintiffs one final chance to pull up their socks and get ready for trial. But such an opportunity cannot be at the risk of the defendants' entitlement to know with precision what is claimed as a trade secret before any discovery of the defendants' allegedly infringing materials. See, e g, *SmithKlineBeecham Pharmaceuticals Co v Merck & Co, Inc , 766 A 2d 442, 447 (Del 2000)*; *Computer Economics, Inc v Gartner Group, Inc , 50 F Supp 2d 980, 989 (S D Cal 1999)*

ORDER

1. On or before June 30, 2004, the plaintiffs, through their counsel, may have the opportunity to provide to the Court and the defendants, through their counsel, a second designation, in affidavit [*11] form and under oath, that sets forth with rigorous and focused particularity what, and only what, the plaintiffs claim to constitute the trade secrets allegedly misappropriated by either of the defendants that form the basis for this law suit.

The designation must, with clarity that can be understood by a lay person, make clear and distinguish what is protectable from that which is not

2 Upon receipt of the second designation referred to in paragraph 1 above, the defendants shall have until July 23, 2004, to submit to the Court and counsel for the plaintiffs, a response to the second designation.

If the response is other than an acceptance of the adequacy of the second designation, the defendants' response, like the plaintiffs' second designation, shall be in affidavit form and under oath.

3 The Court will hold a status conference on August 4, 2004, at 2:00 p.m , for the purpose of discussing the future course of this case.

A. If no second designation is served by the plaintiffs within the time provided, then this Court will grant summary judgment in favor of the defendants on Count I relating to the trade secret issues and will expect the parties to present proposals for possible [*12] minimal further discovery and litigation, if any, on Count II for breach of the licensing agreement and Count III for breach of fiduciary duties by the individual defendant

B If a second designation is served and accepted for adequacy, without waiving any rights to challenge the trade secret nature of what is designated, then the Court will expect the parties to present proposals for further minimal discovery and litigation of the entire case

C If a second designation is served and not accepted for adequacy, then the Court, at the status conference, will accept such written filings either side chooses to make and will hear oral argument on the parties' respective positions The Court's subsequent decision on the adequacy of the second designation will dictate whether the case proceeds on all three counts or just on Counts II and III

Allan van Gestel

Justice of the Superior Court

DATED: June 11, 2004

OVION EXHIBIT J

Exhibit 10.6

MUSKET RESEARCH ASSOCIATES INC.

------------ JUNE 6, 1996

Stuart D. Edwards President and CEO Somnus Medical Technologies, Inc. 995 Benicia
Avenue Sunnyvale, CA 94086

Dear Stu:

Musket Research Associates, Inc. (MRA) would like to be retained as a
nonexclusive finder/advisor in connection with the proposed private placement of
Series B Convertible Preferred Somnus Medical Technologies, Inc. ("Somnus"), or
any financing for Somnus which arises out of that effort. The specific services
to be provided by MRA and fees to be received will be:

1. MRA shall (i) analyze the financial performance and projections of the Company
and assist in determining an appropriate valuation range for the new equity
capital; (ii) assist in the development of presentation materials for investor
solicitations.

2. (a) Contact qualified investors and, if acceptable to you or your
representative, send the necessary documents ourselves or through your office.
Documents sent by you at our request should be accompanied by a cover letter
and/or a business card from MRA, or, if these are not available, a specific
reference to our introduction. After appropriate screening, set up and accompany
you to meetings with interested parties as often as scheduling allows. Manage
ongoing discussions and coordinate the closings with the investors solicited, or
caused to be solicited by MRA.

   (b) MRA acknowledges that the offering will be made pursuant to the private
offering exemption from registration under Section 4(2) of the Securities Act of
1933 and Rule 506 promulgated thereunder, and that Somnus securities are to be
sold only to "accredited investors" (as defined in the SEC's Regulation D) who
also satisfy any applicable securities law. Before each closing, Somnus will
validate these "accredited investors" via the traditional suitability
questionnaire, copies of which will be provided to MRA.

   (c) Prior to sending any descriptive materials to potential investors, MRA
will provide to Somnus a list of these investors so that Somnus can make the
appropriate securities law filings, if any, in such jurisdictions. MRA will send
materials previously approved by Somnus when cleared to do so by an Somnus
representative and will not be responsible for assuring that such jurisdictional
filings have been made beforehand. MRA will not make any general solicitation in
connection with the financing and will conduct its obligations hereunder in a
manner consistent with the requirements of Rule 506.

(d) The potential investors contacted by MRA are subject to acceptance by Somnus in its sole and absolute discretion, and Somnus is under no obligation to sell any of its capital stock to such parties. MRA shall be deemed an independent contractor and shall have no right, power or authority to create any obligations on behalf of Somnus.

3. (a) Somnus agrees to pay MRA finder's fees of 7% of the aggregate proceeds received by Somnus from the sale of Series B Preferred Stock, or any other debt or equity instrument arising out of this financing effort, to parties solicited by or cause to be solicited by MRA ("MRA Contacts"). MRA Contacts will be determined by the mailings made directly by MRA, at its request, or at the request of these solicited parties. MRA Contacts will be listed on Schedule A of this contract and will be updated as new mailings are authorized.

(b) Schedule A investors will specifically exclude (i) current Somnus investors, and (ii) parties being actively solicited directly by Somnus or one of its representatives, not previously contacted by MRA and approved by the Company as a Schedule A investor. A complete listing of these two exclusion groups will be provided to MRA by Somnus as soon as possible but not later than the time of signing of this contract and will be attached hereto as Schedule B. Somnus is authorized to and will update MRA periodically as to any additions it has made to Schedule B. At Somnus's sole discretion, it may authorize a switch of an investor listed on Schedule B to Schedule A, carrying with it the obligation to pay the fees outlined in Section 3(a) above.

4. The Company will inform MRA immediately if it engages any additional finders on this financing, including at such notice a complete description of any fee agreement with such additional finder. If the Company agrees to pay fees in excess of those stated above, the fees payable to MRA will increase to the same level, at the sole discretion of MRA.

5. MRA will receive consideration for a similar finder's agreement in the event of future private financings by Somnus. If MRA is not invited to participate in ------- such financings as a finder, MRA will still be entitled to receive fees from Somnus amounting to 3% of the aggregate funds invested in or loaned to Somnus by investors MRA brought into the current financing (and compensated for as per Section 3 above) for a period of two years after the final closing of the current financing.

6. MRA will be allowed, in its sole discretion, to substitute not less than 25% of the cash fees owed to it by Somnus, as per Sections 3, 4, and 5 above, for equity or debt instruments in Somnus, in whatever form and at whatever value as was paid by the investors contacted by MRA shall be bound by similar terms and conditions as such investors and provided further that such issuance to MRA shall comply with applicable state securities laws and shall not preclude Somnus's reliance on Rule 506 with respect to the financing. MRA hereby represents that it is an "accredited investor" for purposes of Regulation D. All payments due to MRA will be made will be made within 10 days of the closing of the financing for which they are payable. Cash or equity will be made out directly to Musket Research Associates, Inc. unless otherwise specified.

7. Whether or not the financing contemplated herein is consummated, the Company will reimburse MRA for its reasonable out-of-pocket expenses incurred from this financing, provided such expenses have been approved in advance by Somnus, such approval to not be unreasonably withheld. An initial nonrefundable payment of $10,000 as an advance against these expenses will be paid to MRA upon the

execution of this contract. Somnus-approved expenses incurred by MRA prior to closing will be submitted for reimbursement by Somnus and should be paid within two weeks of receipt.

8.    Investors for which MRA is compensated as per Sections 3, 4, and 5 above will be listed on Schedule C of this contract. For each one percent of the shares actually sold in the Company's IPO that are purchased by investors or parties or directly affiliated with the investors listed on Schedule C, MRA will be granted 1000 options or warrants to purchase Somnus common stock at a price equivalent to the actual IPO price. Such options or warrants will expire 5 (five) years after grant and carry antidilution provisions and piggyback registration rights.

9.    This engagement may be terminated by Somnus or MRA at any time without cause, upon written notice to that effect by the other party. However, MRA shall be entitled to success fees, as described in Sections 3, 4 and 5 above, in the event that, at any time prior to the expiration of two years after termination of this agreement, a financing, loan, credit facility, or other investment is consummated by Somnus with an investor listed on Schedule A at the time of termination. Section 8 will have no termination clauses or expiration will have no termination clauses or expiration dates.

10.   The company agrees to indemnify MRA under the terms set forth in Exhibit 1, which is included herein by reference.

Sincerely,

/s/David B. Musket
David B. Musket
President Musket Research Associates


Agreed and Accepted:

/s/Stuart D. Edwards
Stuart D. Edwards                     Date
President and Chief Executive Officer Somnus Medical Technologies, Inc.

EXHIBIT 1
---------

SOMNUS MEDICAL TECHNOLOGIES, INC. ("SOMNUS") agrees to indemnify and hold
harmless Musket Research Associates, Inc. ("MRA") and each of MRA's officers,
directors, agents, employees and controlling persons (within the meaning of each
of Section 20 of the Securities Exchange Act 1934, as amended, and Section 15 of
the Securities Act of 1933, as amended)(each of the foregoing, including MRA,
being hereinafter referred to as an "Indemnified Person") to the fullest extent
permitted by law from and against any and all losses, claims, damages, expenses
(including reasonable fees and disbursements for counsel), actions (including
shareholder derivative actions), proceedings, investigations (whether formal or
informal, or in tort, contract or otherwise), inquiries or threats thereof (all
of the foregoing being hereinafter referred to as "Liabilities"), based upon,
relating to or arising out of MRA's engagement hereunder (including conduct prior
to the date hereof) or any Indemnified Person's role therein including, without
limitation, any liabilities relating to or arising out of the engagement by
SOMNUS of any other financial advisor or investment banker: provided,
                                                  -------- however,
that SOMNUS shall not be liable under this paragraph to the extent that - -------
it is finally judicially determined by a court of competent jurisdiction that
such Liabilities resulted from the willful misconduct or gross negligence of the
Indemnified Person seeking indemnification. In connection with SOMNUS' obligation
to indemnify for expenses as set forth above, SOMNUS further agrees to advance or
reimburse each Indemnified Person for such expenses (including reasonable fees
for counsel) as they are incurred by such Indemnified Person: provided, however,
that if any Indemnified Person is reimbursed hereunder for - ----------------
any expenses, such reimbursement of expenses shall be refunded by the Indemnified
Person who received such expenses to the extent it is finally judicially
determined by a court of competent jurisdiction that the Liabilities in question
resulted from the willful misconduct or gross negligence of such Indemnified
Person.

MRA confirms that it shall have due regard to any reasonable request which SOMNUS
may make in relation to the defense of any claim subject to SOMNUS indemnifying
and securing MRA, in a manner satisfactory to MRA against any and all reasonable
costs, charges, and expenses incurred by it in complying with any such request.

If the indemnification or reimbursement provided for hereunder is finally
judicially determined by a court of competent jurisdiction to be unavailable to
an Indemnified Person in respect to any Liabilities (other than as a consequence
of a final judicial determination by such a court of willful misconduct or gross
negligence of such Indemnified Person), then SOMNUS agrees, in lieu of
indemnifying such Indemnified Person, to contribute to the amount paid or payable
by such Indemnified Person as a result of such Liabilities (i) in such proportion
as is appropriate to reflect the relative benefits received, or sought to be
received, by SOMNUS on the one hand and by such Indemnified Person on the other
from the transaction in connection with which MRA has been engaged, or (ii) if
(but only if) the allocation provided in clause (i) of this sentence is not
permitted by applicable law, in such proportion as is appropriate to reflect not
only the relative benefits referred to in such clause (i) of this sentence is not
permitted by applicable law, in such proportion as is appropriate to reflect not
only the relative benefits referred to in such clause (i) but also the relative
fault of SOMNUS and of such Indemnified Person: provided, however, that in no
event shall the aggregate amount contributed by - ---------------- the
Indemnified Person exceed the amount of fees actually received by his or its

affiliate or employer pursuant to such engagement. The relative benefits received or sought to be received by SOMNUS on the one hand and by MRA on the other shall be deemed to be in the same proportion as (i) the gross proceeds raised in the transactions subject to this Agreement bears to (ii) the fees paid or payable to MRA hereunder.

MUSKET RESEARCH ASSOCIATES INC.

SCHEDULE A INVESTORS
--------------------

Approved by  /s/ Stuart D. Edwards
             ----------------------
Date    6/13/96
             ------------------------------

INVESTORS ELIGIBLE FOR FULL MRA FEES


Easton Capital Essex (Boston) First Eagle HPB INVESCO Iridian Asset Management
Kingdon Capital Medical Venture Management AS Rose & Co. The Travelers Companies
Welch & Forbes Westfield Capital Zeisger Capital


and all parties and entities affiliated with any group listed above.


125 CAMBRIDGEPARK DRIVE - 1ST FLOOR - CAMBRIDGE, MA 02140 617-441-8800 FAX 617-
441-0855

MUSKET RESEARCH ASSOCIATES INC.

SOMNUS SCHEDULE INVESTORS

Approved by  /s/ Stuart D. Edwards
             -----------------------
Date   9/5/96
             ----------------------------

INVESTORS ELIGIBLE FOR FULL MRA FEES

Easton Capital/ES Partners Essex (Boston) First Eagle HPB Elliot Hahn Rob Hess
Steve Hochberg INVESCO Iridian Asset Management Kingdon Capital Frank Litvack
Patrick McBrayer MedCap/ProMed Medical Venture Management AS/Viking Medical
Ventures Moss Forest Norwest Och-Ziff Rose & Co. John Simon Third Point Partners
The Travelers Companies Welch & Forbes Westfield Capital Zesiger Capital


and all parties and entities affiliated with any group listed above.


125 CAMBRIDGEPARK DRIVE - 1ST FLOOR - CAMBRIDGE, MA 02140 617-441-8800 FAX 617-
441-0855

MUSKET RESEARCH ASSOCIATES INC.

SOMNUS SCHEDULE B INVESTORS          /s/ Stuart D. Edwards
                                          9/5/96

Investors NOT Eligible for any MRA Fees


All existing Somnus investors

Joe Cifulillo Hardwin Mead Schwartz Communications Dennis Sheehan



and all parties and entities affiliated with any group listed above.




125 CAMBRIDGEPARK DRIVE - 1ST FLOOR - CAMBRIDGE, MA 02140
617-441-8600 - FAX 617-441-0855