# IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS
### BOSTON DIVISION

| | |
|---|---|
| Musket Research Associates, Inc., <br><br> Plaintiff, <br><br> v. <br><br> Ovion, Inc., <br> William S. Tremulis, and <br> Jeffrey P. Callister, <br><br> Defendants. <br> ――――――――――――― <br> Ovion, Inc., <br><br> Counterclaimant, <br><br> v. <br><br> Musket Research Associates, Inc., <br> David B. Musket, and <br> Sue Ann Latterman, <br><br> Counterdefendants. | Case No. 05-10416 MEL |

## DEFENDANTS' MEMORANDUM IN
## SUPPORT OF MOTION FOR SUMMARY JUDGMENT

**TABLE OF CONTENTS**

I.   INTRODUCTION ......................................................................................................1

II.  STATEMENT OF FACTS ........................................................................................2

     A.  The Parties .......................................................................................................2

     B.  Pursuant To A Written Engagement Letter, Ovion Retained MRA As A
         "Nonexclusive Finder/Advisor"........................................................................3

         1.  MRA Agreed To Provide Services, Which MRA Now Describes As Its
             "Work Product" ........................................................................................3

         2.  MRA Agreed That Its Compensation, If Any, Would Be Contingent............................ 4

         3.  Ovion Was Entitled To Use MRA's Services (Or Work Product) In
             Connection With A Corporate Transaction .................................................5

         4.  The Notice Provision Of The Engagement Letter Is Narrowly Drawn .......................5

         5.  Ovion Had No Obligation To Consummate A Transaction With Any Party
             Solicited By MRA......................................................................................6

     C.  Neither Contingency Contemplated In The Engagement Letter Was Realized ................6

     D.  Pursuant To The Parties' Written Agreement, MRA Is Not Entitled To Any
         Compensation ...................................................................................................7

     E.  MRA Has Sued For Compensation To Which It Is Not Entitled ...............................7

III. SUMMARY JUDGMENT SHOULD BE ENTERED AGAINST EACH OF
     MRA'S CLAIMS .....................................................................................................8

     A.  The Court Should Enter Summary Judgment Against Claims That Are Legally
         Or Factually Insufficient ..................................................................................8

     B.  No Reasonable Jury Could Find For MRA On The Factual Bases For Its Claims ............9

     C.  Each Of MRA's Claims Is Legally Flawed .......................................................11

         1.  Breach Of Contract .................................................................................11

         2.  Breach Of Covenant Of Good Faith And Fair Dealing ...............................13

         3.  Promissory Estoppel ...............................................................................13

         4.  Quantum Meruit......................................................................................14

         5.  Conversion ..............................................................................................15

         6.  Fraud, Negligent Misrepresentation, And Concealment...............................16

         7.  Violation Of Mass. Gen. L. Ch. 93A .......................................................16

IV. CONCLUSION .......................................................................................................17

# TABLE OF AUTHORITIES

*AccuSoft Corp. v. Palo,*
   237 F.3d 31 (1st Cir. 2001)..........................................................................10, 13

*Alexander v. Berman,*
   560 N.E.2d 1295 (Mass. 1990).....................................................................10, 12

*Anderson v. Liberty Lobby, Inc.,*
   477 U.S. 242 (1986) ....................................................................................8, 9, 11

*Bay Colony Marketing Co. v. Fruit Stand, Inc.,*
   672 N.E.2d 987 (Mass. App. Ct. 1996) ..............................................................12

*Boswell v. Zephyr Lines, Inc.,*
   606 N.E.2d 1336 (Mass. 1993).............................................................................14

*CCC Corporate Services, Inc. v. Snell & Wilmer, L.L.P.,*
   No. 03-4045, 2004 U.S. App. LEXIS 10479 (10th Cir. May 27, 2004)
   (unpublished) .......................................................................................................11

*Celotex Corp. v. Catrett,*
   477 U.S. 317 (1986) ........................................................................................8, 11

*Cheswell, Inc. v. Premier Homes and Land Corp.,*
   319 F. Supp. 2d 135 (D. Mass. 2004).................................................................16

*Chokel v. Genzyme Corp.,*
   17 Mass. L. Rep. 83, 2003 Mass. Super. LEXIS 417 (Mass. Super. Ct.
   2003)....................................................................................................................13

*Cox v. Thornton Associates, Inc.,*
   8 Mass. L. Rep. 715, 1998 Mass. Super. LEXIS 425 (Mass. Super. Ct.
   1998)....................................................................................................................14

*Dimaio Family Pizza & Luncheonette, Inc. v. Charter Oak Fire Ins. Co.,*
   349 F. Supp. 2d 128 (D. Mass. 2004).................................................................13

*Harvard Apparatus, Inc. v. Cohen,*
   130 F. Supp. 2d 161 (D. Mass. 2001).................................................................15

*Jayson Assocs. v. UPS Co.,*
   NO. 04-10771-RWZ, 2004 U.S. Dist. LEXIS 13191 (D. Mass. July 15,
   2004)....................................................................................................................15

*Lattuca v. Cusolito,*
   180 N.E.2d 658 (Mass. 1962).............................................................................15

*Learning Express, Inc. v. Ray-Matt Enters.*,
    74 F. Supp. 2d 79 (D. Mass. 1999) .................................................................................... 16

*Levings v. Forbes & Wallace, Inc.*,
    396 N.E.2d 149 (Mass. App. Ct. 1979) ............................................................................. 16

*Madan v. Royal Indem. Co.*,
    532 N.E.2d 1214 (Mass. App. Ct. 1999) ........................................................................... 16

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
    475 U.S. 574 (1986) ............................................................................................................ 8

*Morris v. Brandeis University*,
    13 Mass. L. Rep. 627, 2001 Mass. Super. LEXIS 518 (Mass. Super. Ct.
    2001) ................................................................................................................................. 10

*North East Technical Sales, Inc. v. Barshad*,
    12 Mass. L. Rep. 97, 2000 Mass. Super. LEXIS 397 (Mass. Super. Ct.
    2000) ................................................................................................................................. 13

*Okmyansky v. Herbalife Int'l of Am., Inc.*,
    415 F.3d 154 (1st Cir. 2005) ............................................................................................. 14

*Ollie's Bargain Outlet v. New Eng. Bus. Exch., Inc.*,
    1:03-CV-1819, 2005 U.S. Dist. LEXIS 31591 (D. Pa. Nov. 28, 2005) .............................. 13

*Petricca v. Simpson*,
    862 F. Supp. 13 (D. Mass. 1994) ...................................................................................... 16

*Rhode Island Hosp. Trust Nat'l Bank v. Varadian*,
    647 N.E.2d 1174 (1995) .................................................................................................... 14

*Shank v. William R. Hague, Inc.*,
    192 F.3d 675 (7th Cir. 1999) ............................................................................................ 10

*Smilow v. Southwestern Bell Mobile Sys.*,
    323 F.3d 32 (1st Cir. 2003) .............................................................................................. 15

*Stavaridis v. Dynamic Machine Works, Inc.*,
    2 Mass. L. Rep. 446, 1994 Mass. Super. LEXIS 738 (Mass. Super. Ct.
    1994) ............................................................................................................................ 13, 15

*Steiner v. Unitrode Corp.*,
    834 F. Supp. 40 (D. Mass. 1993) ...................................................................................... 16

*Union v. R. Gordon & Co.*,
    86-35783, 1995 Mass. Super. LEXIS 770 (Mass. Super. Ct. Apr. 28, 1995) .................... 15

*Zarum v. Brass Mill Materials Corp.*,
    134 N.E.2d 141 (Mass. 1956) ........................................................................................... 14

## DEFENDANTS' MEMORANDUM IN
## SUPPORT OF MOTION FOR SUMMARY JUDGMENT

Defendants submit this memorandum in support of *Defendants' Motion For Summary Judgment*, which is submitted herewith. Defendants also submit herewith *Defendants' Statement Of Material Facts As To Which There Is No Genuine Dispute, Pursuant to L.R. 56.1* (hereinafter "State. Facts"). Exhibits A-G are attached to *Defendants' Statement Of Material Facts.* Exhibit G is the affidavit of William S. Tremulis, one of the Defendants.


## I.    INTRODUCTION

In July, 2004, Defendant Ovion, Inc. ("Ovion") engaged Plaintiff Musket Research Associates, Inc. ("MRA") as a "nonexclusive finder/advisor" pursuant to a written engagement letter (the "Engagement Letter"). MRA agreed to provide certain services. MRA also agreed that its compensation, if any, would be contingent. Two specific contingencies were set forth in the agreement. One contingency required, among other things, a "Corporate Transaction," such as a merger and acquisition with a corporate partner, before the 180th day following the date of the Engagement Letter (*i.e.*, before January 17, 2005).

Neither contingency was realized. Ovion eventually merged with and was acquired by American Medical Systems, Inc. ("AMS"), but not until July 7, 2005, well after the 180th day. MRA did "find" AMS and was not involved in the transaction between Ovion and AMS.

The Engagement Letter did not limit in any way Ovion's right to pursue a "Corporate Transaction." In addition, the Engagement Letter did not limit whether or to what extent Ovion used MRA's services to pursue a Corporate Transaction. Moreover, the Engagement Letter did not impose any obligation on Ovion to apprise MRA of the status of its pursuit of a Corporate Transaction.

Now, even though a Corporate Transaction was one of only two contingencies contemplated in the Engagement Letter, MRA nevertheless alleges that Ovion and MRA had an oral agreement or understanding that Ovion (1) would not actively pursue a Corporate Transaction and (2) would not use MRA's services in pursuit of a Corporate Transaction. For example, MRA contends that, because MRA allegedly revised or updated some of Ovion's presentation materials, Ovion therefore could not use its own presentation materials to pursue a Corporate Transaction.

MRA's unfounded allegations are the basis of an amalgam of nine causes of action asserted by MRA against Ovion. MRA has no evidence to support its allegations, other than the self-serving, uncorroborated assertions of MRA's president and his only employee.

As a matter of law, no reasonably jury could find for MRA on the basis of such "evidence," particularly in view of the parties' written agreement. MRA is not entitled to have the Court rewrite the parties' contract to impose new obligations on Ovion or bestow new rights on MRA. The Engagement Letter, an express written contract, governs the parties' relationship. Any alleged oral agreements are barred by the Statute of Frauds, which expressly prohibits oral agreements for brokers or finders like MRA. Accordingly, for these reasons and other reasons set forth below, Ovion respectfully requests that the Court enter summary judgment against each cause of action asserted by MRA.

## II.    STATEMENT OF FACTS

### A.    The Parties

In this action, the Defendants are Ovion, Inc. ("Ovion"), William S. Tremulis ("Mr. Tremulis"), and Jeffrey P. Callister ("Mr. Callister"). (State. Facts, ¶ 1.) The Plaintiff is Musket Research Associates, Inc. ("MRA"). (*Id.*) Ovion has counterclaimed against MRA, David B. Musket ("Mr. Musket"), and Sue Ann Latterman ("Ms. Latterman"). (*Id.*)

In July, 2004, Ovion was a small company with a focus on minimally invasive alternatives to surgical sterilization. Ovion was founded by Mr. Tremulis and Mr. Callister. (State. Facts, ¶ 2.)

According to MRA, "MRA is a small firm that specializes in securing venture financing for start-up companies. [Mr.] Musket is its founder and president and his principal employee is [Ms.] Latterman." (*Id.*, ¶ 3.)

### B.    Pursuant To A Written Engagement Letter, Ovion Retained MRA As A "Nonexclusive Finder/Advisor"

In July, 2004, Ovion retained MRA "as a nonexclusive finder/advisor" on the terms set forth in a written agreement (the "Engagement Letter"). (Exhibit A.) As described more specifically below, MRA agreed to provide certain services and also agreed that its compensation, if any, would depend on the realization of certain contingencies set forth in the Engagement Letter. (*Id.*, §§ 2-3.)

### 1.    MRA Agreed To Provide Services, Which MRA Now Describes As Its "Work Product"

As set forth in the Engagement Letter, MRA agreed, as a "nonexclusive finder/advisor," to provide the following services:

> MRA shall (i) analyze the financial performance and projections of the Company and provide advice regarding the appropriate valuation range for the new equity capital; (ii) assist in the development of presentation materials for investor solicitations; (iii) contact qualified investors and, if acceptable to you or your representative, send the necessary documents ourselves or through your office . . . ; (iv) after appropriate screening, set up and accompany you to meetings with interested parties as often as scheduling allows; and (v) manage ongoing discussions and coordinate the closings with investors solicited, or caused to be solicited by MRA.

(Exhibit A, Engagement Letter, § 2(a).)

For purposes of this litigation, MRA now has adopted the term "work product" to describe the services it agreed to provide. For instance, MRA now alleges:

3

Over the course of a more than six month engagement with Ovion, MRA produced thousands of pages of budgets, forecasts, plans, due diligence materials, and presentation materials on Ovion's behalf. . . . MRA did not create this work product out of thin air. By necessity, it worked with materials provided by Ovion. . . . In each case, MRA made multiple revisions and additions to a working document. . . .

MRA conducted hundreds of telephone conversations with doctors, venture capitalists, and others in the course of preparing due diligence materials for Ovion and in the course of soliciting inventors on behalf of Ovion. In addition, MRA answered multiple different questions for venture capital investors in face to face meetings to promote Ovion. All these communications constitute MRA's work product.

(State. Facts, ¶ 8.) According to MRA, documents such as "budgets, forecasts, plans, due diligence materials, and presentation materials" are "working documents" that evolve over time. (*Id.* ¶ 9.) MRA apparently now contends that Ovion's materials became MRA's property once MRA "put its mark on" them by editing or updating them in some fashion. (*Id.*)

### 2. MRA Agreed That Its Compensation, If Any, Would Be Contingent

As set forth in the Engagement Letter, MRA agreed that its compensation, if any, would depend on the realization of certain contingencies. (Exhibit A, Engagement Letter, § 3.) More specifically, the Engagement Letter provided for two circumstances when MRA could become entitled to compensation:

(1) private placement of Ovion stock with "MRA Contacts" or "Ovion VC Contacts,"[1] or

(2) a "Corporate Transaction" (i.e., a merger, acquisition, or private placement of Ovion stock with a corporate partner) consummated "during the term of" and before "the 180th day following the date" of the Engagement Letter.

---

[1] "MRA Contacts" were "parties solicited or caused to be solicited by MRA" and "accepted [by Ovion], as evidenced solely by a countersignature thereto on Schedule A." (Exhibit A, Engagement Letter, § 3(a).) "Ovion VC Contacts" were listed on Schedule B. (*Id.*)

(*Id*, §§ 1, 3.)  If the first contingency were realized, MRA could receive "Finder's Fees" and possibly a "Success Fee."  (*Id.* §§ 3(a), 3(c).)[2]  The Engagement Letter expressly provided: "MRA shall receive no fees for any entity that is not either an MRA Contact or an Ovion VC Contact."  (Id., § 3(a).)  If the second contingency were realized, MRA could receive an "Advisory Fee" not to exceed $225,000 less any Finder's Fees.  (Id. § 3(d).)[3]

### 3.    Ovion Was Entitled To Use MRA's Services (Or Work Product) In Connection With A Corporate Transaction

As discussed above, a Corporate Transaction (such as a merger and acquisition) was one of two contingencies expressly contemplated by the parties as set forth in the Engagement Letter. Nothing in the Engagement Letter restricted or limited whether or to what extent Ovion could use MRA's services (or work product) for purposes of a Corporate Transaction.  (Exhibit A, Engagement Letter.)  For example, to the extent that MRA may have updated or revised some of Ovion's presentation materials, nothing restricted or limited Ovion's use of such materials.

### 4.    The Notice Provision Of The Engagement Letter Is Narrowly Drawn

As executed by the parties, the Engagement Letter included a provision regarding notice to MRA during the term of the Engagement Letter.  (Exhibit A, Engagement Letter, § 3(g).)

---

[2] More specifically, MRA could receive seven percent (7%) of the aggregate cash proceeds from the private placement of Ovion stock with "MRA Contacts."  (Exhibit A, Engagement Letter, § 3(a).)  MRA could receive two percent (2%) for U.S. Venture Partners and three percent (3%) for other "Ovion VC Contacts."  (*Id*)  In addition, if this first contingency were realized during the term of the Engagement Letter, MRA could receive a "'Success Fee' equal to $225,000 less any" Finder's Fees.  (*Id*, § 3(c).)

[3] More specifically, if a Corporate Transaction were consummated during the term of the Engagement Letter and within 90 days of the date of the Engagement Letter, MRA could receive an "'Advisory Fee' equal to $125,000 less any" Finder's Fees (Exhibit A, Engagement Letter, § 3(d).)  If a Corporate Transaction were consummated between the 90th and the 180th day following the date of the Engagement Letter, MRA could receive an "'Advisory Fee' equal to $225,000 less any fees payable to MRA pursuant to Section 3(a)."  (*Id*)  As of the 180th day

(continued . . .)

Specifically, Ovion was to give notice to MRA "if, during the term of the [Engagement Letter], [Ovion] engages any additional finders." (State. Facts, ¶ 16.) Ovion accepted no obligation to give notice to MRA regarding the status of Ovion's pursuit of a Corporate Transaction. (*Id.*, ¶¶ 15-17.) In any event, after Ovion signed a letter of intent with AMS, Ovion promptly informed MRA that Ovion had agreed to negotiate exclusively with a potential corporate partner. (*Id.*, ¶¶ 25-26 (Tremulis Aff., ¶¶ 11-12).)

### 5.    Ovion Had No Obligation To Consummate A Transaction With Any Party Solicited By MRA

As set forth in the Engagement Letter, Ovion had no obligation to consummate a transaction with any party solicited by MRA. Indeed, the Engagement Letter expressly provides:

> The potential investors contacted by MRA are subject to acceptance by OVION in its sole and absolute discretion, and OVION is under no obligation to sell any of its capital stock to such parties.

(Exhibit A, Engagement Letter, § 2(d).)

### C.    Neither Contingency Contemplated In The Engagement Letter Was Realized

As discussed above, MRA agreed that its compensation, if any, would depend on the realization of certain contingencies. Neither contingency contemplated in the Engagement Letter was realized. (State. Facts, ¶ 20.) With respect to the first contingency, no MRA Contact or Ovion VC Contact invested in Ovion, and none of Ovion's stock was placed with any of these entities. (*Id.*, ¶ 21.) With respect to the second contingency, Ovion did not consummate a Corporate Transaction either during the term of the Agreement or before the 180th day following

---

following the date of the Engagement Letter, MRA was no longer entitled to an Advisory Fee. (*Id.*)

the date of the Engagement Letter.[4]  (*Id.*, ¶ 22.)

**D.    Pursuant To The Parties' Written Agreement, MRA Is Not Entitled To Any Compensation**

Because neither contingency contemplated in the Engagement Letter was realized, MRA is not entitled to any compensation.  MRA purports to be an experienced broker and, on information and belief, frequently operates pursuant to a contingency agreement.  MRA should appreciate that, when it provides services for contingent compensation, it may receive no compensation if the pertinent contingencies are not realized.

**E.    MRA Has Sued For Compensation To Which It Is Not Entitled**

On March 7, 2005, MRA filed suit against Ovion.  (*See* Complaint (Docket No. 1).)  On March 16, 2005, MRA filed a First Amended Complaint.  (Exhibit B, First Am. Compl (Docket No. 11).)

As now described by MRA, "MRA alleges that Ovion has violated its agreement with MRA by, among other things:  (1) misleading MRA about its pursuit of corporate, as opposed to venture financing; and (2) using MRA's work product to solicit, and negotiate an agreement with AMS."  (Exhibit D, MRA Protect. Order Mem., at 4-5.)  According to MRA, these allegations are "the heart of MRA's claims in this case."  (*Id.* at 10.)

---

[4] The Engagement Letter is dated July 21, 2004.  (Exhibit A.)  The "180th day following the date" of the Engagement Letter would be January 17, 2005.  (State. Facts, ¶ 23.)  Ovion consummated a merger and acquisition by American Medical Systems, Inc. ("AMS") on July 7, 2005, which well after the "180th day."  (*Id.*, ¶ 24.)  With respect to the merger and acquisition, the MRA Parties admit that they, individually and collectively, did <u>not</u> do any of the following:

"contact or solicit AMS on behalf of Ovion, or cause AMS to be contacted or solicited on behalf of Ovion"

"communicate with AMS on behalf of Ovion"

"set up any meetings between AMS and Ovion"

"accompany Ovion or its representatives to any meeting with AMS or its representatives"

"manage any discussions between Ovion and AMS"

"coordinate the closing between Ovion and AMS"

(*Id.*, ¶ 28.)

In an attempt to state a viable claim, MRA has shoehorned these allegations into an amalgam of nine amorphous causes of action: (1) breach of contract; (2) breach of the covenant of good faith and fair dealing; (3) promissory estoppel; (4) quantum meruit; (5) conversion; (6) fraud; (7) negligent misrepresentation; (8) concealment; and (9) violation of Massachusetts General Law Ch. 93A. (Exhibit B, First Am. Compl. (Docket No. 11), ¶¶ 15-55.)

## III. SUMMARY JUDGMENT SHOULD BE ENTERED AGAINST EACH OF MRA'S CLAIMS

In this case, each of the causes of action asserted by MRA is insufficient, both legally and factually. The relationship between Ovion and MRA is governed by their written contract, *i.e.*, the Engagement Letter. In view of the express terms of that contract, MRA's claims cannot stand. Summary judgment should be entered against MRA on each of its claims.

### A. The Court Should Enter Summary Judgment Against Claims That Are Legally Or Factually Insufficient

Summary judgment "shall be rendered forthwith" where "there is no genuine issue as to any material fact" and "the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). "Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986).

"Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). To survive a motion for summary judgment, "there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). Indeed, "[o]ne of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims . . . ." *Celotex* at 323-24.

In ruling on a summary judgment motion, the court must decide "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson,* 477 U.S. at 251-52.

**B.    No Reasonable Jury Could Find For MRA On The Factual Bases For Its Claims**

As discussed above, Ovion retained MRA as a "nonexclusive finder/advisor" pursuant to the terms of the Engagement Letter. (Exhibit A.) Ovion accepted no obligation to apprise MRA as to whether or to what extent Ovion was engaged in negotiations with any prospective investor or business partner. (State. Facts, ¶¶ 15-17.) Moreover, Ovion had no obligation to consummate a transaction with any party solicited by MRA. (*Id.*, ¶ 19.) MRA agreed to provide certain services and agreed that its compensation, if any, would depend on the realization of either of two contingencies. (*Id.*, ¶¶ 5, 7, 10-11.) One of the two contingencies expressly set forth in the Engagement Letter was consummation of a "Corporate Transaction," such as a merger and acquisition, "during the term of" and before "the 180th day following the date" of the Engagement Letter. (*Id.*, ¶ 11.)

MRA now alleges that Ovion represented or agreed that Ovion would not (1) actively pursue a Corporate Transaction or (2) use MRA's work product in pursuit of a Corporate Transaction. (Exhibit D, MRA Protect. Order Mem., at 2, 4-5.) According to MRA, these allegations are the heart of each asserted cause of action. (*See* Exhibit B, First Am. Compl., ¶¶ 15-50; Exhibit D, MRA Protect. Order Mem., at 10 ("the heart of MRA's claims in this case").)

In view of the express terms of the Engagement Letter, no reasonable jury could find for MRA on these allegations at the heart of its case. A "Corporate Transaction" is one of two contingencies expressly contemplated in the Engagement Letter. (Exhibit A, § 3(d).) Accordingly, no reasonable jury could find that Ovion agreed or represented that it would not actively pursue such a transaction. Likewise, no reasonable jury could find that Ovion agreed or

9

represented that Ovion would not use MRA's services (or work product) in pursuit of such a transaction, or that Ovion agreed that it would be barred from using its own budgets, forecasts, business plans, and presentation materials simply because MRA may have updated or revised them.

If MRA wanted a restriction on the use of its services or work product, it could have negotiated for such a provision in the Engagement Letter. MRA did not, and it cannot now retroactively amend the contract to include such a provision. *See Alexander v. Berman*, 560 N.E. 2d 1295, 1297 (Mass. 1990) ("The broker is in a better position . . . to protect these expectations by including [such] a provision.") It is also improper for MRA to ask the Court to modify the agreement to include such provisions. *See AccuSoft Corp. v. Palo*, 237 F.3d 31, 41 (1st Cir. 2001) ("We have also made clear that we do not consider it our place to rewrite contracts entered into between sophisticated business entities.").

Nothing in the Engagement Letter supports MRA's allegations. Moreover, in response to Ovion's interrogatories, MRA has conceded that no documents or other written undertaking support its allegations. (State. Facts, ¶ 6.) Under such circumstances, self-serving, uncorroborated statements from Mr. Musket or Ms. Latterman are insufficient as a matter of law to establish MRA's unsupported allegations. *See, e.g., Morris v. Brandeis University*, 13 Mass. L. Rep. 627, 2001 Mass. Super. LEXIS 518 at *8-11 (Mass. Super. Ct. 2001) (summary judgment granted on breach of contract claim where plaintiff's self-serving affidavit, "standing alone, [was] unacceptable to defeat summary judgment"); *Shank v. William R. Hague, Inc.*, 192 F.3d 675, 682 (7th Cir. 1999) (Plaintiffs failed to show a genuine issue of material fact as to whether oral contracts existed where there was an absence of evidence in the record to support the assertions contained in one plaintiff's self-serving affidavit.); *CCC Corporate Services, Inc. v. Snell & Wilmer, L.L.P.*, No. 03-4045, 2004 U.S. App. LEXIS 10479, at *11-14 (10th Cir. May

27, 2004) (unpublished) (holding plaintiff failed to provide evidence of an oral assignment sufficient to overcome summary judgment where the only evidence presented was a self-serving statement that there was an oral agreement).

Accordingly, because MRA has not and cannot establish the factual allegations at the heart of its claims, summary judgment should be entered against each of MRA's causes of action. To survive a motion for summary judgment, "there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252. Indeed, "[o]ne of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims . . . ." *Celotex* at 323-24. Each of MRA's causes of action is unsupported by evidence from which a reasonable jury could find for MRA.

### C.    Each Of MRA's Claims Is Legally Flawed

As discussed above, MRA is unable to present evidence from which a reasonable jury could find in MRA's favor. In addition, even assuming, *arguendo*, that MRA's <u>factual</u> allegations were sufficient to survive summary judgment, nevertheless MRA cannot establish a viable cause of action because each of its claims is <u>legally</u> flawed, as discussed below.

#### 1.    Breach Of Contract

Even assuming, *arguendo*, that MRA's factual allegations were true, nothing that Ovion did or did not do was a breach of the parties' contract as set forth in the Engagement Letter. As discussed above, the Engagement Letter expressly contemplates two contingencies, one of which is a "Corporate Transaction." (Exhibit A, § 3.) Nothing in the Engagement Letter restricts whether or to what extent Ovion could use MRA's services (or work product) to pursue such a transaction. (State. Facts, ¶ 14.) Nothing in the Engagement Letter obligates Ovion to apprise MRA of the status of Ovion's pursuit of a Corporate Transaction. (State. Facts, ¶¶ 15-17.) Moreover, for a "Corporate Transaction" MRA was entitled to compensation (*i.e.*, an Advisory

11

Fee) only in the event that Ovion consummated the transaction before the 180th day following the date of the Engagement Letter, among other things. (*Id*, § 3(d).) Ovion's merger and acquisition with AMS was consummated on July 7, 2005, well after the 180th day (i.e., January 17, 2005) following the date of the Engagement Letter. (State. Facts ¶ 24.) Accordingly, MRA is not entitled to any compensation as a "nonexclusive finder/advisor" pursuant to the written Engagement Letter.

MRA also alleges that Ovion entered certain oral agreements regarding MRA's services as a nonexclusive finder/advisor. (State. Facts, ¶ 6.) By statute, any such agreement is void and unenforceable by operation of law:

> Any agreement to pay compensation for service as a broker or finder or for service rendered in negotiating a loan or in negotiating the purchase, sale or exchange of a business, its good will, inventory, fixtures, or an interest therein, including a majority of voting interest in a corporation, shall be void and unenforceable unless such agreement is in writing, signed by the party to be charged therewith, or by some other person authorized. For the purpose of this section, the term "negotiating" shall include identifying prospective parties, providing information concerning prospective parties, procuring an introduction to a party to the transaction or assisting in the negotiation or consummation of the transaction.

MASS. GEN'L. LAWS ch. 259, § 7 (2005) (Statute of Frauds). The Statute of Frauds was designed "to discourage claims for commissions based on conversation which persons heard differently or remembered differently." *Alexander* 560 N.E.2d at 1298.

MRA has not and cannot present evidence of a writing for the alleged oral agreements. (State. Facts, ¶ 6.) Therefore, pursuant to the Statute of Frauds, no contract exists with respect to these alleged agreements, and MRA's claim for breach of contract must fail with respect to any such alleged agreements. *See Bay Colony Marketing Co v Fruit Stand, Inc*, 672 N.E.2d 987, 988 (Mass. App. Ct. 1996) (holding that directed verdict should be entered for defendant because recovery based on an oral agreement was barred by Ch. 259, § 7); *North East Technical Sales, Inc v. Barshad*, 12 Mass. L. Rep. 97, 2000 Mass. Super. LEXIS 397 at *4-6 (Mass. Super. Ct.

2000) (granting motion to dismiss breach of contract claim where plaintiff presented no evidence of a written and signed contract); *Stavaridis v. Dynamic Machine Works, Inc.*, 2 Mass. L. Rep. 446, 1994 Mass. Super. LEXIS 738 at *13-15 (Mass. Super. Ct. 1994) (granting summary judgment on plaintiff's breach of contract claim because there was no written agreement as required under Ch. 259, § 7).

### 2.    Breach Of Covenant Of Good Faith And Fair Dealing

As a matter of law, "without a breach of the contract, there can be no claim for a breach of an implied covenant of good faith and fair dealing." *Chokel v. Genzyme Corp*, 17 Mass. L. Rep. 83, 2003 Mass. Super. LEXIS 417 at *9 (Mass. Super. Ct. 2003) (citing *AccuSoft Corp. v. Palo*, 237 F.3d 31 (1st Cir. 2001)); *see also Ollie's Bargain Outlet v. New Eng. Bus. Exch., Inc*, 1:03-CV-1819, 2005 U.S. Dist. LEXIS 31591 at *5 (D. Pa. Nov. 28, 2005) ("there can be no claim for a breach of an implied covenant of good faith and fair dealing without a breach of contract"); *Dimaio Family Pizza & Luncheonette, Inc v. Charter Oak Fire Ins. Co*, 349 F. Supp. 2d 128, 134 n.6 (D. Mass. 2004). Accordingly, because MRA has not and cannot establish a breach of contract, MRA's cause of action for breach of the covenant of good faith and fair dealing must fail.

Moreover, "[t]he requirement of good-faith performance, under the implied covenant of good faith and fair dealing, ultimately is circumscribed by the obligations actually contained in the agreement. . . . New or independent rights or duties separate from those already in a contract cannot be added by a judge in the cloak of the implied covenant of good faith and fair dealing." *Chokel*, 2003 Mass. Super. LEXIS, at *9-11.

### 3.    Promissory Estoppel

Where parties have executed a written contract, quasi-contractual claims such as promissory estoppel must fail as a matter of law. *Okmyansky v. Herbalife Int'l of Am., Inc*, 415

F.3d 154, 162 (1st Cir. 2005) ("The plaintiff concedes the existence of a valid express contract between the parties -- and the existence of such a contract bars the application of the equitable doctrines that he belatedly invokes."); *Rhode Island Hosp. Trust Nat'l Bank v. Varadian*, 647 N.E.2d 1174 (1995) (An oral statement made in the face of a written contract was not a "promise" or "commitment" for promissory estoppel purposes because the existence of a written contract demonstrated the parties' intention that it would govern their intricate transaction.).

Here, MRA acknowledges, as it must, that the Engagement Letter executed on July 29, 2004, is an agreement between Ovion and MRA. (State. Facts., ¶ 4.) The Engagement Letter governs the relationship between Ovion and MRA. (Exhibit A.) It describes the services that MRA agreed to provide as well as the circumstances under which MRA could receive contingent compensation. (*Id*, §§ 2-3.) Accordingly, because the relationship between Ovion and MRA is governed by a written contract, MRA's claim for promissory estoppel fails as a matter of law.

In addition, MRA's claim for promissory estoppel is barred by the Statute of Frauds. *Cox v. Thornton Associates, Inc.*, 8 Mass. L. Rep. 715, 1998 Mass. Super. LEXIS 425 at *7 (Mass. Super. Ct. 1998) (Pursuant to ch. 259, § 7, "promissory estoppel offers no relief" where attempted recovery is based on an oral contract.)

### 4.   Quantum Meruit

Like promissory estoppel, MRA's cause of action for quantum meruit, which is an equitable quasi-contractual claim, must fail as a matter of law because the relationship between Ovion and MRA is governed by a written contract. *Okmyansky*, 415 F.3d at 162; *see also Boswell v. Zephyr Lines, Inc.*, 606 N.E.2d 1336, 1342 (Mass. 1993) ("Recovery in quantum meruit presupposes that no valid contract covers the subject matter of a dispute. Where such a contract exists, the law need not create a quantum meruit right to receive compensation for services rendered."); *Zarum v. Brass Mill Materials Corp.*, 134 N.E.2d 141, 143 (Mass. 1956)

(holding that "the law will not imply a contract where there is an existing express contract covering the same subject matter"). "Where there is an agreement which provides for compensation in the form of a commission . . . , a broker is not entitled to recover for the fair value of his services." *Union v. R. Gordon & Co.*, 86-35783, 1995 Mass. Super. LEXIS 770 at *8 (Mass. Super. Ct. Apr. 28, 1995) (citing *Lattuca v. Cusolito*, 180 N.E.2d 658 (Mass. 1962); *see also Smilow v. Southwestern Bell Mobile Sys.*, 323 F.3d 32, 39 (1st Cir. 2003) ("Where . . . there is an enforceable express or implied in fact contract that regulates the relations of the parties or that part of their relations about which issues have arisen, there is no room for quasi contract.").

In addition, MRA's claim for quantum meruit is barred by the Statute of Frauds. *Stavaridis*, 1994 Mass. Super. LEXIS 738 at *14-15 ("Since a claim for quantum meruit is a claim on a contract implied in law, the plain and ordinary language of the statute bars claims for quantum meruit.").

### 5.    Conversion

MRA's cause of action for "conversion" of its "work product" also must fail as a matter of law. MRA is now using the term "work product" to describe the services that it agreed to provide in the Engagement Letter. (State. Facts, ¶¶ 8-9.) Regardless of the terminology, "a cause of action for conversion . . . does not apply to intangible items." *Jayson Assocs. v. UPS Co.*, No. 04-10771-RWZ, 2004 U.S. Dist. LEXIS 13191 at *4 (D. Mass. July 15, 2004); *see also Harvard Apparatus, Inc. v. Cohen*, 130 F. Supp. 2d 161, 164 (D. Mass. 2001) ("This court previously stated that it could not locate any authority to suggest that Massachusetts has expanded the common law tort of conversion beyond its traditional application to chattels.").

### 6.    Fraud, Negligent Misrepresentation, And Concealment

As set forth in the Engagement Letter, MRA was retained as a "nonexclusive finder/advisor." (Exhibit A.) MRA clearly was aware that Ovion could pursue a "Corporate Transaction" because that circumstance was one of two contingencies contemplated in the Engagement Letter. (*Id*, § 3(d).) Moreover, the Engagement Letter describes those things for which MRA should receive notice during the course of the engagement. (State. Facts, ¶¶ 15-17.) The status of Ovion's pursuit of a Corporate Transaction is not among the topics for which Ovion was required to give notice. (*Id*) In any event, Ovion promptly informed MRA when Ovion signed a letter of intent with AMS. (*Id.*, ¶¶ 25-26.) Accordingly, even assuming, *arguendo*, that MRA's factual allegations were true, MRA cannot establish the elements of fraud, negligent misrepresentation, or concealment because MRA's theories are legally flawed. *See e.g., Learning Express, Inc v Ray-Matt Enters.*, 74 F. Supp. 2d 79, 84-85 (D. Mass. 1999) ("False statements of opinion, of conditions to exist in the future, or of matters promissory in nature," do not qualify as representations of material fact.); *Petricca v. Simpson*, 862 F. Supp. 13, 16 (D. Mass. 1994); *Steiner v Unitrode Corp.*, 834 F. Supp. 40, 46 (D. Mass. 1993).

### 7.    Violation Of Mass. Gen. L. Ch. 93A

In order to violate Chapter 93A of the Massachusetts statutes, the alleged conduct must "attain a level of rascality that would raise an eyebrow of someone inured to the rough and tumble of the world of commerce." *Cheswell, Inc v. Premier Homes and Land Corp.*, 319 F. Supp. 2d 135, 142 (D. Mass. 2004) (quoting *Levings v. Forbes & Wallace, Inc.*, 396 N.E.2d 149, 153 (Mass. App. Ct. 1979). "[T]he mere breach of a contract, without more, does not amount to a c. 93A violation." *Madan v. Royal Indem Co*, 532 N.E.2d 1214, 1217 (Mass. App. Ct. 1999). Even assuming, *arguendo*, that MRA's allegations were true, MRA cannot establish a claim for a violation of Chapter 93A.

16

## IV.    CONCLUSION

For the reasons set forth herein, Defendants respectfully request entry of summary judgment against each of the counts asserted by Plaintiff in the First Amended Complaint.

Respectfully submitted,

Dated: January 27, 2006

By _Leland G. Hansen_

Leland G. Hansen
Christopher V. Carani
McANDREWS, HELD & MALLOY, LTD.
500 W. Madison Street, 34th Floor
Chicago, Illinois 60661
(312) 775-8000 (telephone)
(312) 775-8100 (facsimile)

Dale A. Malone (BBO #552376)
BANNER & WITCOFF, LTD.
28 State Street, 28th Floor
Boston, Massachusetts  02109
Telephone: (617) 720-9600
Facsimile:  (617) 720-9601

*Attorneys for Defendant and Counterclaimant Ovion, Inc. and Defendants William S. Tremulis and Jeffrey P. Callister.*

## Certificate of Service

I hereby certify that this document, filed through the ECF system, will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF), on January 27, 2006.

Date: January 27, 2006

By: _Christopher V. Carani_

Christopher V. Carani