UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| MUSKET RESEARCH ASSOCIATES, INC., ) <br> ) <br>     Plaintiff, ) <br> ) <br>     v. ) <br> ) <br> OVION, INC., WILLIAM S. TREMULIS, ) <br> and JEFFREY P. CALLISTER, ) <br> ) <br>     Defendants. ) <br> _____ ) <br> ) <br> OVION, INC., ) <br> ) <br>     Counterclaimant, ) <br> ) <br> v. ) <br> ) <br> MUSKET RESEARCH ASSOCIATES, INC., ) <br> DAVID B. MUSKET, and ) <br> SUE ANN LATTERMAN, ) <br> ) <br>     Counterdefendants. ) | **No. 05 10416 MEL** |

## PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION
## TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

### *Request for Oral Argument*

Pursuant to Local Rule 7.1(d), Plaintiff hereby requests an oral argument on Defendants'

Motion for Summary Judgment.

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................................... 1

STATEMENT OF FACTS .................................................................................................... 2

ARGUMENT .......................................................................................................................... 10

I.     OVION HAS FAILED TO MEET THE STANDARDS FOR SUMMARY
JUDGMENT ................................................................................................ 10

     A.    Ovion Is Not Entitled to Summary Judgment on MRA's Contract
Claim Because It Failed to Disclose That It Was Soliciting
American Medical Systems .................................................................. 10

     B.    Ovion Is Not Entitled to Summary Judgment Because It Breached
the Covenant of Good Faith and Fair Dealing and Deprived MRA
of the Fruits of Its Bargain ................................................................. 11

     C.    Ovion Is Not Entitled to Summary Judgment on MRA's Fraud,
Negligent Misrepresentation, and Concealment Causes of Action
Because It Fraudulently Induced MRA to Enter into the Contract.......... 13

     D.    Ovion Is Not Entitled to Summary Judgment on MRA's Statutory
Unfair Competition Claim under Mass. Gen. L. Ch. 93A, Which Is
Brought on the Basis of Ovion's Fraudulent and Deceitful Conduct ...... 15

     E.    MRA Has Sufficiently Pleaded the Remaining Causes of Action,
and Disputed Material Facts Preclude Summary Judgment on the
Remaining Causes of Action ............................................................... 16

          1.    MRA's Equitable Claims Are Not Barred Simply Because
a Contract Exists Between MRA and Ovion .............................. 16

               a.    MRA Can Maintain a Quantum Meruit Claim in
Addition to  the Breach of Contract Claim ...................... 17

               b.    MRA's Promissory Estoppel Claim Is Made as an
Alternative  to Its Breach of Contract Claim and
Therefore Survives Summary Judgment.......................... 17

          2.    MRA's Conversion Claim Is Based Not on Intangible
Services,  But Rather on Work Product That Has Been
Merged into Tangible Documents .............................................. 18

     F.    As Set Forth Above, MRA Has Demonstrated the Existence of
Genuine Issues of Material Facts........................................................... 19

CONCLUSION................................................................................................................. 20

# TABLE OF AUTHORITIES

**Page**

## CASES

*Anderson v. Liberty Lobby, Inc.,*
 477 U.S. 242 (1986) ................................................................................................10

*Anthony's Pier Four, Inc. v. HBC Associates,*
 411 Mass. 451 (1991) ..................................................................................11, 12, 15

*Berenson v. Nat'l Fin. Servs., LLC,*
 403 F.Supp.2d 133 (D.Mass. 2005) ......................................................................10, 19

*Boston Five Cents Savings Bank v. Secretary of the Dep't of HUD,*
 768 F.2d 5 (1st Cir. 1985) ......................................................................................2, 10

*Boswell v. Zephyr Lines, Inc.,*
 414 Mass. 241 (1993) ............................................................................................16

*Chokel v. Genzyme Corp.,*
 17 Mass. L. Rep. 83 (2003), 2003 Mass. Super. LEXIS 417, 8-11 ...............................12

*Commonwealth v. Rizzuto,*
 1980 WL 4637 (Mass.Super., May 9, 1980) ............................................................18

*Des Brisay v. Foss,*
 264 Mass. 102 (1928) ............................................................................................11

*Flesner v. Technical Communication Corp.,*
 410 Mass. 805 (1991) ............................................................................................12

*Guckenberger v. Boston Univ.,*
 974 F.Supp. 106 (D.Mass. 1997) ..........................................................................18

*Levings v. Forbes & Wallace, Inc.,*
 8 Mass.App.Ct. 498 (1979) ....................................................................................15

*Lord & Lady's Enterprises, Inc. v. John Paul Mitchell Systems,*
 46 Mass.App.Ct. 262 (1999) ..................................................................................18

*McEvoy Travel Bureau v. Norton Co.,*
 408 Mass. 704 (2004) ........................................................................................13, 14

*MediaCom Corp. v. Rates Tech., Inc.,*
 4 F.Supp.2d 17 (D.Mass. 1998) ..............................................................................10

# TABLE OF AUTHORITIES
### (continued)

**Page**

*Meng v. Trs. of Boston Univ.*,
    44 Mass.App.Ct. 650 (1998)...................................................................17

*Newfield House, Inc. v. Massachusetts Dep't of Public Welfare*,
    651 F.2d 32 (1st Cir. 1981)................................................................17

*Okerman v. VA Software Corp.*,
    16 Mass.L.Rptr. 513, 2003 WL 21960599 (Mass.Super. 2003)........................12

*Okmyansky v. Herbalife Int'l of America, Inc.*,
    415 F.3d 154 (1st Cir. 2005).............................................................16

*Palriwala v. Palriwala Corp.*,
    64 Mass.App.Ct. 663 (2005)........................................................16, 17

*Pino v. Yenof*,
    353 Mass. 775 (1968) ....................................................................11

*Speakman v. Allmerica Fin. Life Ins. & Annuity Co.*,
    367 F.Supp.2d 122 (D. Mass. 2005) ...............................................12, 15

*Wozniak & Padula, P.C. v. Gilmore, Rees, Carlson & Cataldo, P.C.*,
    2004 Mass.App.Div. 49, 2005 WL 851085 (Mass.App.Div., Apr 08, 2005)..............18

## STATUTES

Federal Rule of Civil Procedure 56(c) ............................................................10

Federal Rule of Civil Procedure 56(e) ............................................................10

## MISCELLANEOUS

*Comment d to Restatement of Contracts, Second*, § 131 ...............................................11

Plaintiff Musket Research Associates, Inc. ("MRA") submits this memorandum in opposition to Defendants Ovion, Inc., William S. Tremulis, and Jeffrey P. Callister's (collectively "Ovion") motion for summary judgment.

## INTRODUCTION

In June of 2004, after trying unsuccessfully for over a year to raise money on its own, Ovion approached MRA, a venture banking boutique, and requested MRA's assistance in raising capital for its medical device company. At that time, Ovion's principals specifically told MRA that Ovion intended to pursue venture-backed financing, rather than a corporate acquisition to grow their business. MRA relied on these representations, as well as Ovion's promise to identify all "parties being actively solicited directly by Ovion" in a Schedule B when it agreed to enter into an Engagement Letter (the "Contract") with Ovion.

Unbeknownst to MRA, and notwithstanding Ovion's representations to the contrary, Ovion was engaged both before and after the date of the Contract in secret discussions with several potential corporate partners; corporate partners that were never disclosed on Schedule B, although they were being actively solicited at the time of the Contract. While MRA was hard at work preparing materials to present Ovion in the best possible light to potential investors, Ovion, in a shameless maneuver to cut out any remuneration for MRA, was covertly taking these materials and using them to solicit potential corporate partners. One of these corporations, American Medical Systems, Inc. ("AMS"), eventually acquired Ovion. Once Ovion had a binding letter of intent with AMS, it turned around and terminated the Contract with MRA, taking the position that it owed MRA nothing.

In effect, Ovion hopes to convince this Court that under the terms of the Contract MRA had agreed to work for free. Nothing could be further from the truth. In fact, if the Court were to accept Ovion's argument, the Contract would fail for lack of consideration. Ovion's argument simply does not make sense. Instead, Ovion's failure to disclose its active solicitation of AMS constituted a breach of the express agreement with MRA, which required identification of "parties being actively solicited directly by Ovion." "An argument between parties about the

meaning of a contract is typically an argument about 'material facts'" and is for the jury to decide. *Boston Five Cents Sav. Bank v. Sec'y of the Dep't of HUD*, 768 F.2d 5, 8 (1st Cir. 1985).

Ovion also breached the implied covenant of good faith and fair dealing when, by its actions, it prevented MRA from reaping the fruits of the parties' agreement. Ovion used MRA's work product without MRA's knowledge or consent and engaged in secret negotiations in order to deprive MRA of the fees it would have been entitled to. This conduct also constitutes unfair and deceptive business practice within the meaning of Chapter 93A.

In addition, Ovion fraudulently induced MRA to enter into the contract with Ovion by repeatedly disavowing its desire and intent to enter into a merger. Ovion knew, because MRA specifically told it so, that MRA would not enter into a relationship with Ovion if Ovion was not interested in obtaining venture financing. Yet, in order to get MRA to provide substantial high-quality work product, which it could convert and use for its own purposes, Ovion made repeated misrepresentations and actively concealed from MRA its negotiations with potential corporate partners. These facts, which Ovion disputes, are for the jury to determine.

MRA has alleged facts to more than support its causes of action. As a result, MRA respectfully requests that Ovion's motion for summary judgment be denied.

## STATEMENT OF FACTS

### A.    *MRA Is More Than a Finder.*

MRA is a venture banking boutique that focuses on assisting emerging health care companies. Affidavit of David B. Musket ("Musket Aff.") ¶2. Its president is David B. Musket ("Musket") and its principal employee on the west coast is Dr. Sue Ann Latterman ("Latterman"). *Id.* ¶¶1, 3. MRA assists emerging companies to raise money in several ways beyond simply introducing companies to investors:

- MRA uses its extensive experience in the industry to present companies in the best possible light to potential investors. Musket Aff. ¶4.
- MRA takes a lead role in preparing extensive due diligence responses and analyses for interested investors. *Id.*

- MRA's solid reputation along with its extensive contacts and established relationships with investors helps it get audiences with key investors for its clients. *Id.*

- MRA is very experienced in negotiating the most favorable financing terms possible for its clients. *Id.*

**B.    MRA Must Choose Its Engagements Carefully.**

MRA only has the resources to take on a few engagements at a time, typically handling only two to four financings a year. Musket Aff. ¶5. For this reason, MRA seeks assurances from prospective clients that they are committed to using MRA's services to obtain venture financing. *Id.* MRA avoids entering into projects with clients that prefer to sell their company to a corporation. MRA's experience is that venture investors are reluctant to expend resources investigating an investment in a company whose management is looking to cash out rather than build the company. *Id.*

**C.    MRA Agreed to Enter into and Continue Its Engagement with Ovion Because
It Relied on Ovion's Representations That Ovion Was Not Pursuing a Corporate
Acquisition.**

Throughout the parties' pre-contract discussions, Ovion repeatedly told MRA that it wanted to pursue venture backed financing, and was not interested in a corporate acquisition. On several occasions prior to June 2004, Robert Hess ("Hess"), a director and major shareholder of Ovion, discussed his interest in having MRA assist Ovion in its attempt to secure financing. Musket Aff. ¶6. Hess introduced MRA to Ovion's other two board members, William S. Tremulis ("Tremulis"), and Jeffrey P. Callister ("Callister"). *Id.* In a series of meetings and conversations, Ovion and MRA discussed the role MRA would play in pursuing financing for Ovion.

On June 8, 2004, Dr. Latterman met with Tremulis, Callister, and Hess at the Ovion offices in San Mateo, California. Affidavit of Dr. Sue Ann Latterman ("Latterman Aff.") ¶9. This meeting lasted over four hours and included a thorough discussion of financing strategy. *Id.* Tremulis and Callister assured Dr. Latterman that they wanted to do a venture financing because

they wanted to grow the company themselves. *Id.* They told Dr. Latterman they thought it was too early in the process to take an investment from a corporate partner as they did not want to prematurely limit Ovion's acquisition potential. *Id.*

On June 11, Musket spoke with Hess regarding the June 8 meeting. Musket Aff. ¶8. Hess offered MRA a half-fee structure on the few venture firms that Ovion had already solicited, saying that Ovion wanted MRA's help in managing negotiations with all parties. *Id.* Hess told Musket that he felt corporate discussions were a waste of management time at this point and that venture-backed financing would be the best vehicle to finance the company. *Id.*

On June 16, Dr. Latterman, Tremulis, and Callister had a further meeting at the Ovion offices, in which Musket participated by telephone. Latterman Aff. ¶10; Musket Aff. ¶9. During the meeting, Musket asked Tremulis and Callister point blank whether they were interested in pursuing a corporate transaction. Latterman Aff. ¶10; Musket Aff. ¶9. Both denied they were looking to do a corporate deal. Latterman Aff. ¶10; Musket Aff. ¶9. Instead, they represented that they wanted to obtain venture financing so that they could stay in charge of the company and see it through clinical trials before ceding control to another company. Latterman Aff. ¶10; Musket Aff. ¶9. Musket told Callister and Tremulis that MRA had no interest in being used as a "stalking horse" for a corporate transaction and that they should either exhaust any such efforts or cease them before they hired MRA. Latterman Aff. ¶10; Musket Aff. ¶9.

In the same meeting, Callister and Tremulis told Musket and Dr. Latterman that they had established communications with a small number of potential corporate partners as a backup plan when they had been unable to attract venture financing, but that they wanted to use the funds from the contemplated financing to build up the business before any such discussion would likely become serious. Musket Aff. ¶9. MRA recommended that all such communications with corporate partners should cease during the period of the financing as this could work against the financing process if it became known that the company was actively trying to sell itself. *Id.* Callister said he would return "courtesy" calls so as not to damage the relationships he had established but it was clearly understood that Ovion would not actively solicit corporations

without notifying MRA. *Id.* Callister told MRA that a corporate transaction would only happen if "lighting struck." and a company approached them with a deal too good to refuse. *Id.*

MRA relied upon Tremulis and Callister's representations that they were not pursuing a corporate acquisition, and that Ovion's preferred financing method was a private placement of preferred stock, when it decided to enter into the Contract. Musket Aff. ¶9; Latterman Aff. ¶10.

After execution of the Contract, Ovion continued to assure MRA that it was not interested in pursuing a corporate acquisition path. For example, on August 3, 2004, Musket met with Callister, Tremulis and Dr. Keith Issacson, one of Ovion's principal medical/scientific advisors, and a salesperson from Storz, a medical device company. Musket Aff. ¶18. During this meeting Tremulis and Callister gave no indication that they were interested in seeking a corporate partner prior to completing the clinical trials under discussion. *Id.*

Throughout the remainder of the summer and fall of 2004, Ovion continued to assure MRA that it was not seeking a corporate partner. On November 11, 2004, Musket met with Ovion during a Scientific Advisory Board dinner in San Francisco during which he specifically inquired if there had been any corporate activity during the American Association of Gynecologic Laproscopists ("AAGL") meeting. Musket Aff. ¶19. Ovion's response provided no indication that anything other than general informational meetings had taken place or were being scheduled. *Id.* In fact, Tremulis and Callister specifically told Dr. Latterman that they were meeting with medical device companies Stortz and Olympus only to obtain equipment for Ovion's upcoming clinical trial and they were not considering Stortz or Olympus as a corporate partner, or seeking to raise money from any corporate partner. Latterman Aff. ¶14.

On November 18, 2004, Musket and Dr. Latterman participated in a telephone conference with Tremulis, Callister and Hess in which they discussed financing by means of private placement versus corporate partnership. Musket Aff. ¶20; Latterman Aff. ¶15. Tremulis and Callister again assured MRA that they wanted to do a private placement and were not in discussions with any corporate partner. Musket Aff. ¶20; Latterman Aff. ¶15.

On December 7, 2004, Dr. Latterman met with Tremulis and Callister and two venture

capitalists for USVP at the USVP offices. Musket participated by phone. Latterman Aff. ¶16.
At this meeting, USVP provided a detailed term sheet and expressed an interest in becoming the
lead investor in the Ovion financing. *Id.* Immediately after that meeting, Dr. Latterman,
Tremulis, Callister and Hess had a further telephone call in which they discussed USVP's offer.
Although Tremulis and Callister declined USVP's offer, they reiterated that they wanted to
pursue a venture financing and not a corporate deal and encouraged MRA to continue to pursue
other venture parties. *Id.*

     In MRA's meetings with Ovion in January and the beginning of February 2005, Ovion
and its principals continued to assure MRA that they were only interested in a venture-backed
deal. On January 18, 2005, Dr. Latterman spoke with Karen Boezi ("Boezi") of the venture firm
Thomas McNerney & Partners. Latterman Aff. ¶17. Boezi, who was pregnant, told Dr.
Latterman that she could do one more deal before going on maternity leave. *Id.* She specifically
inquired as to whether Ovion was serious about a venture-backed deal because she did not want
to waste her time otherwise. *Id.* Dr. Latterman told Tremulis and Callister about this
conversation and asked them to confirm that they were serious about doing a venture-based deal.
*Id.* Tremulis and Callister assured Dr. Latterman that this was the route they wanted to take and
that there was no corporate partner in the picture. *Id.* Based on these representations, Dr.
Latterman went back to Boezi and assured her she would not be wasting her time. *Id.*

     Ovion continued assuring MRA that it was committed to venture financing in
conversations in February 2005. For example on February 4, 2005, Dr. Latterman met with
Tremulis, Callister and Hess at Ovion's offices to discuss the possibility of doing a smaller round
of venture financing. Latterman Aff. ¶18. After this meeting, Tremulis and Callister reiterated
to Dr. Latterman that they were committed to doing a venture financing-based deal, even if it
meant doing a smaller initial round. *Id.*

**D.**    ***Ovion's Representations to MRA Were False and Fraudulent.***

     *[This section has been redacted and filed under seal pursuant to LR. 7.2].*

*[This section has been redacted and filed under seal pursuant to LR. 7.2].*

*[This section has been redacted and filed under seal pursuant to LR. 7.2].*

**E.    The Contract Required Ovion to Disclose to MRA the Corporate Parties It Was Actively Soliciting.**

On July 29, 2004, MRA entered into the Contract with Ovion to provide services as an advisor and finder. Under the express language of the Contract, Ovion had an obligation to identify "parties being actively solicited directly by Ovion" on a Schedule B to the Contract at the time of its execution. § 3(b). MRA understood that Section 3(b) required Ovion to disclose any corporate parties that it was actively soliciting on Schedule B. Musket Aff. ¶12.

MRA relied on this provision for a number of reasons. First, knowing whom Ovion had contacted and the status of those discussions was crucial to MRA, because MRA would not have begun its representation of Ovion, or may have terminated its representation of Ovion if an acceptable fee could not be negotiated, had MRA known that Ovion was actively pursuing a parallel corporate opportunity. Musket Aff. ¶¶7, 13. Ovion repeatedly disavowed any interest in being acquired by another company. *See generally* Section C, *supra*.

Second, knowing whom Ovion had already contacted was essential to MRA's performance under the Contract and beneficial to Ovion. MRA and Ovion needed to communicate openly and honestly with each other about potential opportunities, so that Ovion would be able to maximize the ultimate valuation for financing purposes by having multiple bidders in a competitive auction-like process. Latterman Aff. ¶11. Similarly, to the extent Ovion had found a potential merger partner, MRA could have used such a fact as leverage to obtain more favorable offers from potential venture capital investors. Musket Aff. ¶13.

**F.    MRA Relied on the Nondisclosures in Schedule B to Its Detriment.**

Schedule B consisted of parties that MRA either was not eligible to receive fees for or parties that MRA had pre-negotiated a partial fee for. Musket Aff. ¶11. MRA reasonably expected Ovion to negotiate fees for those parties it was actively soliciting. *Id.* ¶¶11-14. For instance, MRA negotiated a 2% fee for USVP and a 3% fee for Sprout Group, InterWest,

DeNovo, Versant, and Vertical Group. *See* Schedule B. Had Ovion disclosed that it was actively soliciting a corporate acquisition, MRA would not have continued with the engagement without first negotiating an appropriate fee for MRA's services and an appropriate role for MRA to play in a potential corporate transaction. *Id.* ¶13. In addition, MRA would not have agreed to keep Ovion's pursuit of a corporate partner secret from the venture funds that MRA was soliciting and negotiating with on behalf of Ovion. *Id.* Instead, because of Ovion's duplicity, MRA continued blindly with the engagement, to its detriment.

MRA provided Ovion with services that Ovion used without MRA's knowledge to solicit AMS and other corporate parties. This undermined MRA's ability to secure venture capital for Ovion. Musket Aff. ¶13. At the same time, it improved Ovion's ability to consummate a transaction with AMS, which it ultimately did.

*[This section has been redacted and filed under seal pursuant to LR 7.2].*

**G.    *MRA Did Not View the Advisory Fee As a Representation That Ovion Was Actively Soliciting Corporate Parties.***

MRA and Ovion added the Advisory Fee provision in Section 3(d) of the Contract to address Ovion's representation that a corporate transaction might take place if "lightning struck." Musket Aff. ¶16. MRA understood lightning could strike in the form of an unsolicited offer from a corporation because Ovion had previously established communications with a small number of potential corporate partners as a backup plan when they had not been able to attract venture financing on their own. *Id.* ¶9. MRA did not understand this provision to mean that Ovion had carte blanche to actively solicit corporations using MRA's work product, and that it was in the process of doing so. *Id.* ¶¶16-17. In fact, MRA expected that Ovion would want MRA to play a role in negotiating a corporate transaction if negotiations became serious. *Id.* ¶¶14-15. MRA's interpretation of the Contract is the only reasonable one. It makes no sense that MRA would have agreed to do the work for free.

**H.**  ***The Covenant of Good Faith and Fair Dealing Implicit in the Contract Prohibited Ovion from Using MRA's Services to Solicit Undisclosed Corporate Parties.***

MRA could receive commissions only if Ovion obtained financing from a party disclosed on a written schedule attached to the contract. § 3(a). The contract prohibited MRA from receiving commissions if Ovion obtained financing from an undisclosed party. Thus, it was essential to the bargain that Ovion would not use MRA's services to pursue a financing with an undisclosed party.

## ARGUMENT

**I.**    **OVION HAS FAILED TO MEET THE STANDARDS FOR SUMMARY JUDGMENT**

In order to obtain summary judgment, the movant must establish that (1) there is no genuine dispute of material facts and (2) the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). Summary judgment is warranted if, after reviewing the facts *in the light most favorable to the nonmoving party*, no genuine issues of material fact remain. *Berenson v. Nat'l Fin. Servs., LLC*, 403 F.Supp.2d 133, 143 (D.Mass. 2005), citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). A "genuine" issue of fact is one that a reasonable jury, on the record before the court, could resolve in favor of either party. *Berenson*, 403 F.Supp.2d at 143. In making its determination, the court must view all evidence *in the light most favorable to the nonmovant* and is to draw all *reasonable inferences in favor of that party*. *Id.*; *MediaCom Corp. v. Rates Tech., Inc.*, 4 F.Supp.2d 17, 33 (D.Mass. 1998). Ovion cannot establish that it is entitled to judgment as a matter of law if MRA has articulated a viable legal theory entitling MRA to relief should MRA prevail on the facts at trial. Fed. R. Civ. P. 56(e). Here, Ovion has failed to make either showing on any of the causes of action.

### A.    **Ovion Is Not Entitled to Summary Judgment on MRA's Contract Claim Because It Failed to Disclose That It Was Soliciting American Medical Systems.**

"An argument between parties about the meaning of a contract is typically an argument about 'material facts.'" *Boston Five Cents Sav. Bank v. Sec'y of the Dep't of HUD*, 768 F.2d 5, 8

(1st Cir. 1985). Here, the parties dispute the meaning of the Contract and their obligations thereunder.

Section 3(b) of the Contract expressly requires Ovion to provide MRA a complete listing of all "parties being actively solicited directly by Ovion" in a Schedule B to be attached to the contract no later than its signing. *See* Musket Aff. ¶11. Ovion did not list AMS on this Schedule B, notwithstanding the fact that Ovion was actively soliciting AMS when Ovion signed the Contract and throughout the course of the performance of the Contract. Ames Aff., Exh. A; Musket Aff. ¶12. Ovion denies that it was under any obligation to disclose that it was negotiating with AMS. To the extent that Ovion disputes the meaning of this express and unambiguous provision, it is a jury question. To the extent that Ovion disputes that it was actively soliciting AMS in this time frame, it is also a question for the jury.

Ovion also contends that it is entitled to judgment as a matter of law on MRA's breach of contract claim because it is barred by the statute of frauds. But this argument is a complete red herring. Amazingly, Ovion ignores a foundational fact: *a written agreement exists* between MRA and Ovion. It is hornbook law that a writing need not set forth every single term of an agreement in order to satisfy the statute of frauds. *See Comment d to Restatement of Contracts, Second*, § 131 ("[A]ny writing . . . may be sufficient, including a will, a notation on a check, a receipt, a pleading, or an informal letter."); *Pino v. Yenof*, 353 Mass. 775 (1968); *Des Brisay v. Foss*, 264 Mass. 102 (1928). Here, the Contract sets forth the essential terms of the parties' agreement, including the services that are to be provided by MRA. Because a written contract exists, and the parties dispute the meaning of its terms and the obligations thereunder, Ovion is not entitled to judgment as a matter of law.

### B. Ovion Is Not Entitled to Summary Judgment Because It Breached the Covenant of Good Faith and Fair Dealing and Deprived MRA of the Fruits of Its Bargain.

A covenant of good faith and fair dealing is implied in every contract, and the covenant provides that "neither party shall do anything that will have the effect of destroying or injuring the rights of the other party to receive the fruits of the contract." *Anthony's Pier Four, Inc. v.*

*HBC Associates,* 411 Mass. 451, 471-472 (1991) (breach of covenant where one party used a discretionary right under a contract as a pretext to extract price concessions).  Courts have "long recognized that claims of breach of the covenant of good faith and fair dealing are rarely appropriate for summary judgment" because the defendant's motivations or state of mind, at issue in these claims, is a factual inquiry. *Okerman v. VA Software Corp.*, 16 Mass.L.Rptr. 513, 2003 WL 21960599 *6 (Mass.Super. 2003), citing *Flesner v. Technical Communication Corp.*, 410 Mass. 805, 809 (1991) ("where motive, intent, or other state of mind questions are at issue, summary judgment is often inappropriate").

Contrary to Ovion's contention, the covenant of good faith and fair dealing can be breached absent a breach of the express terms of a contract.  *Speakman v. Allmerica Fin. Life Ins. & Annuity Co.*, 367 F.Supp.2d 122, 132 (D. Mass. 2005) ("A party may breach the covenant of good faith and fair dealing implicit in every contract without breaching any express term of that contract."); *Anthony's Pier Four, Inc. v. HBC Associates*, 411 Mass. 451 (1991) (upholding trial court's determination of breach of contract and breach of implied covenant of good faith and fair dealing).  As the court in *Speakman* reasoned, to hold otherwise would make the covenant a "mere redundancy" since the "essential inquiry is whether the challenged conduct conformed to the parties' reasonable understanding of performance obligations, as reflected in the overall spirit of the bargain, not whether the defendant abided by the letter of the contract in the course of performance." *Id.*[1]

Here, Ovion agreed to pay MRA fees in exchange for MRA's services.  Under the contract, MRA could receive fees only if Ovion obtained financing from a party disclosed on the Schedules to the Contract.  § 3(a).  Thus, it was essential to the bargain that Ovion not take any action to deny MRA fees by using MRA's services and work product to secretly negotiate a

---

[1] The proposition that there can be no breach of the implied covenant absent a breach of contract, advanced by the court in *Chokel v. Genzyme Corp.*, 17 Mass. L. Rep. 83 (2003), 2003 Mass. Super. LEXIS 417, *8-*11, appears to be an unreasoned and unnecessary extrapolation of the concept that the requirement of good faith performance under the implied covenant is ultimately circumscribed by the obligations contained in the agreement.  While the latter concept keeps the implied covenant from being used to "create rights and duties not contemplated by the provisions of the contract or the contractual relationship," *Speakman*, 367 F.Supp.2d at 132, it does not – and should not – be expanded to make breach of contract a categorical prerequisite to a breach of the implied covenant.

merger with an undisclosed party. MRA did not enter into the Contract believing that it was giving away – for free – its work product, which was the culmination of hundreds of hours of work, to Ovion to use in any way it wanted. The work product included presentations to potential investors, forecasts and forward-looking financials, spreadsheets, papers on history and background of the technology, interviews with various doctors, communications with various potential investors, and market analyses, among others. Latterman Aff. ¶12. MRA would not have permitted Ovion to share or disseminate MRA's work product with any party not listed on either Schedule A (MRA contacts) or Schedule B (Ovion contacts). *Id.*

MRA has submitted substantial evidence that demonstrates that Ovion breached the implied covenant by secretly soliciting AMS and other corporate parties using MRA's work product. Ames Aff., Exhs. C, H. Therefore, Ovion is not entitled to judgment as a matter of law on MRA's cause of action for breach of the implied covenant because a jury may find that Ovion acted in bad faith and by its wrongful conduct prevented MRA from reaping the fruits of its bargain.

C.    **Ovion Is Not Entitled to Summary Judgment on MRA's Fraud, Negligent Misrepresentation, and Concealment Causes of Action Because It Fraudulently Induced MRA to Enter into the Contract.**

"[P]arties to a contract, whether experienced in business or not, should deal with each other honestly, and . . . a party should not be permitted to engage in fraud to induce the contract." *McEvoy Travel Bureau v. Norton Co.*, 408 Mass. 704, 712-713 (2004). *McEvoy Travel Bureau* involved facts similar to those at issue here. The plaintiff, a travel agency, entered into an agreement to be the exclusive travel agent for the defendant company. *Id.* at 707-708. Notwithstanding their oral agreement that this was a long-term arrangement, the written agreement contemplated a one-year arrangement with a sixty-day termination option. *Id.* The defendant dismissed these terms as a mere technicality drafted by the legal department that were "inoperative" and "meaningless." *Id.* Relying on the oral representations, the plaintiff made a significant investment in its business by moving its office, hiring extra personnel, and purchasing computer and other equipment. *Id.* Even before the parties signed the written agreement,

however, the defendant company had contemplated finding alternative arrangements either in-house or with other agencies to meet its travel planning needs. *Id.* The court held that the defendants' misrepresentations prior to the signing of the contract were made in order to induce the plaintiff to sign, and such misrepresentations could be a basis for a common law fraud claim. *Id.* at 709. The court also found that the contract could reasonably be construed not to be the parties' complete understanding of their agreement.[2] *Id.* at 712. Ultimately, it is for a jury to decide factual disputes concerning a fraudulent inducement claim. *Id.* at 709-710.

Here, MRA has presented record evidence supporting its fraudulent inducement allegations that preclude summary judgment. Dr. Sue Ann Latterman and David Musket, MRA's principals, have submitted affidavits attesting that:

- MRA entered into the Contract based on Ovion's statements that it was committed to venture financing and did not intend to actively pursue a corporate partner. Musket Aff. ¶7.

- MRA entered into the Contract with the understanding that Ovion would disclose on Schedule B all parties that it was actively soliciting at the time of execution, including corporate parties. *Id.* ¶11.

- When Ovion failed to identify any corporation on Schedule B, MRA believed that it was not actively soliciting corporate parties. *Id.* ¶12.

- MRA would not have committed to pursuing venture funding on Ovion's behalf had it known that Ovion intended to secretly pursue corporate financing with parties not disclosed on Schedule B. *Id.* ¶¶7, 11-12.

- Ovion's secret pursuit of corporate financing injured MRA's ability to secure venture funding for Ovion. *Id.* ¶13.

In addition, MRA's counsel has submitted record evidence that shows Ovion's assurances to MRA were false when made:

---

[2] MRA notes that the Contract does *not* contain an "integration" clause stating that the contract contains all understandings among the parties and that any oral or other representations are superseded by the Contract.

*[Redacted and filed under seal pursuant to LR 7.2]*

Therefore, the Court should deny Ovion's motion for summary judgment, as disputed factual issues exist with regard to MRA's claims based on fraud and deceit.

### D.    Ovion Is Not Entitled to Summary Judgment on MRA's Statutory  Unfair Competition Claim under Mass. Gen. L. Ch. 93A, Which Is  Brought on the Basis of Ovion's Fraudulent and Deceitful Conduct.

Ovion's halfhearted attempt to seek summary judgment on MRA's statutory unfair competition claim ignores well-settled law. First, whether the alleged conduct is sufficiently egregious to constitute unfair business practices is a question of fact for the jury. *Levings v. Forbes & Wallace, Inc.*, 8 Mass.App.Ct. 498, 504 (1979) ("Whether a given practice runs afoul of these touchstones [of unfairness] must be determined from the circumstances of each case.") Second, MRA has competently alleged claims of fraud, negligent misrepresentation, concealment, and breach of the implied covenant of good faith and fair dealing against Ovion, as set forth above. These claims can be the basis of MRA's Chapter 93A claim, even if Ovion's breach of the Contract is deemed not to be a violation of Chapter 93A. *Id.*; *Speakman*, 367 F.Supp.2d 122, 141 (D. Mass. 2005) ("Allegations sounding in fraud and misrepresentation can form the basis for a claim of unfair and deceptive trade practices [under Chapter 93A]."); *Anthony's Pier Four, Inc. v. HBC Associates*, 411 Mass. 451, 474-476 (1991) (Chapter 93A claim based on conduct constituting breach of implied covenant of good faith and fair dealing).

The facts that form the basis of MRA's Chapter 93A claim include, without limitation, Ovion's repeated and continued representations disavowing its intent and desire to find a merger partner, Ovion's secret pursuit of AMS and other corporate partners, Ovion's use of MRA's work product to solicit corporate partners, and Ovion's conduct, as a whole, which effectively deprived MRA of the benefits of the bargain under the Contract. Therefore, Ovion is not entitled to judgment as a matter of law on MRA's Chapter 93A claim.

E.    **MRA Has Sufficiently Pleaded the Remaining Causes of Action, and
      Disputed Material Facts Preclude Summary Judgment on These Claims.**

1.    **MRA's Equitable Claims Are Not Barred Simply Because
      a Contract Exists Between MRA and Ovion.**

Ovion's argument that MRA cannot maintain its equitable claims of promissory estoppel
and quantum meruit because the relationship between MRA and Ovion is governed solely by a
written contract is contrary to law and based on misapplied holdings taken out of context without
analysis.

In *Palriwala v. Palriwala Corp.*, 64 Mass.App.Ct. 663 (2005), the court held recently that
a jury may award quantum meruit damages notwithstanding a finding that a valid contract had
not been breached. Ovion relies on *Okmyansky v. Herbalife Int'l of America, Inc.*, 415 F.3d 154
(1st Cir. 2005), a federal court decision citing Massachusetts law which predates *Perivale*, in
support of its argument to the contrary. *Okmyansky* involved equitable claims that were raised
by the plaintiff for the first time on appeal. Although the court stated, ***in dictum***, that the
existence of a valid express contract barred the application of the equitable doctrines, a review of
the underlying case law shows that the statement should not be taken at face value.

*Boswell v. Zephyr Lines, Inc.*, 414 Mass. 241 (1993), cited by the court in *Okmyansky*,
involved a claim by an attorney against a client whom he represented as counsel associated by
the client's primary counsel. Because the plaintiff attorney had a contractual relationship with
the client's primary counsel for compensation for services rendered, the court held that the
plaintiff attorney could not recover in quantum meruit against the client directly (whose
obligation was to pay his primary counsel, who would in turn pay the plaintiff). In this context,
the court stated, "Where such a contract exists, the law need not create a quantum meruit right to
receive compensation for services rendered." *Id.* at 250. Clearly, this statement of the law is
inapposite here, because the court is referring to a situation where a plaintiff may not recover in
quantum meruit against a defendant with whom plaintiff has no contractual relationship, because
plaintiff has a contractual right of recovery against a nonparty. Here, MRA's contract is with
Ovion, and MRA can seek equitable relief against Ovion even where a contract exists.

### a.    MRA Can Maintain a Quantum Meruit Claim in Addition to the Breach of Contract Claim.

Under the doctrine of quantum meruit, one who renders goods or services in the absence of an enforceable contract may be entitled to payment for those goods or services to the extent the recipient benefited from them. *See, e.g., Newfield House, Inc. v. Massachusetts Dep't of Public* Welfare, 651 F.2d 32, 38 (1st Cir. 1981); *Meng v. Trs. of Boston Univ.*, 44 Mass.App.Ct. 650, 653 n.4 (1998).  The fact that a contract exists does not preclude an award of damages under the doctrine of quantum meruit.  *Palriwala v. Palriwala Corp.*, 64 Mass.App.Ct. 663 (2005) (holding that a jury's finding of a valid contract, which had not been breached, and the jury's award of damages under the quantum meruit doctrine are not inconsistent).

In support of its quantum meruit claim, MRA has submitted substantial evidence that it prepared and provided certain material and services to Ovion to assist Ovion market itself to potential investors, at the express request of Ovion.  Latterman Aff. 12.  Ovion used these materials to solicit and enter into the merger and acquisition with AMS, without notifying MRA or obtaining MRA's consent.  Ames Aff., Exhs. D, G.  Ovion has undeniably benefited from the services and material that MRA provided.  Ovion has denied these allegations, and Ovion further denies that MRA is entitled to payment under the terms of the parties' contract.  Here, as in *Palriwala*, even if a jury were to find that Ovion has not breached the Contract, a jury may still find that MRA is entitled to quantum meruit damages.  Disputed factual issues remain, and Ovion is not entitled to judgment as a matter of law.

### b.    MRA's Promissory Estoppel Claim Is Made as an Alternative to Its Breach of Contract Claim and Therefore Survives Summary Judgment.

A claim of promissory estoppel is available to a plaintiff as an alternative to a breach of contract claim.  "Even in the absence of consideration to support a binding contractual agreement between the parties, a party reasonably relying on a promise may prevail under a theory of promissory estoppel. . . .  A claim in promissory estoppel is essentially a claim in breach of contract; however, the plaintiff must prove *reasonable reliance* on a promise, offer, or

commitment by the defendant rather than the existence of consideration." *Guckenberger v. Boston Univ.*, 974 F.Supp. 106, 150 (D.Mass. 1997) (emphasis in original). A promissory estoppel claim is commonly asserted as an alternative theory of recovery to a breach of contract claim. *See, e.g., Lord & Lady's Enterprises, Inc. v. John Paul Mitchell Systems*, 46 Mass.App.Ct. 262, 266 n.4 (1999).

In support of its promissory estoppel claim, MRA has submitted substantial evidence that Ovion made unambiguous promises relating to its intent not to actively pursue corporate opportunities and its intent to work with MRA in good faith, among other things. Musket Aff. ¶¶18-23; Latterman Aff. ¶¶14-18. MRA reasonably relied on these promises to its detriment. To the extent Ovion disputes these facts, a triable issue exists for the jury. And, as discussed above, that a contract exists between the parties does not preclude a promissory estoppel claim.

> **2.     MRA's Conversion Claim Is Based Not on Intangible Services, But Rather on Work Product That Has Been Merged into Tangible Documents.**

Conversion properly lies where the defendant has interfered with plaintiff's right to possession of property. Intangible property that has been merged in, or evidenced by, a document may be the proper subject matter of conversion. *See Wozniak & Padula, P.C. v. Gilmore, Rees, Carlson & Cataldo, P.C.*, 2004 Mass.App.Div. 49, 2005 WL 851085 (Mass.App.Div., Apr 08, 2005); *Commonwealth v. Rizzuto*, 1980 WL 4637 (Mass.Super., May 9, 1980). MRA's cause of action for conversion relates to the work product that MRA prepared and provided to Ovion. The work product included Ovion's presentation to potential investors, forecasts and forward-looking financials, spreadsheets, papers on history and background of the technology, interviews with various doctors, communications with various potential investors, and market analyses, among others. Latterman Aff. ¶ 12. Contrary to Ovion's assertion, MRA does not define "work product" to describe only the *services* it provided to Ovion; the product of MRA's services, including extensive research, were memorialized in *tangible written form*. Therefore, MRA has sufficiently identified the property that is the proper subject matter of a conversion claim.

F.    **As Set Forth Above, MRA Has Demonstrated the Existence of Genuine Issues of Material Facts.**

MRA has submitted numerous facts that a reasonable jury, on the record before the Court, could resolve in favor of either party. *Berenson*, 403 F.Supp.2d at 143. The following are some of the key material facts underlying MRA's claims in this action:

- Ovion made representations to MRA prior to and at the time the parties entered into the Contract that Ovion was not seeking a merger opportunity and that it preferred to find venture capital investors. Musket Aff. ¶9; Latterman Aff. ¶¶7-10.

- Ovion continued to make representations to MRA during the term of the Contract, and as late as February 2005 that Ovion was not seeking a merger opportunity and that it preferred to find venture capital investors. Latterman Aff. ¶¶14-18.

- MRA would not have entered into the Contract had MRA known that Ovion was not in fact interested in finding venture capital money but, instead, wanted to find a merger partner. Musket Aff. ¶7.

- MRA understood that the "Advisory Fee" provision in section 3(d) was a backup provision, in case "lightning struck," where MRA would assist Ovion in the unlikely and unexpected event that Ovion received an unsolicited merger offer that was too good to pass up. *id.* ¶16.

- Lightning did not strike. Instead, Ovion covertly solicited AMS, and hid its discussions from MRA, in order to purposefully deprive MRA of the fruits of its bargain. Ames Aff., Exhs. A-D, G.

- The Contract requires Ovion to identify and designate the parties that Ovion has contacted in an effort to find financing or corporate opportunity for Ovion. Contract § 3(a); Musket Aff. ¶¶11-12.

- Based on Ovion's representation, MRA entered into the Contract and spent hundreds of hours analyzing Ovion and its position in its business sector, preparing documents for Ovion for presentation to venture capitalists, contacting venture capitalists and in general measuring the venture community's interests in Ovion, among other things, in

accordance with its obligations under the Contract.  Latterman Aff. ¶¶11-12.

- Unbeknownst to MRA, Ovion was soliciting corporate partners before and during the term of the Contract and used MRA's work product to that end.  Ames Aff., Exhs. A-D, H.

- MRA never gave Ovion consent or permission to use the documents MRA prepared in connection with MRA's representation of Ovion in its own secret pursuit of a corporate merger with AMS.  Latterman Aff. ¶13.

Ovion strongly disputes most, if not all, of these and other material facts, which are relevant to all of MRA's causes of action.  Therefore, summary judgment is not warranted here, and Ovion's motion should be denied.

## CONCLUSION

Based on the above, MRA respectfully requests that this Court deny Ovion's motion for summary judgment.

Respectfully submitted,

MUSKET RESEARCH ASSOCIATES, INC.,
DAVID B. MUSKET and
SUE ANN LATTERMAN
By their attorneys,

___/s/ Brooks A. Ames_____
Brooks A. Ames (BBO #641192)
DLA PIPER RUDNICK GRAY CARY US LLP
One International Place, 21st Floor
100 Oliver Street
Boston, MA  02110-2613
(617) 406-6000 (telephone)
(617) 406-6100 (fax)

Arthur S. Beeman (admitted pro hac vice)
Pamela K. Fulmer (admitted pro hac vice)
DLA PIPER RUDNICK GRAY CARY US LLP
153 Townsend Street, Suite 800
San Francisco, CA  94107
(415) 836-2541 (telephone)
(415) 836-2501 (fax)

Dated:  February 9, 2006