UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| Musket Research Associates, Inc. | ) No. 05-CV-10416 MEL |
| Plaintiff, | ) |
| v. | ) |
| Ovion, Inc., William S. Tremulis, and Jeffrey P. Callister. | ) |
| Defendants. | ) |
| and Related Counterclaims | ) |

**AFFIDAVIT OF DAVID MUSKET IN SUPPORT OF MUSKET RESEARCH ASSOCIATES OPPOSITION TO MOTION FOR SUMMARY JUDGMENT**

I, David Musket, depose and state as follows:

1.  I am the President and Chief Executive Officer of Plaintiff and Counter-defendant Musket Research Associates ("MRA"), and am a Counter-defendant in this action. I have personal knowledge of the matters stated herein, and if called as a witness, could and would testify competently thereto.

2.  Following my graduation from Boston College (summa cum laude/Phi Beta Kappa) I spent four years in a doctoral program at Cornell University Medical College before being hired as a pharmaceutical industry analyst in the Equities Research Division of Goldman Sachs. I was promoted to Vice President soon thereafter with independent responsibility for half of the firm's drug stock coverage. In 1991 I moved my family to Boston and set up MRA as a venture banking boutique focused on assisting emerging healthcare companies. MRA is an NASD registered broker dealer and I am its

SF\3124204.1
358547- 1                                                1.

Securities Principal with supervisory responsibilities for all its banking activities. Since its inception in 1991 MRA has assisted roughly 40 client companies under contracts substantially the same as that for Ovion, Inc. ("Ovion"). Through MRA's banking activities I have served on several Boards of Directors of private companies including four periods of service that extended into the public markets. In two of these public companies I was one of the lead directors that worked on the subsequent acquisition of these companies, a role we have also served for several private companies. So, while MRA was primarily hired to handle a venture financing for Ovion there should be no doubt that MRA was qualified to provide valuable Advisory Services during the negotiation and closing of the transaction with American Medical Systems ("AMS"). Through its nearly 15 years of doing business MRA has never brought any legal action against a former client company nor has any action been brought against it.

3. MRA is a small firm with five full time employees, one of whom is Dr. Sue Ann Latterman, a Counterdefendant in this action. MRA's principal office is located in Cambridge, Massachusetts in close proximity to the rich source of healthcare technologies and financial institutions located in Massachusetts. Dr. Latterman is based in the San Francisco Bay Area and deals primarily with healthcare technologies and venture capitalists in that region.

4. MRA assists emerging companies in raising money in several ways. First, we are extremely knowledgeable about what the venture capital community looks for in a company when deciding whether or not to make an investment. This insight helps us

prepare appropriate due diligence materials to present the client company in a positive manner. Second, Dr. Latterman and I have extensive contacts and established relationships with investors and a solid reputation in this field that helps us get audiences and a fair hearing for our clients. Due to the competitive nature of venture financing, it is crucial that investors have confidence in the screening process of the investment banker reflecting their judgment about the strength of the company and thus the potential investment. MRA has an excellent reputation for working with successful companies. Third, once an investment group determines that they would like to more seriously research a potential investment, MRA generally takes a lead role in preparing, coordinating, and editing all such due diligence responses. This often involves detailed analyses of the competitive landscape, preparation of budgets and financial projections, review of patents, reimbursement outlook, conference calls with physicians and outside experts among other things. Finally, once a venture group presents a financing proposal or Term Sheet we are very experienced in negotiating the terms of such proposals, coordinating the full syndicate around the agreed upon terms, and reviewing the legal documents associated with closing the transaction. MRA's contracts, including that for Ovion, obligate MRA to rebate at least 25% (and often much more) of any pretax fees generated in the same investment vehicle for which it earned the fees. This co-investment puts a significant portion of MRA's profit at the same risk as management and the venture investors it solicits, distinguishing it from most of its peers. Except for the closing issues we performed all these services for Ovion during the term of our

engagement as evidenced by the over 20,000 pages of documents produced by us in discovery.

5. Given the time consuming nature of the financing process, especially for early stage healthcare companies, MRA only has the resources to take on a few engagements at a time and has typically only handled 2 to 4 financings per year. This is definitely not a business driven by inventory like real estate brokerage but is more akin to a long courtship culminating in a marriage proposal. Our long history and success in this sector has resulted in many more requests for our help than we could possibly handle in an efficient manner. For example, from the period in June 2004 until February 2005 when Ovion disclosed to us that they had signed a Letter of Intent to be acquired by AMS, Dr. Latterman, the investment professional with primary responsibility for Ovion's financing, was minimally involved in other financing projects. For this reason, we have been very careful to seek assurances from prospective clients that they are committed to using MRA's services to obtain venture financing if we take on their project. It is easy to understand why MRA would not be interested in working on any project where the client's preference is to sell their company to a corporation. In the short term, a corporate acquisition would generally present a higher current valuation than might be expected from the venture community. In addition, we would expect many venture investors to be reluctant to spend time and money researching such an investment if they knew management would prefer to cash out rather than build the company.

6. In June of 2004, Ovion was a start-up considering how to fund its human clinical trials. On several occasions prior to June 2004, Robert Hess ("Hess"), a director and one of the three major shareholders in Ovion, had contacted me to discuss the possibility of MRA assisting Ovion in its financing activities. Hess, who was an old friend and investment partner of mine, explained that Ovion had been working intermittently since the Spring of 2003 to raise money for its venture, but had not been successful. As a result, Hess had spoken to Ovion's two other Board members, William Tremulis ("Tremulis") and Jeffrey Callister ("Callister") about retaining MRA to help them raise the next round of their financing. I advised Hess that Sue Ann Latterman would take the lead on this project and that she would arrange a meeting with Ovion to assess the opportunity. Hess was familiar with Dr. Latterman's work on two other MRA projects in which he was involved and was happy to provide her the information.

7. When Hess, Tremulis, and Callister first approached MRA, and on multiple occasions thereafter, they specifically represented to both myself and Dr. Latterman that Ovion wanted to pursue venture backed financing, rather than a corporate acquisition to grow their business. During our pre-contract discussions we were told specifically by Tremulis and Callister that they recognized that the value of their company would rise dramatically following the successful completion of the clinical trials that were to be the principal use of proceeds for the contemplated financing. They did not want to be acquired by another corporation, because they wanted to remain in control of the company. In fact, Callister and Tremulis both represented that Ovion was not pursuing a

corporate deal, and that the only way they would enter into such a deal is if "lightning struck" and they were approached by a company and made an offer that they just couldn't refuse. Had we known that Ovion intended to actively pursue a corporate transaction on a parallel track during the contract period, we would never have entered into the agreement.

8. On June 11, 2004 I had a call with Hess to compare notes following a four hour review at Ovion between Hess, Callister and Tremulis with Dr. Latterman on June 8. Hess said that Ovion was very interested in having MRA manage the financing effort so that they could run the company during this critical period. He offered MRA a half fee structure on the few venture groups that management had already contacted saying that they wanted our help in managing the negotiations with all parties. We discussed several other issues. There was no mention of any active effort to sell the company. In fact, Hess said he felt that any corporate discussions were a waste of management time at this point and that the financing would be the best vehicle to finance the company.

9. On or about June 16, 2004 Dr. Latterman met with Tremulis and Callister in Ovion's offices. I was on the telephone. During these conversations I specifically asked the Ovion founders if they were committed to a venture financing and the long term path required to build the company or whether they would prefer the quick exit via a corporate acquisition. As part of this conversation we discussed lifestyle issues, valuation considerations, ownership dilution, potential management changes and other related topics. Both Callister and Tremulis affirmed that they were committed to the financing

path. I made it clear that that MRA had no interest in being used as a "stalking horse" for a corporate transaction and that they should either exhaust any such efforts or cease them before they hired MRA., Tremulis and Callister both denied that they were seriously pursuing a corporate acquisition. Instead, they represented to us that they wanted to obtain venture financing so that they could keep control of the company, and see Ovion through clinical trials before ceding control to another corporation. Tremulis and Callister told us that Ovion had established communications with a small number of potential corporate partners as a backup plan when they had been unable to attract venture financing but that they wanted to use the funds from the contemplated venture financing to build up the business before any such discussions would likely become serious. We recommended that all such communications with corporate partners should cease during the period of the financing as this could work against the financing process if it became known that the company was actively trying to sell itself. (In fact, we learned later that at least one investor we had called on dropped out when they were informed that an acquisition might be under discussion.) Callister said he would return "courtesy" calls so as not to damage the relationships he had established but it was my clear understanding that there would be no active solicitation of corporate investors without notification to MRA. During this meeting Callister said that a corporate acquisition would only happen if "lightning struck," and a company approached them with a deal too good to be refused. MRA relied upon Tremulis and Callister's representations that they were not pursuing a corporate acquisition, and that Ovion's preferred financing method was a private placement of preferred stock, when it decided to enter into the agreement.

10. On July 29, 2004 MRA and Ovion executed an agreement (the "Engagement Letter"), whereby MRA agreed to assist Ovion in raising its next round of financing. The formal agreement was the culmination of almost a month and a half of discussions.

11. The Engagement Letter contained several provisions that would protect MRA in the event that Ovion chose to solicit a corporate party:

- The Engagement Letter required Ovion to disclose on a written schedule the names of all the parties it was actively soliciting at the time it executed the agreement Since MRA would either be ineligible to receive fees on investments from these groups or would have pre-negotiated partial fees on such investments this list is a crucial determinant in MRA's decision to enter into such an agreement. There was no exception made for corporate entities. See Section 3(b) (requiring Ovion to provide a complete listing of "parties being actively solicited directly by Ovion . . . as soon as possible but not later than signing of [agreement]").

- The Engagement Letter contemplated that Ovion would negotiate MRA's fees for the parties identified on this written schedule in good faith. See Section 3(b) ("At Ovion's sole discretion, it may authorize a switch of an investor listed on Schedule B to Schedule A, carrying with it the obligation to pay the fees outlined in Section 3(a) **or a mutually agreeable amount**

**to be specifically listed on Schedule A and B."**) (emphasis added). Ovion confirmed that it shared this understanding of the agreement by negotiating MRA's fees for every party that Ovion listed on this schedule. See Schedule B (listing negotiated fees for US Venture Parties, De Novo, Interwest, Sprout, Versant, and Vertical Group).

- The Engagement Letter required Ovion to update this schedule if Ovion began actively soliciting additional parties during the term of the engagement. Again, no exception was made for corporate entities.

- The Engagement Letter permitted MRA to terminate the engagement on 10 days notice if MRA could not reach an agreement on fees with Ovion for any party listed on the written schedule. See Section 7 ("This engagement may be terminated by Ovion or MRA at any time without cause, upon 10 days written notice to that effect by the other party.").

- The Engagement Letter required Ovion to pay MRA an Advisory Fee if the negotiated fees payable to MRA for a particular corporate transaction did not equal a minimum amount. See Section 3(d) (requiring Ovion to pay MRA an Advisory Fee if the "aggregate fees payable to MRA pursuant to Section 3(a) are less than" a certain amount). For instance, if Ovion consummated a corporate transaction within three months of executing the agreement, MRA would be guaranteed a total fee of no less than $125,000.

> If Ovion consummated a corporate transaction within six months, MRA would be guaranteed a total fee of no less than $225,000.

- The Engagement Letter required Ovion to pay MRA whatever commission it had negotiated for a corporate party even after the Advisory Fee expired. See Section 3(b) (requiring Ovion to pay MRA "a mutually agreeable amount to be specifically listed on both Schedules A and B.").

- The Engagement Letter required Ovion to immediately inform MRA if it engaged any additional finders. See Section 3(g). Ovion had informed MRA prior to beginning the engagement that it was not using other finders. (In fact, Ovion never disclosed that it was working with other finders.)

12. Ovion did not identify any corporations on the written schedule it attached to the Engagement Letter. I believed that this meant that Ovion was not actively soliciting corporate partners. I believed that if Ovion began to actively solicit a corporate partner it had an obligation to disclose it. Ovion did not inform me that it had a different view of its obligations under the agreement until this opinion was expressed in an e-mailed letter from Ovion's attorney after it had signed a letter of intent with AMS.

13. If Ovion had disclosed that it was actively soliciting a corporate acquisition, I would not have continued the engagement without first negotiating an appropriate fee for MRA's services and an appropriate role for MRA to play in a potential corporate transaction. I would not have agreed to keep Ovion's pursuit of a corporate partner a

secret from the venture funds that MRA was soliciting, and negotiating with, on behalf of Ovion. In fact, the failure to relate the likelihood of this competitive offer from a corporate entity to the venture firms who had either already submitted a Term Sheet or were known to be preparing a Term Sheet unfairly disadvantaged MRA from receiving a potentially acceptable offer from these groups. Furthermore, since any venture group would expect MRA to be informed about these corporate discussions there would be an assumption that MRA had used them as a backup strategy in the case that a corporate deal could not be consummated, damaging MRA's reputation. In the period from mid-December through January, Ovion seemed to be slow to respond to due diligence and Term Sheet issues that were under negotiation with multiple venture groups. These delays would seem to have been orchestrated by MRA further damaging MRA's reputation.

14. Ovion never gave me any reason to believe it would not agree to pay a commission for a corporate party that it was actively soliciting. In fact, by agreeing to pay a commission for venture funds it had already solicited on its own, Ovion made it clear to me that it would pay a commission for MRA's services even where MRA was not playing the role of a finder. See Schedule B (listing negotiated commissions for US Venture Parties, De Novo, Interwest, Sprout, Versant, and Vertical Group).

15. The fact that Ovion continued to position us as the lead in the negotiations with the interested venture funds, including the Schedule B groups, reinforced our belief that MRA would have a central role in any financing negotiation. The fact that Ovion had

agreed to pay a MRA a Success Fee if the commissions it owed to MRA for a non-corporate transaction did not meet a threshold amount was further evidence that Ovion had expected MRA to play a central role in the negotiation and closing of any financing transaction. See Section 3(c)( requiring Ovion to pay MRA a Success Fee if the "aggregate fees payable to MRA pursuant to Section 3(a) are less than $225,000").

16. The inclusion of Section 3(d) covering default minimum Advisory Fees in the case of a corporate transaction was added to the contract after the prospect of the "lightning strike" scenario was discussed. This was a quickly negotiated and drafted section that defined minimum compensation based on the time MRA would be involved on the project. I did not view the Advisory Fee as a ceiling for the fees MRA could receive in the event of a corporate transaction but as a floor. Nor did I view the Advisory Fee provision as excluding the possibility that MRA could negotiate a commission for a corporate party if Ovion disclosed it was actively soliciting one.

17. In other words, Ovion readily agreed to pay MRA a minimum Advisory Fee of $125,000 during the first 90 days and $225,00 from the 90th to the 180th day of our engagement before MRA had done any work on this transaction. The six month timetable was included by Ovion to cover a reasonable period that would not create a situation whereby MRA would sign the agreement and then do nothing for a year or more and still reap the benefits of a firesale acquisition that our inactivity had forced them into. It was specifically discussed that we would have time to make any amendments that might be necessary as the project progressed. I believe Ovion deceived MRA about its acquisition

talks to avoid having to negotiate (i) the additional commission MRA would expect for Ovion's use of its services to effect an acquisition and (ii) the topic of a required extension to the six month deadline.

18.  On or about August 3, 2004, I met with Callister, Tremulis, Dr. Keith Isaacson, one of Ovion's principal medical/scientific advisors, and a salesperson from Storz, a medical device company, in Newton, Massachusetts. At the meeting, the parties discussed the comparative merits of Ovion's technology, its competitive position, and the amount of clinical data required to validate the efficacy of Ovion's product. Callister and Tremulis gave no indication that they were interested in seeking a corporate partner prior to completing the clinical trials under discussion. In fact, the assessment of the clear weaknesses of the competitive products argued strongly for advancing the technology as an independent entity.

19.  On or about November 11, 2004, I met with Ovion during a Scientific Advisory Board dinner in San Francisco during which I specifically inquired if there had been any corporate activity during the AAGL meeting. Ovion's responses provided no indication that anything other than general informational meetings had taken place or were being scheduled. I remember expressing some surprise to them that this could be the case given the "buzz" that seemed to be growing about their product as evidenced by the illustrious group of investigators that were attending this dinner. This query was just shrugged off with no potential explanation offered. There was definitely no mention that

they were seriously talking to American Medical Systems ("AMS") or any other corporate partner.

20. On or about November 18, 2004, Dr. Latterman and I participated in a phone conference with Tremulis, Callister and Hess in which they discussed financing by means of private placement versus corporate partnership. Tremulis and Callister again assured us that they wanted to do a private placement and were not in discussions with any corporate partner.

21. On or about December 7, 2004, Dr. Latterman met with Tremulis, Callister and two venture capitalists for USVP at the USVP offices in Menlo Park, California. I participated by phone. Immediately after that meeting, Latterman, Tremulis, Callister and Hess had a further telephone call with in which they discussed USVP's offer. Despite the disappointment about the unacceptable offer from USVP, Tremulis and Callister reiterated that they wanted to pursue a venture financing and not a corporate deal and encouraged us to continue to pursue other parties.

22. In all of these conversations in the summer and fall of 2004, Ovion reiterated that it did not want to pursue a corporate deal and instead was committed to venture financing. In reliance on these representations, MRA spend hundreds of hours of time working on Ovion's behalf. MRA spent significant time cultivating its contacts in the venture community to raise the money, and on multiple occasions assured the various venture funds that Ovion was committed to venture based financing. As a result, MRA

put its own professional reputation on the line. Both MRA and the venture firms in question expended considerable effort in pursuit of the venture financing opportunity with Ovion. Ovion chose not to pursue any of these deals. MRA's ability to do business with venture capitalists is highly dependent on the personal credibility of its principals. Ovion's refusal to pursue the venture deals that MRA was trying to facilitate has injured MRA's reputation within the venture capitalist community and negatively affected MRA's good will.

23. I believe that unbeknownst to Dr. Latterman and me, Ovion was pursuing a parallel path to a corporate acquisition. I believe that Ovion knew that if it disclosed this parallel path, we would expect to be compensated if our work product was used or we would decide to terminate the contract.

24.     On a February 17, 2005 telephone conference, we learned for the first time that Ovion had entered into a letter of intent with an unnamed corporate partner.

25.     On March 10, 2005 We received a faxed letter representing a 10 day notice to terminate the agreement with MRA.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct and that this affidavit was executed on February 10, 2006 in Boston, Massachusetts.

_____/s/_____<br>
David B. Musket

I hereby attest that I have on file all holograph signatures for any signatures indicated by a "conformed" signature (/s/) within this e-filed document.

_____/s/_____<br>
Brooks A. Ames