UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| Musket Research Associates, Inc., )<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>Ovion, Inc., William S. Tremulis, and Jeffrey )<br>)<br>P. Callister, )<br>)<br>Defendants. )<br>)<br>And Related Counterclaims. )<br>) | No. 05-CV-10416 MEL |

**AFFIDAVIT OF SUE ANN LATTERMAN IN SUPPORT OF MUSKET RESEARCH ASSOCIATES' OPPOSITION TO MOTION FOR SUMMARY JUDGMENT**

I, Sue Ann Latterman, aver as follows:

1. I am an employee of Plaintiff and Counter-defendant Musket Research Associates, Inc. ("MRA"), and am a Counter-defendant in this action. I have personal knowledge of the matters stated herein, and if called as a witness, could and would testify competently thereto.

2. In 2002 I joined MRA. My educational background includes a Bachelor of Arts in Biology and a Veterinary Medical degree from The University of Pennsylvania and a Masters in Business Administration from The University of Pittsburgh. After practicing veterinary medicine for four years and then getting an MBA, I decided to change career paths and get more involved with business and finance. In 1990 I went to work in market research for a wholly owned subsidiary of Eli Lilly & Co known as Hybritech, analyzing markets and clinical decision trees for new technologies. After several years at Hybritech, Mohr Davidow Ventures, a premier

venture capital fund in Silicon Valley recruited me. During my time at Mohr Davidow I assisted with investments in four early stage medical device/diagnostic companies, two of which went public and the other two were acquired. In 2003 I met a serial entrepreneur who in 2004 asked me to help him start a new medical device company. We began with an idea drawn on a paper tablecloth, raised an initial round of approximately $2.5 million and the company was ultimately sold to a major medical device manufacturer for approximately $230 million. I met David Musket ("Musket") while I was an employee of Mohr Davidow when we worked together on Rita Medical Systems. Prior to my joining MRA, I provided consulting services to MRA on a private placement for Oratec International. This company ultimately went public and then was successfully acquired by Smith & Nephew. During the 3 plus years I have worked for MRA, I have assisted Musket with strategy and financing of Conor Medsystems who went public in December of 2004 and Savacor, Inc. who was purchased by St. Jude in December of 2005.

3.  MRA is an investment banking firm focused on assisting emerging healthcare companies such as Ovion Inc. ("Ovion") in raising capital. MRA is located in Boston, Massachusetts where its President and Chief Executive Officer David Musket resides. Although MRA is located in Massachusetts, many of the medical device companies that MRA assists in obtaining financing are located in California, and in other states. I work mostly with companies in California that are seeking to raise money.

4.  MRA assists emerging medical companies in raising money in several ways. First, unlike some of our competitors, MRA is extremely knowledgeable about what the venture community looks for in a company when deciding whether or not to make an investment. Second, Musket and I have deep contacts and established relationships with investors, and can use these contacts to identify and ultimately secure rich sources of funding. Third, before MRA

takes on a new client to present to the venture community, our firm does a tremendous amount of due diligence on the Company. Because the business is so relationship driven, it is extremely important that the venture capital community has a great deal of confidence in the investment banker, and his or her judgment about the strength of the company and thus the potential investment. MRA has an excellent reputation in the venture community, and is known for its thoroughness. Investors know that if they are being approached by MRA about a deal, they will get a complete and detailed picture concerning the investment potential of the company seeking financing, and that the company likely presents a significant investment opportunity. Finally, MRA is extremely skilled in assisting emerging companies in packaging the deal, and presenting the company in the best light possible to investors.

5.   There are many components to successfully packaging the investment opportunity. We analyze the size of the market and the competition, how the product matches up against competing products, the current state of the art, the cost to the healthcare system with and without the product, and reimbursement by Medicare for the hospital, surgical center, physician office visit and/or physician fees, to name a few. We must also be familiar with the regulatory process which includes the clinical trials that will be needed to bring the product to market and the patients and endpoints involved in those trials, as they will determine the length of time and cost it will take for product approval and the product labeling that is crucial for successful marketing. We interview physicians in the specialty area that will ultimately use the new technology and/or have knowledge about the current state of the art treatment. MRA has an extensive set of connections among luminary physicians in various medical specialties that we have carefully developed over the years. These clinicians are instrumental in understanding the potential for a new technology and ultimately to getting a new company financed.

6.      In June of 2004, Ovion was a start-up company holding multiple patents for medical devices in the area of women's healthcare. On several occasions prior to June 2004, Robert Hess ("Hess"), a director and one of the three major shareholders in Ovion, had contacted MRA's President, David Musket ("Musket"), to discuss the possibility of MRA assisting Ovion in its financing activities. Hess explained that Ovion had been intermittently working to raise money for its venture, but had not been successful. Apparently it was this failure that caused Ovion to seek the assistance of MRA.

7.      When Ovion first approached MRA, Hess as well as Ovion's two other Board Members and founders William Tremulis ("Tremulis") and Jeffrey Callister ("Callister"), specifically represented on multiple occasions to both myself and David Musket that they wanted to pursue venture backed financing, rather than a corporate acquisition. During these pre-contract discussions we were told specifically that Ovion did not want to go the corporate acquisition route yet because Tremulis and Callister wanted to remain in control to take the company through its clinical trials.

8.      On or about June 3, 2004, Hess returned my call to him from the previous day to discuss Ovion's financing goals. During our conversation Hess provided background information about Ovion, and told me that Ovion was seeking to raise its first institutional round of financing. He assured me that Ovion wanted to obtain venture based funding for the company, and made no mention that Ovion was pursuing any corporate transaction.

9.      On June 8, 2004, I met with Tremulis, Callister and Hess at the Ovion offices in San Mateo. This meeting lasted over four hours and included a thorough discussion of financing strategy. Tremulis and Callister assured me that they wanted to do a venture financing because

they wanted to grow the company themselves and increase its net worth. Tremulis and Callister told me that they thought that it was too early in the process to take an investment from a corporate partner as they did not want to prematurely limit Ovion's acquisition potential.

10. On or about June 16, 2004, I drove down to Ovion's offices to meet with Tremulis and Callister in person. Musket was on the telephone. Musket raised the issue of the different valuations that Ovion could get with a venture financing versus a corporate financing. During the course of this meeting, Musket asked Tremulis and Callister point blank whether they were interested in pursuing a corporate transaction. Both denied that they were looking to do a corporate deal. Instead, they again represented that they wanted to obtain venture financing so that they could stay in charge of the company, and see it through clinical trials before looking to be acquired. They also wanted to continue to grow the company in order to maximize its potential value. During this conversation Musket made it clear that that he had no interest in having MRA used as a "stalking horse" for a corporate transaction. If Ovion wanted to go that route, then Musket told Tremulis and Callister that MRA was not interested in the deal. During this meeting both Tremulis and Callister told us that Ovion had established communications with a small number of potential corporate partners but that they wanted to use the funds from the contemplated financing to build up the business before any such discussions would likely become serious. MRA relied upon Tremulis and Callister's representations that they were not pursuing a corporate acquisition, and that their preferred financing method was a private placement of preferred stock, when we decided to enter into the agreement.

11. These discussions took place in June and July of 2004 and culminated in a formal banking agreement dated July 21, 2004, which was executed on July 29, 2004 (the "Contract"). Pursuant to the Contract, I understood that MRA had agreed to:

- analyze the financial performance and projections of Ovion
- provide advice regarding Ovion's appropriate valuation range
- assist in the development of presentation and due diligence materials for investor solicitations
- contact qualified investors and send them materials
- set up and accompany Ovion to meetings with interested parties
- manage ongoing discussions and coordinate closings

In exchange, I understood that Ovion had agreed to pay MRA a percentage commission if Ovion obtained financing from (i) a party that MRA introduced to Ovion or (ii) one of six parties Ovion had already actively solicited. MRA and Ovion identified these parties on a Schedule A and a Schedule B to the Agreement. I also understood that Ovion had listed all potential investors on the Schedule B with which Ovion considered to be actively interested in Ovion. This would include corporations considering an investment or an acquisition. I believed that Ovion had agreed to immediately notify MRA if they were newly approached by a potential investor including any corporate partners or if they began actively soliciting a party not already identified on the Schedule B and that MRA could then negotiate an appropriate fee or decide to terminate the contract. The way that I understood the agreement is that MRA and Ovion were a team, and each member of the team needed to communicate openly and honestly with the other about potential opportunities. Such open communication about potential prospects is the best way to maximize the ultimate valuation by having more than one bidder interested in the financing in a competitive auction-like process. It was also in keeping with the honest way we deal with the investment community. MRA has built an excellent reputation with the investment community and the investors that we work with know they can depend on our word.

12.     Immediately after the execution of the Agreement I went to work preparing materials to assist Ovion with its private placement. I prepared materials for the parties listed on both Schedules A and B. Among other things I rewrote Ovion's presentation to potential investors. Ovion's existing presentation was not well written and was not an effective marketing tool for the company. I rewrote the presentation and made it much more compelling, concise and complete. In fact several VCs that had viewed both presentations, commented to me how much better the MRA version was. The presentation is crucial as it is the first exposure a VC has to the company and it's founders and thus is responsible for that very important first impression and it is used by most VCs to determine whether or not they will move forward with doing due diligence on the company. I also prepared forecasts and assisted with creating forward looking financials, interviewed various doctors working with Ovion and prepared them to speak with potential investors, set up and participated in calls between investors and doctors, drafted answers and otherwise assisted with obtaining information and explanations requested by investors, prepared market analyses for VCs as needed, called venture capitalists and set up meetings and communicated with venture capitalists via email (over 500 separate emails in all) and via telephone. I also checked the portfolio companies of each VC fund looking for potential conflicts of interest before I contacted that particular VC. After setting up a meeting with an approved VC fund, I prepared Ovion prior to the meeting by giving them written background information on each person attending the meeting. I also attended the actual meetings with the VCs so I could note any questions the VCs might have, follow up with answers to those questions and make any changes to the presentation that were needed. In addition, I introduced Ovion to a potential new CEO, prepared spreadsheets so that various term sheets could be easily compared, negotiated with VCs on terms both orally and in writing and organized the

capitalization table. Venture Capitalists are very busy people so I try to do as much of their due diligence work as possible. This helps to keep their forward momentum and moves them towards making an investment decision. As I knew the areas the VCs were likely to want more detail than they were given in the presentation and/or I heard certain questions asked several times over the course of the company's roadshow, I continuously prepared or assisted with preparing various updated and comprehensive documents for them. One example was a reimbursement document I created that outlined payments for hospitals, surgical-centers, physician offices and physicians for procedures when the Ovion products would be used and compared them to the current state-of-the-art treatment reimbursements. Reimbursement is a very confusing area, but is a major factor in a VCs decision-making process on whether or not to invest in a new technology. Another example was a document that reviewed the history, safety and legal issues of relevant current state-of-the-art technology. The women's healthcare area has traditionally had issues with lawsuits relating to new technologies and I wanted to show the VCs why this would not likely be a problem for Ovion. VCs always want to know what a company is going to do with the money they raise so I worked with Ovion to prepare a timeline with major milestones and dollars needed to get there and prepared two overview documents of the Ovion clinical trials, one covering the safety trial results to date, the other outlining the upcoming Pivotal US Clinical Trial. In addition, I analyzed competitors' patents, their funding records and drafted Ovion's Executive Summary. I reviewed pleadings related to the patent infringement lawsuit between Ovion and Conceptus and discussed that settlement with Leland Hansen (counsel for Ovion during its lawsuit with Conceptus and now the counsel for Ovion against MRA) several times as the VCs had serious concerns about this dispute and I needed to be able to convince them the outcome of this dispute was positive for Ovion. I persuaded Ovion that

they needed to obtain a third party review of the patent issues raised by their lawsuit with Conceptus and the follow on interference(s) Conceptus was filing, as I believed that the ongoing patent issue(s) with Conceptus was one of the major reasons Ovion had been having trouble raising money. All in all I would estimate that I spent over 500 hours of time preparing presentation materials and performing other work relating to the Ovion project.

13.    I believed the Agreement between MRA and Ovion required Ovion to inform me before it directly solicited any party using the work product described above. This belief was confirmed by Ovion's conduct. Ovion notified me and sought my advice before communicating directly with the investors listed on both Schedules A and B. For instance, Ovion asked me to ghost write a solicitation letter to InterWest, a party Ovion had solicited before executing the Agreement. I would not have permitted Ovion to share my materials with a party not listed on either Schedule A or Schedule B. More importantly, I would not have put myself into the position where I could mislead my investment contacts about Ovion's fund raising intent.

14.    Sometime in the late fall of 2004, I began to grow suspicious that Ovion was not being completely forthcoming about its intentions with regard to a corporate acquisition. On October 21, 2004 I sent an email to Tremulis and Callister marked high importance in which I asked them to give me the names of their contacts at Storz, Olympus and AMS. In this email I specifically mention "you don't want to string along the VCs if your real intent is to sell the company sooner than later..." I invited Tremulis and Callister to openly discuss their intentions with respect to an acquisition. Callister responded by providing me the names of contacts at Olympus only (he did not include any telephone numbers) and completely ignoring my effort to open a dialogue on the acquisition issue. On or about November 10, 2004 at the American Association of Gynecologic Laproscopists ("AAGL") conference held in San Francisco, I again

specifically asked Tremulis and Callister about meetings they were going to have during the AAGL with Storz and Olympus, medical device companies that could have been a potential corporate partner for Ovion. Tremulis and Callister assured me that the only purpose of their meetings with these companies was to obtain equipment for Ovion's upcoming clinical trial and that they were not considering Storz or Olympus as a corporate partner, or seeking to raise money from any corporate partner. They did not mention any meetings with AMS. I continued to believe that something more was going on than they were telling me so I asked David Musket to follow up with Tremulis and Callister on their plans for meeting with corporations when he arrived at the AAGL the next day.

15.     On or about November 18, 2004, Musket and I participated in a phone conference with Tremulis, Callister and Hess in which they discussed financing by means of private placement versus corporate partnership. Tremulis and Callister again assured us that they wanted to do a private placement, and were not pursuing a corporate transaction. During this meeting we also specifically discussed different sizes of private placements as we knew the valuations for early stage medical device companies were low at this point in time.

16.     On or about December 7, 2004, I met with Tremulis, Callister and two venture capitalists for USVP at the USVP offices in Menlo Park, California. Musket participated by phone. During the meeting, USVP provided a detailed termsheet and indicated that it was interested in becoming the lead investor in the Ovion financing. Immediately after that meeting, Tremulis, Callister, Hess and I had a further telephone call with Musket in which we discussed USVP's offer. Tremulis, Callister and Hess were unanimous in their opinion that the USVP offer was unacceptable and directed us to immediately communicate this information to USVP. At the same time they reiterated their desire to pursue a venture financing and directed us to

continue our efforts with several groups that were just behind USVP in their due diligence process.

17.     On January 18, 2005, I had a conversation with Karen Boezi ("Boezi") of venture firm, Thomas McNerney & Partners. Boezi who was pregnant, told me that she could do one more deal prior to going out on maternity leave. She specifically inquired as to whether Ovion was serious about a venture backed deal, because she did not want to waste her time if they were not serious. As a result of this conversation, I went back to Tremulis and Callister and told them that Boezi had said that she had one deal left before going out on maternity leave, and wanted to confirm that Ovion was serious about doing a venture based deal. Both Tremulis and Callister assured me that this was the route that they wanted to take, and that there was no corporate partner in the picture. Based on these representations, I went back to Boezi and assured her that she would not be wasting her time. It is important to understand that many of the VC funds I introduced to Ovion accepted a meeting with them based on my word that the company was a solid potential investment and that Tremulis and Callister were honest and capable executives. All of the venture community knew about Tremulis and Callister being in a patent lawsuit with Conceptus. In fact, several VCs questioned me about Tremulis's and Callister's reputations as they had not heard good things about them in the recent past. I gave my word based on Rob Hess's endorsement and Tremulis's and Callister's repeated assertion to me and Mr. Musket that they were serious about raising venture capital and they were not interested in an acquisition at this time. Due to Tremulis's and Callister's repeated misrepresentations, I gave misinformation to my investment contacts that has potentially damaged their trust in my word.

18.     On or about February 5, 2005, I met with Tremulis, Callister and Hess at Ovion's offices in San Mateo to discuss the possibility of doing a smaller round of venture financing,

enough so the company could reach a significant milestone(s). MRA's strategy here was to enable Ovion to reduce their technology risk through reaching these additional milestones while giving Conceptus, Ovion's major competitor, the time it needed to increase its sales which MRA believed would happen within the year and would improve the investing environment for women's heathcare companies. That strategy would have reduced or at the least delayed MRA's fees, but we believed was a valid strategy for Ovion to get maximum value for the company should the VCs not be willing to give Ovion the value they wanted initially. From February 2005 to today, Conceptus has more than doubled its market capitalization as MRA anticipated. Tremulis and Callister reiterated to me that they were committed to doing a venture financing-based deal as they ultimately wanted to sell their company for maximum value.

19.  Sometime during the first week of February, 2005, I learned that one of the venture investors we had approached on the Ovion financing, Warburg Pincus, who had rather mysteriously dropped out after a very positive meeting, had done so because they had heard that Ovion was pursuing a parallel acquisition track. Warburg was one of the largest shareholders in AMS and has a representative on the AMS Board of Directors. This fact supports the point we had made to Ovion, during both our precontract discussions and later during the term of our engagement, that if it became known that the company was "for sale" it could seriously hinder our efforts to secure venture financing. We believe the venture community logically expected us to know that Ovion was pursuing a parallel financing path. Their presumption that we had strung them along without informing them of the competitive nature of the financing has damaged our reputation with several firms and may make it more difficult to do business with these firms in the future.

20. On a February 17, 2005 telephone conference, we learned for the first time that Ovion had entered into a letter of intent with an unnamed corporate partner, and would be terminating our contract. At no time in that conversation did Callister or Tremulis thank MRA for the work we had done or mention any payment they planned to make to MRA.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct and that this affidavit was executed on February 10, 2006 in Mill Valley, California.

                                              /s/
                                     Sue Ann Latterman

I hereby attest that I have on file all holograph signatures for any signatures indicated by a "conformed" signature (/s/) within this e-filed document.

                                              /s/
                                     Brooks A. Ames