UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| MUSKET RESEARCH ASSOCIATES, INC., )<br><br>Plaintiff, )<br><br>v. )<br><br>OVION, INC., WILLIAM S. TREMULIS, )<br>and JEFFREY P. CALLISTER, )<br><br>Defendants. )<br>_____)<br>OVION, INC., )<br><br>Counterclaimant, )<br><br>v. )<br><br>MUSKET RESEARCH ASSOCIATES, INC., )<br>DAVID B. MUSKET, and )<br>SUE ANN LATTERMAN, )<br><br>Counterdefendants. )<br>_____) | **No. 05 10416 MEL** |

## PLAINTIFF'S STATEMENT OF MATERIAL FACTS
## AS TO WHICH THERE EXISTS A GENUINE ISSUE TO BE TRIED

Plaintiff, Musket Research Associates, Inc. ("MRA"), submits this statement pursuant to

LR 56.1. This statement responds to Defendant's Rule 56.1 statement and sets forth additional

facts to be tried.

### Response to Defendant's Rule 56.1 Statement

1.      In this action, the Defendants are Ovion, Inc. ("Ovion"), William S. Tremulis

("Mr. Tremulis"), and Jeffrey P. Callister ("Mr. Callister"). (Exhibit B, First Am. Compl.

(Docket No. 11).) The Plaintiff is Musket Research Associates, Inc. ("MRA"). (*Id.*) Ovion has

counterclaimed against MRA, David B. Musket ("Mr. Musket"), and Sue Ann Latterman ("Ms. Latterman"). (Answer & Countercl.)

Response No. 1

Undisputed.

2.    In July 2004, Ovion was a small company with a focus on minimally invasive alternatives to surgical sterilization. (Exhibit G, Tremulis Aff. ¶ 3.) Ovion was founded by Mr. Tremulis and Mr. Callister in 1996. (*Id.* ¶ 2.)

Response No. 2

Undisputed.

3.    According to MRA, "MRA is a small firm that specializes in securing venture financing for start-up companies. [Mr.] Musket is its founder and president and his principal employee is [Ms.] Latterman." (Exhibit D, MRA Protect. Order Mem. (Docket No. 31), at 3.)

Response No. 3

Undisputed.

4.    In July 2004, Ovion retained MRA "as a nonexclusive finder/advisor" on the terms set forth in a written agreement (the "Engagement Letter"). (Exhibit A.) MRA acknowledges that the Engagement Letter is an agreement between Ovion and MRA. (Exhibit C, MRA Suppl. Interrog. Resp., at 2.)

Response No. 4

Disputed. The Engagement Letter required Ovion to inform MRA immediately if it engaged any additional finders other than MRA. *See* Ovion's Exhibit A, Engagement Letter, Section 3(g). Ovion never disclosed to MRA that it was working with other finders. Musket Affidavit, ¶11.

5.    Pursuant to the Engagement Letter, MRA agreed to provide certain services and also agreed that its compensation, if any, would depend on the realization of certain contingencies set forth in the Engagement Letter. (Exhibit A, Engagement Letter, §§ 2-3.)

Response No. 5

    Undisputed.

    6.    MRA now alleges that Ovion and MRA entered certain oral agreements or understandings regarding MRA's services as a nonexclusive finder/advisor. (Exhibit C, MRA Suppl. Interrog. Resp., at 2-3.) In response to Ovion's interrogatories, MRA has conceded that there are no documents or other written undertakings related to these alleged oral agreements (*Id.* at 3 (identifying the Engagement Letter and a Nondisclosure Agreement as the only documents and things relating to any alleged agreements and understandings between Ovion and MRA).)

Response No. 6

    Disputed. Ovion has mischaracterized MRA's interrogatory response. MRA stated that it executed the Engagement Letter based on certain agreements and understanding with Ovion. *See* Ovion's Exhibit C, MRA Suppl. Interrog. Resp., at 2-3. Contrary to Ovion's implication, these agreements and understandings were based on obligations set forth expressly in the Engagement Letter, in addition to Ovion's conduct and oral representations. *See* Musket Affidavit, ¶¶7-12; Latterman Affidavit, ¶¶7-11.

    7.    As set forth in the Engagement Letter, MRA agreed, as a "nonexclusive finder/advisor," to provide the following services:

> MRA shall (i) analyze the financial performance and projections of the Company and provide advice regarding the appropriate valuation range for the new equity capital; (ii) assist in the development of presentation materials for investor solicitations; (iii) contact qualified investors and, if acceptable to you or your representative, send the necessary documents ourselves or through your office . . . (iv) after appropriate screening, set up and accompany you to meetings with interested parties as often as scheduling allows; and (v) manage ongoing discussions and coordinate the closings with investors solicited, or caused to be solicited by MRA.

> (Exhibit A, Engagement Letter, § 2(a).)

Response No. 7

    Undisputed.

~BOST1:407730.v1
12639

8.     For purposes of this litigation, MRA now has adopted the term "work product" to describe the services it agreed to provide.  For instance, MRA now alleges:

> Over the course of a more than six month engagement with Ovion, MRA produced thousands of pages of budgets, forecasts, plans, due diligence materials, and presentation materials on Ovion's behalf. . . .  MRA did not create this work product out of thin air.  By necessity, it worked with materials provided by Ovion. . . . In each case, MRA made multiple revisions and additions to a working document. . . .

> MRA conducted hundreds of telephone conversations with doctors, venture capitalists, and others in the course of preparing due diligence materials for Ovion and in the course of soliciting inventors on behalf of Ovion.  In addition, MRA answered multiple different questions for venture capital investors in face to face meetings to promote Ovion.  All these communications constitute MRA's work product.

(Exhibit E, MRA Opp'n. to Compel (Docket No. 38), at 4-5.)

Response No. 8

Disputed.  MRA has characterized the services it provided to Ovion as its "work product."  However, this does not mean that MRA's work product does not include documents.  MRA disputes that MRA's discovery brief constitutes record evidence, as required by LR 56.1.

9.     According to MRA, documents such as "budgets, forecasts, plans, due diligence materials, and presentation materials" are "working documents" that evolve over time.  (Exhibit E, MRA Opp'n. To Compel (Docket No. 38), at 4-5.)  MRA apparently now contends that Ovion's materials became MRA's property once MRA "put its mark on" them by editing or updating them in some fashion.  (*Id.* at 4.)

Response No. 9

Disputed.  Ovion has mischaracterized MRA's discovery brief to suggest that MRA merely edited or updated Ovion's materials.  In fact, MRA did far more.  *See* Latterman Affidavit, ¶12.  MRA disputes that MRA's discovery brief constitutes record evidence, as required by LR 56.1.

10.     As set forth in the Engagement Letter, MRA agreed that its compensation, if any, would depend on the realization of certain contingencies.  (Exhibit A, Engagement Letter, § 3.)

4

~BOST1:407730.v1
12639

Response No. 10

      Undisputed.

      11.     More specifically, the Engagement Letter set forth two circumstances where MRA could become entitled to compensation.

> (a)     private placement of Ovion stock with "MRA Contacts" or "Ovion VC Contacts,"
>
> or
>
> (b)     a "Corporate Transaction" (i.e., a merger, acquisition, or private placement of Ovion stock with a corporate partner) consummated "during the term of" and before "the 180th day following the date" of the Engagement Letter.

(*Id.*, §§ 1, 3.)[1]

Response No. 11

      Disputed.  The Engagement Letter sets forth a circumstance in which MRA could become entitled to compensation for a "Corporate Transaction" beyond "the 180th day following the date" of the Engagement Letter.  Section 3(b) requires Ovion to provide MRA a complete listing of "parties being actively solicited directly by Ovion" in a Schedule B attached to the contract.  This means a corporate party could be added to Schedule B.  It further contemplates that Ovion "may authorize a switch of an investor listed on Schedule B to Schedule A, carrying with it the obligation to pay the fees outline in Section 3(a) . . . or a mutually agreeable amount to be listed on both Schedules A and B."  This means a corporate party could be added to Schedule A alongside a specifically listed commission.  Thus, MRA could be compensated under Section 3(a) and Section 3(b) in the event that Ovion consummated a merger, acquisition, or Placement involving a corporate partner (a "Corporate Transaction").  Pursuant to these sections,

---

[1]     "MRA Contacts" were "parties solicited or caused to be solicited by MRA" and "accepted [by Ovion], as evidenced solely by a countersignature thereto on Schedule A."  (Exhibit A, Engagement Letter, § 3(a).)  "Ovion VC Contacts" were listed on Schedule B.  (*Id.*)

~BOST1:407730.v1
12639

MRA could be entitled to compensation notwithstanding the 180 day time limit set forth in Section 3(d).

12.    If the first contingency were realized, MRA could received "Finder's Fees" and possibly a "Success Fee." (*Id.* §§ 3(a), 3(c).)[2]

Response No. 12

Disputed.  Section 3(a) expressly refers to "Finder's Fees" only in relation to MRA Contacts as set forth in a Schedule A.  In fact, MRA would also be entitled to an "additional fee" for Ovion VC Contacts and to US Venture Partners. *See* Ovion Exhibit A, Engagement Letter, Section 3(a).  In addition, as set forth in Response 11, MRA could also receive fees for a corporate party identified on Schedule A and B pursuant to Section 3(b).

13.    If the secondary contingency were realized, MRA could receive an "Advisory Fee" not to exceed $225,000 less any Finder's Fees. (*Id.* § 3(d).)[3]

Response No. 13

Disputed.  MRA could receive an "Advisory Fee" not to exceed $225,000 less fees set forth for a corporate party identified on Schedule A and Schedule B pursuant to Section 3(b). *See* Ovion Exhibit A, Engagement Letter, Section 3(a), Section 3(b), Section 3(d).

14.    A Corporate Transaction (such as a merger and acquisition) was one of two contingencies expressly contemplated by the parties as set forth in the Engagement Letter (Exhibit A, Engagement Letter, § 3(d).)  Nothing in the Engagement Letter restricted or limited

---

[2]    More specifically, MRA could receive seven percent (7%) of the aggregate cash proceeds from the private placement of Ovion stock with "MRA Contacts." (Exhibit A, Engagement Letter, § 3(a).)  MRA could receive two percent (2%) of cash proceeds from U.S. Venture Partners and three percent (3%) of cash proceeds from other "Ovion VC Contacts." (*Id.*)  In addition, if this first contingency were realized during the term of the Engagement Letter, MRA could receive a "'Success Fee' equal to $225,000 less any" Finder's Fees. (*Id.*, § 3(c).)

[3]    More specifically, if a Corporate Transaction were consummated during the term of the Engagement Letter and within 90 days of the date of the Engagement Letter, MRA could receive an "'Advisory Fee' equal to $125,000 less any" Finder's Fees (Exhibit A, Engagement Letter, § 3(d).)  If a Corporate Transaction were consummated between the 90th and the 180th day following the date of the Engagement Letter, MRA could receive an "'Advisory Fee' equal to $225,000 less any fees payable to MRA pursuant to Section 3(a)." (*Id.*)  As of the 180th day following the date of the Engagement Letter, MRA was no longer entitled to an Advisory Fee. (*Id.*)

6

whether or to what extent Ovion could use MRA's services (or work product) for purposes of a Corporate Transaction. (Exhibit A, Engagement Letter.)

Response No. 14

Disputed. As set forth in Response No. 11 above, there was a third contingency contemplated by the Engagement Letter. Specifically, the Engagement Letter contemplated that Ovion could be compensated for a corporate party listed on Schedules A and B pursuant to Section 3(b). Moreover, the Engagement Letter contemplated that Ovion would only use MRA's services to solicit a party disclosed in either Schedule A or Schedule B, or in other words an MRA Contact or an Ovion VC Contact. *See* Ovion Exhibit A, Engagement Letter, Section 1. Section 1 explicitly ties MRA's agreement to provide services to Ovion's agreement to provide fees. Therefore, it would violate the fundamental bargain between the parties if Ovion could profit from MRA's services without having to pay fees. Finally, the Engagement Letter contains an implied covenant of good faith and fair dealing. This covenant prohibits Ovion from undermining MRA's right to receive the fruits of the contract. Ovion breached this covenant to the extent it covertly solicited corporate parties using MRA's work product. This would constitute an effort by Ovion to deny MRA the fruits of the contract by profiting from MRA's services without compensating MRA.

15.    As executed by the parties, the Engagement Letter included a provision regarding notice to MRA during the term of the Engagement Letter. (Exhibit A, Engagement Letter, § 3(g).)

Response No. 15

Undisputed.

16.    Specifically, Ovion was to give notice to MRA, "if, during the term of the [Engagement Letter], [Ovion] engages any additional finders." (*Id.*)

Response No. 16

Undisputed.

7

17.    Ovion accepted no obligation to apprise MRA as to whether or to what extent Ovion was engaged in negotiations with any prospective investor or business partner. (*Id.*)

Response No. 17

Disputed. MRA had an obligation to identify "parties being actively solicited directly by Ovion" on Schedule B to the contract. *See* Ovion Exhibit A, Engagement Letter, Section 3(a). Moreover, the Advisory Fee provision of Section 3(d) provided for compensation to MRA should Ovion enter into a "Corporate Transaction," thereby requiring Ovion to apprise MRA of its negotiations with potential corporate partners. Finally, Ovion had an obligation under the implied covenant of good faith and fair dealing to notify MRA if it was engaging in activity that would injure MRA's ability to obtain financing from the parties Ovion had identified in Schedule A and Schedule B.

18.    After Ovion and MRA executed the Engagement Letter, Ovion never engaged another "finder." (Exhibit G, Tremulis Aff., ¶ 7.)

Response No. 18

Disputed. Ovion engaged at least one "finder" after executing the Engagement Letter. *See* Ames Affidavit.

19.    The Engagement Letter expressly states that MRA was retained as a "nonexclusive finder/advisor." (Exhibit A, Engagement Letter, § 1.) Moreover, as set forth in the Engagement Letter, Ovion had no obligation to consummate a transaction with any party solicited by MRA. Indeed, the Engagement Letter expressly provides:

> The potential investors contacted by MRA are subject to acceptance by OVION in its sole and absolute discretion, and OVION is under no obligation to sell any of its capital stock to such parties.

(*Id.*, § 2(d).)

~BOST1:407730.v1
12639

Response No. 19

Disputed.  Under the implied covenant of good faith and fair dealing, Ovion had an obligation not to injure MRA's right to recover under the contract by abusing its discretion under Section 2(d).

20.     Neither contingency contemplated in the Engagement Letter was realized. (Exhibit G, Tremulis Aff., ¶¶ 8-9.)

Response No. 20

Disputed.  As set forth in Paragraph 11 above, Section 3(b) expressly contemplates that MRA may receive fees for a party identified on Schedule A or Schedule B.  This contingency was not realized because Ovion failed to disclose that it was actively soliciting corporate parties.

21.     With respect to the first contingency, no MRA Contact or Ovion VC Contact invested in Ovion, and none of Ovion's stock was placed with any of those entities.  (*Id.*, ¶ 8.)

Response No. 21

Undisputed.

22.     With respect to the second contingency, Ovion did not consummate a Corporate Transaction either during the term of the Engagement Letter or before the 180th day following the date of the Engagement Letter.  (*Id.*, ¶ 9.)

Response No. 22

Undisputed.

23.     The Engagement Letter is dated July 21, 2004.  (Exhibit A, Engagement Letter.) The "180th day following the date" of the Engagement Letter is January 17, 2005.

Response No. 23

Disputed.  The Engagement Letter was executed on July 29, 2004.  *See* Ovion's Exhibit A, Engagement Letter.  The "180th day following the date thereof" is January 25, 2005.

9

24.    On July 7, 2005, well after the 180th day following the date of the Engagement Letter, Ovion consummated a merger with and acquisition by American Medical Systems, Inc. ("AMS"). (Exhibit G, Tremulis Aff., ¶ 10.)

Response No. 24

Undisputed.

25.    On February 17, 2005, Ovion signed a letter of intent and agreed to negotiate exclusively with AMS. (Exhibit G, Tremulis Aff., ¶ 11.)

Response No. 25

Undisputed.

26.    On February 17, 2005, Ovion informed MRA that Ovion had signed a letter of intent and agreed to negotiate exclusively with a potential corporate partner. (Exhibit G, Tremulis Aff., ¶ 12.)

Response No. 26

Undisputed.

27.    On March 10, 2005, Ovion sent a letter to MRA terminating the agreement set forth in the Engagement Letter, pursuant to Section 7 of the Engagement Letter.

Response No. 27

Undisputed.

28.    MRA, Mr. Musket, and Ms. Latterman admit that they, individually and collectively, did not do any of the following:

> "contact or solicit AMS on behalf of Ovion, or cause AMS to be contacted or
>    solicited on behalf of Ovion"
> "communicate with AMS on behalf of Ovion"
> "set up any meetings between AMS and Ovion"
> "accompany Ovion or its representatives to any meetings with AMS or its
>    representatives"
> "manage any discussions between Ovion and AMS"
> "coordinate the closing between Ovion and AMS"

(Exhibit F, MRA Resp. to Req. to Admit, at 1-3.)

~BOST1:407730.v1
12639

Response No. 28

    Undisputed.

## Material Facts as to Which There Exists a Genuine Issue to be Tried

    1.     MRA is a venture banking boutique that focuses on assisting emerging health care companies. Affidavit of David B. Musket ("Musket Aff.") ¶2. Its president is David B. Musket ("Musket") and its principal employee on the west coast is Dr. Sue Ann Latterman ("Latterman"). *Id.* ¶¶1, 3. MRA assists emerging companies to raise money in several ways beyond simply introducing companies to investors. *Id.* ¶4.

    2.     MRA uses its extensive experience in the industry to present companies in the best possible light to potential investors. Musket Aff. ¶4.

    3.     MRA takes a lead role in preparing extensive due diligence responses and analyses for interested investors. Musket Aff. ¶4.

    4.     MRA's solid reputation along with its extensive contacts and established relationships with investors helps it get audiences with key investors for its clients. Musket Aff. ¶4.

    5.     MRA is very experienced in negotiating the most favorable financing terms possible for its clients. Musket Aff. ¶4.

    6.     MRA only has the resources to take on a few engagements at a time, typically handling only two to four financings a year. Musket Aff. ¶5. For this reason, MRA seeks assurances from prospective clients that they are committed to using MRA's services to obtain venture financing. *Id.* MRA avoids entering into projects with clients that prefer to sell their company to a corporation. MRA's experience is that venture investors are reluctant to expend resources investigating an investment in a company whose management is looking to cash out rather than build the company. *Id.*

    7.     Throughout the parties' pre-contract discussions, Ovion repeatedly told MRA that it wanted to pursue venture backed financing, and was not interested in a corporate acquisition.

11

On several occasions prior to June 2004, Robert Hess ("Hess"), a director and major shareholder of Ovion, discussed his interest in having MRA assist Ovion in its attempt to secure financing. Musket Aff. ¶6. Hess introduced MRA to Ovion's other two board members, William S. Tremulis ("Tremulis"), and Jeffrey P. Callister ("Callister"). *Id.* In a series of meetings and conversations, Ovion and MRA discussed the role MRA would play in pursuing financing for Ovion.

8.      On June 8, 2004, Dr. Latterman met with Tremulis, Callister, and Hess at the Ovion offices in San Mateo, California. Affidavit of Dr. Sue Ann Latterman ("Latterman Aff.") ¶9. This meeting lasted over four hours and included a thorough discussion of financing strategy. *Id.* Tremulis and Callister assured Dr. Latterman that they wanted to do a venture financing because they wanted to grow the company themselves. *Id.* They told Dr. Latterman they thought it was too early in the process to take an investment from a corporate partner as they did not want to prematurely limit Ovion's acquisition potential. *Id.*

9.      On June 11, Musket spoke with Hess regarding the June 8 meeting. Musket Aff. ¶8. Hess offered MRA a half-fee structure on the few venture firms that Ovion had already solicited, saying that Ovion wanted MRA's help in managing negotiations with all parties. *Id.* Hess told Musket that he felt corporate discussions were a waste of management time at this point and that venture-backed financing would be the best vehicle to finance the company. *Id.*

10.      On June 16, Dr. Latterman, Tremulis, and Callister had a further meeting at the Ovion offices, in which Musket participated by telephone. Latterman Aff. ¶10; Musket Aff. ¶9. During the meeting, Musket asked Tremulis and Callister point blank whether they were interested in pursuing a corporate transaction. Latterman Aff. ¶10; Musket Aff. ¶9. Both denied they were looking to do a corporate deal. Latterman Aff. ¶10; Musket Aff. ¶9. Instead, they represented that they wanted to obtain venture financing so that they could stay in charge of the company and see it through clinical trials before ceding control to another company. Latterman Aff. ¶10; Musket Aff. ¶9. Musket told Callister and Tremulis that MRA had no interest in being

12

used as a "stalking horse" for a corporate transaction and that they should either exhaust any such efforts or cease them before they hired MRA. Latterman Aff. ¶10; Musket Aff. ¶9.

11.   In the same meeting, Callister and Tremulis told Musket and Dr. Latterman that they had established communications with a small number of potential corporate partners as a backup plan when they had been unable to attract venture financing, but that they wanted to use the funds from the contemplated financing to build up the business before any such discussion would likely become serious. Musket Aff. ¶9. MRA recommended that all such communications with corporate partners should cease during the period of the financing as this could work against the financing process if it became known that the company was actively trying to sell itself. *Id.* Callister said he would return "courtesy" calls so as not to damage the relationships he had established but it was clearly understood that Ovion would not actively solicit corporations without notifying MRA. *Id.* Callister told MRA that a corporate transaction would only happen if "lighting struck," and a company approached them with a deal too good to refuse. *Id.*

12.   MRA relied upon Tremulis and Callister's representations that they were not pursuing a corporate acquisition, and that Ovion's preferred financing method was a private placement of preferred stock, when it decided to enter into the Contract. Musket Aff. ¶9; Latterman Aff. ¶10.

13.   After execution of the Contract, Ovion continued to assure MRA that it was not interested in pursuing a corporate acquisition path. For example, on August 3, 2004, Musket met with Callister, Tremulis and Dr. Keith Issacson, one of Ovion's principal medical/scientific advisors, and a salesperson from Storz, a medical device company. Musket Aff. ¶18. During this meeting Tremulis and Callister gave no indication that they were interested in seeking a corporate partner prior to completing the clinical trials under discussion. *Id.*

14.   Throughout the remainder of the summer and fall of 2004, Ovion continued to assure MRA that it was not seeking a corporate partner. On November 11, 2004, Musket met

~BOST1:407730.v1
12639

with Ovion during a Scientific Advisory Board dinner in San Francisco during which he specifically inquired if there had been any corporate activity during the American Association of Gynecologic Laproscopists ("AAGL") meeting. Musket Aff. ¶19. Ovion's response provided no indication that anything other than general informational meetings had taken place or were being scheduled. *Id.* In fact, Tremulis and Callister specifically told Dr. Latterman that they were meeting with medical device companies Stortz and Olympus only to obtain equipment for Ovion's upcoming clinical trial and they were not considering Stortz or Olympus as a corporate partner, or seeking to raise money from any corporate partner. Latterman Aff. ¶14.

15.     On November 18, 2004, Musket and Dr. Latterman participated in a telephone conference with Tremulis, Callister and Hess in which they discussed financing by means of private placement versus corporate partnership. Musket Aff. ¶20; Latterman Aff. ¶15. Tremulis and Callister again assured MRA that they wanted to do a private placement and were not in discussions with any corporate partner. Musket Aff. ¶20; Latterman Aff. ¶15.

16.     On December 7, 2004, Dr. Latterman met with Tremulis and Callister and two venture capitalists for USVP at the USVP offices. Musket participated by phone. Latterman Aff. ¶16. At this meeting, USVP provided a detailed term sheet and expressed an interest in becoming the lead investor in the Ovion financing. *Id.* Immediately after that meeting, Dr. Latterman, Tremulis, Callister and Hess had a further telephone call in which they discussed USVP's offer. Although Tremulis and Callister declined USVP's offer, they reiterated that they wanted to pursue a venture financing and not a corporate deal and encouraged MRA to continue to pursue other venture parties. *Id.*

17.     In MRA's meetings with Ovion in January and the beginning of February 2005, Ovion and its principals continued to assure MRA that they were only interested in a venture-backed deal. On January 18, 2005, Dr. Latterman spoke with Karen Boezi ("Boezi") of the venture firm Thomas McNerney & Partners. Latterman Aff. ¶17. Boezi, who was pregnant, told Dr. Latterman that she could do one more deal before going on maternity leave. *Id.* She

14

specifically inquired as to whether Ovion was serious about a venture-backed deal because she did not want to waste her time otherwise. *Id.* Dr. Latterman told Tremulis and Callister about this conversation and asked them to confirm that they were serious about doing a venture-based deal. *Id.* Tremulis and Callister assured Dr. Latterman that this was the route they wanted to take and that there was no corporate partner in the picture. *Id.* Based on these representations, Dr. Latterman went back to Boezi and assured her she would not be wasting her time. *Id.*

18.     Ovion continued assuring MRA that it was committed to venture financing in conversations in February 2005. For example on February 4, 2005, Dr. Latterman met with Tremulis, Callister and Hess at Ovion's offices to discuss the possibility of doing a smaller round of venture financing. Latterman Aff. ¶18. After this meeting, Tremulis and Callister reiterated to Dr. Latterman that they were committed to doing a venture financing-based deal, even if it meant doing a smaller initial round. *Id.*

*[Paragraphs 19-22 have been redacted and filed under seal pursuant to LR 7.1]*

23.     On July 29, 2004, MRA entered into the Contract with Ovion to provide services as an advisor and finder. Under the express language of the Contract, Ovion had an obligation to identify "parties being actively solicited directly by Ovion" on a Schedule B to the Contract at the time of its execution. § 3(b). MRA understood that Section 3(b) required Ovion to disclose any corporate parties that it was actively soliciting on Schedule B. Musket Aff. ¶12.

24.     MRA relied on this provision for a number of reasons. First, knowing whom Ovion had contacted and the status of those discussions was crucial to MRA, because MRA would not have begun its representation of Ovion, or may have terminated its representation of Ovion if an acceptable fee could not be negotiated, had MRA known that Ovion was actively pursuing a parallel corporate opportunity. Musket Aff. ¶¶7, 13. Ovion repeatedly disavowed any interest in being acquired by another company.

25.     Second, knowing whom Ovion had already contacted was essential to MRA's performance under the Contract and beneficial to Ovion. MRA and Ovion needed to

~BOST1:407730.v1
12639

communicate openly and honestly with each other about potential opportunities, so that Ovion would be able to maximize the ultimate valuation for financing purposes by having multiple bidders in a competitive auction-like process. Latterman Aff. ¶11. Similarly, to the extent Ovion had found a potential merger partner, MRA could have used such a fact as leverage to obtain more favorable offers from potential venture capital investors. Musket Aff. ¶13.

26.    Schedule B consisted of parties that MRA either was not eligible to receive fees for or parties that MRA had pre-negotiated a partial fee for. Musket Aff. ¶11. MRA reasonably expected Ovion to negotiate fees for those parties it was actively soliciting. *Id.* ¶¶11-14. For instance, MRA negotiated a 2% fee for USVP and a 3% fee for Sprout Group, InterWest, DeNovo, Versant, and Vertical Group. *See* Schedule B. Had Ovion disclosed that it was actively soliciting a corporate acquisition, MRA would not have continued with the engagement without first negotiating an appropriate fee for MRA's services and an appropriate role for MRA to play in a potential corporate transaction. *Id.* ¶13. In addition, MRA would not have agreed to keep Ovion's pursuit of a corporate partner secret from the venture funds that MRA was soliciting and negotiating with on behalf of Ovion. *Id.* Instead, because of Ovion's duplicity, MRA continued blindly with the engagement, to its detriment.

*[Paragraph 27 has been redacted and filed under seal pursuant to LR 7.2]*

28.    MRA and Ovion added the Advisory Fee provision in Section 3(d) of the Contract to address Ovion's representation that a corporate transaction might take place if "lightning struck." Musket Aff. ¶16. MRA understood lightning could strike in the form of an unsolicited offer from a corporation because Ovion had previously established communications with a small number of potential corporate partners as a backup plan when they had not been able to attract venture financing on their own. *Id.* ¶9. MRA did not understand this provision to mean that Ovion had carte blanche to actively solicit corporations using MRA's work product, and that it was in the process of doing so. *Id.* ¶¶16-17. In fact, MRA expected that Ovion would want MRA to play a role in negotiating a corporate transaction if negotiations became serious. *Id.*

¶¶14-15. MRA's interpretation of the Contract is the only reasonable one. It makes no sense that MRA would have agreed to do the work for free.

29.    MRA could receive commissions only if Ovion obtained financing from a party disclosed on a written schedule attached to the contract. § 3(a). The contract prohibited MRA from receiving commissions if Ovion obtained financing from an undisclosed party. Thus, it was essential to the bargain that Ovion would not use MRA's services to pursue a financing with an undisclosed party.

Respectfully submitted,

MUSKET RESEARCH ASSOCIATES, INC.,
DAVID B. MUSKET and
SUE ANN LATTERMAN

By their attorneys,

    /s/ Brooks A. Ames
Brooks A. Ames (BBO #641192)
DLA PIPER RUDNICK GRAY CARY US LLP
One International Place, 21st Floor
100 Oliver Street
Boston, MA  02110-2613
(617) 406-6000 (*telephone*)
(617) 406-6100 (*fax*)

Arthur S. Beeman (admitted pro hac vice)
Pamela K. Fulmer (admitted pro hac vice)
DLA PIPER RUDNICK GRAY CARY US LLP
153 Townsend Street, Suite 800
San Francisco, CA  94107
(415) 836-2541 (*telephone*)
(415) 836-2501 (*fax*)

Dated:  February 10, 2006

~BOST1:407730.v1
12639