# IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS
### BOSTON DIVISION

| | |
|---|---|
| Musket Research Associates, Inc., <br><br>          Plaintiff, <br><br>     v. <br><br> Ovion, Inc., <br> William S. Tremulis, and <br> Jeffrey P. Callister, <br><br>          Defendants. | |
| Ovion, Inc., <br><br>          Counterclaimant, <br><br>     v. <br><br> Musket Research Associates, Inc., <br> David B. Musket, and <br> Sue Ann Latterman, <br><br>          Counterdefendants. | **Case No. 05-10416 MEL** |

**[REDACTED]**

### DEFENDANTS' REPLY MEMORANDUM IN
### SUPPORT OF MOTION FOR SUMMARY JUDGMENT

# TABLE OF CONTENTS

I.  INTRODUCTION ...........................................................................................................1

II. MRA'S CONTENTIONS AND THE ALLEGATIONS OF MR. MUSKET
    AND MS. LATTERMAN ARE UNCORROBARATED, INTERNALLY
    INCONSISTENT, AND UTTERLY IMPLAUSIBLE ..................................................4

    A. MRA's Contentions Are Contradicted By The Express Language Of The
       Engagement Letter ..............................................................................................4

    B. MRA's Contentions (And The Affidavits Of Mr. Musket And Ms. Latterman)
       Do Not Withstand Scrutiny ..................................................................................6

       1. Alleged Limitations On Ovion's Pursuit Of Corporate Partners ...................7

       2. Alleged Limitations On Ovion's Use Of MRA's Services Or "Work
          Product" ......................................................................................................11

       3. Alleged Obligations To Inform MRA About The Pursuit Of Corporate
          Transactions ...............................................................................................13

          a. The Sworn Affidavits Of Mr. Musket And Ms. Latterman
             Contradict MRA's New Theory About Schedule B .................................14

          b. Pursuant To The Express Language Of The Engagement Letter,
             Including Schedule B Itself, The Parties To Be Listed On Schedule
             B Were Ovion's Venture Capital Contacts ...........................................15

          c. In Any Event, No Corporations Were "Being Actively Solicited
             Directly By Ovion" When The Engagement Letter Was Executed......................16

       4. The Conduct Of MRA, Mr. Musket, And Ms. Latterman Belies Their
          Allegations ..................................................................................................19

          a. Under The Circumstances Alleged By MRA, Any Intelligent,
             Sophisticated Party Would Have Demanded Written Assurances
             That Ovion Was Not Pursuing A Parallel Corporate Track ...................19

          b. MRA Is Unsuccessful In Its Thinly Veiled Attempt To Neutralize
             Evidence Refuting Its Allegations ........................................................22

III. SUMMARY JUDGMENT SHOULD BE ENTERED AGAINST EACH OF
     MRA'S CLAIMS ........................................................................................................25

    A. MRA's Claims Are Barred By The Statute Of Frauds ....................................26

    B. MRA's Claim For Breach Of Contract................................................................27

       1. MRA's New Theory About Schedule B Is Flawed As A Matter Of Law, And
          In Any Event Ovion Was Not Soliciting AMS When The Engagement Letter
          Was Executed...............................................................................................27

       2. MRA's New Theory About A Third Contingency Is Flawed As A Matter Of
          Law, And The Contingency Was Not Realized In Any Event ...................28

C.  MRA's Claim For Breach Of Covenant Of Good Faith And Fair Dealing .......................29

D.  MRA's Claims For Promissory Estoppel And Quantum Meruit.......................................30

E.  MRA's Claim For Conversion.........................................................................................31

F.  MRA's Claims For Fraud, Negligent Misrepresentation, And Concealment....................32

G.  MRA's Claim For Violation Of Mass. Gen. L. Ch. 93A..................................................33

IV. CONCLUSION ....................................................................................................................34

# TABLE OF AUTHORITIES

**CASES**

*Bay Colony Marketing Co. v. Fruit Salad, Inc.*,
  672 N.E.2d 987 (Mass. App. Ct. 1996) ............................................................................26

*Cheswell, Inc. v. Premier Homes and Land Corp.*,
  319 F. Supp. 2d 135 (D. Mass. 2004) ..............................................................................33

*Commonwealth v. Rizzuto*,
  1980 WL 4637 (Mass. Super. May 9, 1980) ....................................................................31

*Cox v. Thornton Associates, Inc.*,
  8 Mass. L. Rep. 715, 1998 Mass. Super. LEXIS 425 (Mass. Super. 1998) .....................30

*Derrig v. Wal-Mart Stores, Inc.*,
  942 F. Supp. 49 (D. Mass. 1996)......................................................................................27

*Des Brisay v. Foss*,
  162 N.E. 4 (Mass. 1928)...................................................................................................26

*Harvard Apparatus, Inc. v. Cohen*,
  130 F. Supp. 2d 161 (D. Mass. 2001)...............................................................................31

*Jayson Assocs. v. UPS Co.*,
  2004 U.S. Dist. LEXIS 13191 (D. Mass. July 15, 2004) ..................................................31

*Learning Express, Inc. v. Ray-Matt Enters.*,
  74 F. Supp. 2d 79 (D. Mass. 1999)...................................................................................32

*Levings v. Forbes & Wallace, Inc.*,
  396 N.E.2d 149 (Mass. App. Ct. 1979) ............................................................................33

*Lexington Ins. Co. v. All Regions Chem. Labs*,
  647 N.E.2d 399 (Mass. 1995)...........................................................................................27

*LJA Corp. v. Faraca*,
  1995 Mass. Super. LEXIS 692 (Mass. Super. Mar. 14, 1995)..................................4, 26, 32

*McEvoy Travel Bureau v. Norton Co.*,
  563 N.E.2d 188 (Mass. 2004)......................................................................................32, 33

*Morris v. Brandeis University*,
  13 Mass. L. Rep. 627, 2001 Mass. Super. LEXIS 518 (Mass. Super. 2001) ....................25

*Petricca v. Simpson*,
  862 F. Supp. 13 (D. Mass. 1994)......................................................................................32

*Stavaridis v. Dynamic Machine Works, Inc.*,
  2 Mass. L. Rep. 446, 1994 Mass. Super. LEXIS 738 (Mass. Super. 1994) ................27, 30

*Steiner v. Unitrode Corp.*, 834 F. Supp. 40 (D. Mass. 1993)...................................................32

*Turner v. Johnson & Johnson*,
   809 F.2d 90 (1st Cir. 1986)..........................................................................................32, 33

**DEFENDANTS' REPLY MEMORANDUM IN
SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

Defendants submit this reply memorandum in support of *Defendants' Motion For Summary Judgment*, which was filed on January 27, 2006.  (Docket No. 47.)  Defendants also submit herewith the following affidavits:  *Affidavit of Jeffrey P. Callister* ("Callister Aff."); *Affidavit of James Call* ("Call Aff."); *Affidavit of Robert B. Hess* ("Hess Aff."); *Affidavit of Keith B. Isaacson* ("Isaacson Aff."); and *Affidavit of Christopher V. Carani* ("Carani Aff.").

## I.  INTRODUCTION

As MRA concedes, it agreed to work as a "nonexclusive finder/advisor" for Ovion pursuant to a <u>contingency</u> contract.  Pursuant to the express language of the Engagement Letter, MRA's compensation, if any, depended on the realization of either of two contingencies. Neither contingency was realized.  The following material facts are <u>not</u> disputed:

- "As set forth in the Engagement Letter, MRA agreed that its compensation, if any, would depend on the realization of certain contingencies."  (MRA State. Facts (Docket No. 55) at 4-5 ("Response No. 10. Undisputed.").)

- "With respect to the first contingency, no MRA Contact or Ovion VC Contact invested in Ovion, and none of Ovion's stock was placed with any of these entities."  (*Id.* at 9 ("Response No. 21.  Undisputed.").)

- "With respect to the second contingency, Ovion did not consummate a Corporate Transaction either during the term of the Engagement Letter or before the 180th day following the date of the Engagement Letter."  (*Id.* at 9 ("Response No. 22.  Undisputed.").)

Because neither contingency was realized, MRA is not entitled to compensation, and summary judgment should be entered against MRA's claims.

In an appeal to sentiment, MRA now estimates that Ms. Latterman spent over 500 hours performing work for Ovion (Latterman Aff. (Docket No. 57), ¶ 12) and contends that "[i]t makes no sense that MRA would have agreed to do the work for free." (MRA Opp'n (Docket No. 54), at 9).  To the contrary, if an "MRA Contact" had invested $10 million in Ovion, then MRA's

1

seven percent "Finder's Fee" would have been $700,000, which is <u>$1,400 per hour</u> assuming 500

hours of work.  If that scenario had occurred, MRA would not be volunteering to refund a

portion of its Finder's Fee.  Rather, MRA would assert that, because MRA assumed the special

risk that it would receive no payment if the contingencies were not realized, therefore $700,000

(or $1,400 per hour) would be an appropriate fee.  In other words, a special risk justifies a special

reward.  MRA now contends, however, that the Engagement Letter should be interpreted as

though "MRA would [not] have agreed to work for free," *i.e.*, as though MRA bore no special

risk.  MRA cannot have it both ways.

MRA contends that, before the parties executed the Engagement Letter, MRA extracted

certain commitments from Ovion regarding the pursuit of corporate partners.  MRA also asserts

that it expressly stated that it would not represent Ovion unless Ovion agreed to these conditions.

More specifically, MRA alleges:

> MRA executed the Engagement Letter based on the following agreements and
> understandings with Ovion:
>
> - Ovion would not pursue a potential corporate partner until after it had
>   made a good faith effort to obtain venture financing.
> - Ovion would not use MRA as a "stalking horse" for a corporate
>   transaction.
> - Ovion would not use MRA's research, presentation materials, or other
>   work product to solicit or negotiate with potential corporate partners.
> - Ovion would inform MRA if a corporation offered to acquire, fund, or
>   partner with Ovion to assist in the negotiation and financial analysis of any
>   offer.
> - Ovion would compensate MRA, commensurate with standard industry
>   practice, to the extent that Ovion used MRA's research, presentation
>   materials, or other work product to consummate a transaction with a
>   corporate partner.

(Defs.' State. Facts, Exhibit C (MRA Suppl. Interrog. Resp.), at 2-3.)  <u>None of these provisions</u>
<u>are found in the written Engagement Letter</u>.[1]  It is utterly implausible that, after MRA allegedly
refused to represent Ovion unless it agreed to these conditions, MRA then would execute a
written agreement with no such provisions.

The Engagement Letter itself demonstrates that both Ovion and MRA agreed to reduce
their agreement <u>to writing</u>.  According to MRA, "[t]he formal agreement was the culmination of
almost a month and a half of discussions" (Musket Aff., ¶10), during which the issue of a
corporate transaction was discussed repeatedly (<i>see</i> MRA State. Facts. (Docket No. 55) at 11-13,
¶¶ 7-11; Musket Aff. (Docket No. 56), ¶¶ 7-9; Latterman Aff. (Docket No. 57), ¶¶ 7-10).  In
other words, the issue of a corporate transaction was <u>not</u> overlooked during the negotiations.
Also, Mr. Musket claims that since "1991 MRA has assisted roughly 40 client companies under
contracts substantially the same as that for Ovion." (Musket Aff., ¶ 4.)  MRA, therefore, is very
familiar with the ins and outs of such a contract.  In addition, according to MRA, Mr. Musket
and Ms. Latterman (and therefore MRA) are sophisticated parties and combined have decades of
experience negotiating contracts.  (<i>See</i> MRA State. Facts. (Docket No. 55), ¶¶ 3, 5; Musket Aff.
(Docket No. 56), ¶¶ 2, 4-5; Latterman Aff. (Docket No. 57), ¶¶ 2-5.)  Under such circumstances,
no reasonable jury could find that (1) MRA insisted during negotiations that MRA would not
represent Ovion unless Ovion agreed to certain conditions (<i>e.g.,</i> Ovion would only pursue a

---

[1] With respect to the fourth bullet point, MRA now asserts for the first time that, <u>at the time the</u>
<u>parties signed the Engagement Letter</u>, Ovion was required to disclose on Schedule B any
corporations that it was "actively soliciting."  Schedule B was never mentioned in MRA's First
Amended Complaint or in MRA's interrogatory responses, which were supplemented twice.
(Defs. State. Facts (Docket No. 49), Exhibit B and Exhibit C.)  Contrary to MRA's contentions,
the parties to be listed on Schedule B were Ovion's venture capital contacts, not Ovion's
corporate contacts.  In any event, as demonstrated below, Ovion was not actively soliciting AMS
or any other corporation when the parties signed the Engagement Letter, and MRA was well
aware that Ovion had opened discussions with several corporations.

corporate transaction if "lightning struck") and (2) MRA then executed a written agreement with no such provisions. The utter implausibility of such a scenario is highlighted by the fact that MRA's only "evidence" for these alleged oral agreements is the uncorroborated affidavits of Mr. Musket and Ms. Latterman.

MRA's claims are appropriately barred by the Statute of Frauds. "[T]he purpose of the Statute of Frauds is to 'suppress fraud, that is, cooked up claims of agreement, sometimes fathered by wish, sometimes imagined in the light of subsequent events, and sometimes simply conjured up.'" *LJA Corp. v. Faraca*, 94-2952-G, 1995 Mass. Super. LEXIS 692, at *8 (Mass. Super. Mar. 14, 1995). The wisdom of the legislature is borne out by this case.

In response to MRA's appeal for the Court to re-write the parties agreement in equity, Ovion notes that throughout its engagement with MRA: (1) Ovion seriously pursued venture capital and spent a great deal of time and resources pursuing that option; (2) Ovion never represented to MRA that Ovion was not or would not pursue other options including a corporate merger and acquisition; and (3) contrary to MRA's present representations, MRA was aware that Ovion was pursuing venture capital firms and corporations in parallel. (Callister Aff., ¶¶ 19-49; Hess Aff., ¶¶ 1-10.) These issues are not material, however, to the present summary judgment motion.

## II. MRA'S CONTENTIONS AND THE ALLEGATIONS OF MR. MUSKET AND MS. LATTERMAN ARE UNCORROBARATED, INTERNALLY INCONSISTENT, AND UTTERLY IMPLAUSIBLE

### A. MRA's Contentions Are Contradicted By The Express Language Of The Engagement Letter

The Engagement Letter itself is compelling evidence that the parties agreed that their agreement would be <u>in writing</u>, including their agreement regarding compensation to MRA, if any, in the event of a "Corporate Transaction." Indeed, with respect to a "Corporate

Transaction" such as a merger and acquisition, Ovion and MRA set forth a detailed provision in

Section 3(d) of the Engagement Letter. (Defs.' State. Facts (Docket No. 49), Exhibit A, § 3(d).)

Section 3(d) provides for (1) an "Advisory Fee" of $125,000 (minus any fees payable under §

3(a)) in the event of a "Corporate Transaction" consummated during the first 90 days of the

engagement or (2) an "Advisory Fee" of $225,000 (minus any fess payable under § 3(a)) in the

event of a "Corporate Transaction" consummated during the second 90 days of the engagement:

> If, during the term if this Agreement, OVION consummates a merger, acquisition
> or Placement involving a corporate partner (a "Corporate Transaction") within 90
> days of the date hereof and the aggregate fees payable to MRA pursuant to
> Section 3(a) are less than $125,000, then OVION shall pay MRA an "Advisory
> Fee" equal to $125,000 less any fees payable to MRA pursuant to Section 3(a).
> If, during the term of the Agreement, OVION consummates a Corporate
> Transaction between the 90th and the 180th day following the date hereof and the
> aggregate fees payable to MRA pursuant to Section 3(a) are less than $225,000,
> then OVION shall pay MRA an "Advisory Fee" equal to $225,000 less any fees
> payable to MRA pursuant to Section 3(a). This Advisory Fee will be payable at
> the time of the initial closing of whatever financial event OVION does
> consummate.

(*Id.*) As of the 180th day following the date of the Engagement Letter, MRA was no longer

entitled to any compensation in conjunction with a Corporate Transaction. (*Id.*)

As evident from the express language of the Engagement Letter, Ovion and MRA both

understood that Ovion would be pursuing both venture capital and corporate transactions. (*Id.*, §

3.) Nothing in the Engagement Letter limits whether or under what circumstances Ovion could

pursue a Corporate Transaction. (*Id.*, §§ 1-8.) Likewise, nothing in the Engagement Letter

limits whether or to what extent Ovion could use MRA's services (or the product thereof) to

pursue a Corporate Transaction. (*Id.*) Nothing in the Engagement Letter even suggests that a

deal with a venture capital firm is preferred over a deal with a corporation, or vice versa. (*Id.*)

The parties agreed to the terms in the <u>written</u> Engagement Letter after weeks of

negotiations. (Musket Aff. (Docket No. 56), ¶ 10.) MRA concedes, as it must, that Ovion and

MRA discussed both venture capital transactions and corporate transactions from the onset of their relationship. (MRA State. Facts (Docket No. 55), ¶¶ 7-11.) Indeed, according to MRA, the parties discussed the issue of corporate transactions in nearly every substantive conversation before they executed the Engagement Letter. (*Id.*) MRA also concedes that "Callister and Tremulis told Musket and Dr. Latterman that they had established communications with [some] potential corporate partners . . . ." (MRA State. Facts (Docket No. 55) at 12, ¶ 11; Musket Aff. (Docket No. 56), ¶ 9.) MRA cannot claim that it was not aware of the issue when the parties negotiated the contract.

MRA now invites this Court re-write the parties' <u>written</u> contract. To support this misplaced effort, MRA relies exclusively on the uncorroborated affidavits of Mr. Musket and Ms. Latterman. As discussed below, even if MRA's claims were not barred by the Statute of Frauds, MRA's contentions (and the affidavits supporting those contentions) are utterly implausible. No reasonable jury could find for MRA on the basis of such "evidence."

**B.     MRA's Contentions (And The Affidavits Of Mr. Musket And Ms. Latterman) Do Not Withstand Scrutiny**

MRA now contends that, during the course of negotiating the Engagement Letter, MRA and Ovion entered certain oral agreements or understandings that are not set forth in the written contract that they negotiated. These alleged oral agreements fall into three categories:

(1) alleged limitations on Ovion's pursuit of a Corporate Transaction;

(2) alleged limitations on Ovion's use of MRA's services in pursuit of a corporate transaction; and

(3) alleged obligations for Ovion to give "notice" to MRA of Ovion's pursuit of a corporate transaction.

(Defs.' State. Facts, Exhibit C (MRA Suppl. Interrog. Resp.), at 2-3.) Each of these categories is discussed in turn below.

1.    **Alleged Limitations On Ovion's Pursuit Of Corporate Partners**

As to the first category of alleged oral agreements, MRA asserts that, before MRA and Ovion executed the Engagement Letter, the parties orally agreed to limitations on Ovion's pursuit of potential corporate partners. Specifically, MRA contends:

> MRA executed the Engagement Letter based on the following agreements and understandings with Ovion:
>
> - Ovion would not pursue a potential corporate partner until after it had made a good faith effort to obtain venture financing.
>
> - Ovion would not use MRA as a "stalking horse" for a corporate transaction.

(Defs.' State. Facts, Exhibit C (MRA Suppl. Interrog. Resp.), at 2-3.) No such provisions are set forth in the Engagement Letter.

As "evidence" of these alleged oral agreements and understandings, MRA relies exclusively on the uncorroborated affidavits of Mr. Musket and Ms. Latterman. For example, citing only those affidavits, MRA asserts that the following occurred during a meeting on June 16, 2004:

- "Musket asked Tremulis and Callister point blank whether they were interested in pursuing a corporate transaction. Both denied they were looking to do a deal." (MRA State. Facts (Docket No. 55), at 12, ¶ 10.)

- "Musket told Callister and Tremulis that MRA had no interest in being used as a 'stalking horse' for a corporate transaction and that they should either exhaust any such efforts or cease them before they hired MRA." (*Id.*)

- "Callister and Tremulis told Musket and Dr. Latterman that they had established communications with a small number of potential corporate partners as a backup plan when they had been unable to attract venture financing, but that they wanted to use the funds from the contemplated financing to build up the business before any such discussion would likely become serious." (*Id.* at 12-13, ¶ 11.)

- "MRA recommended that all such communications with corporate partners should cease during the period of the financing . . . ." (*Id.* at 13, ¶ 11.)

- "Callister told MRA that a corporate transaction would only happen if 'lightning struck,' and a company approached them with a deal too good to refuse." (*Id.*)

The allegations of Mr. Musket and Ms. Latterman and MRA's contentions based thereon are implausible and contradicted by <u>all</u> the record evidence. Most importantly, the Engagement Letter expressly addresses the possibility of a "Corporate Transaction" but, in stark contrast to Mr. Musket's and Ms. Latterman's affidavits, the Engagement Letter does <u>not</u> mention or suggest any limitation on Ovion's pursuit of a corporate transaction or a preference for a venture capital transaction. (Defs.' State. Fact (Docket No. 49), Exhibit A, § 3(d).) Moreover, MRA has not identified a single shard of evidence to corroborate Mr. Musket's and Ms. Latterman's allegations that such limitations allegedly were agreed upon.

Furthermore, the events following the June 16 meeting refute MRA's allegations. During the meeting on June 16, 2004, Ovion and MRA agreed to negotiate a <u>written</u> engagement letter. Following the meeting, MRA sent Ovion a writing purporting to set forth their agreement. (Callister Aff., ¶ 24; Callister Exhibit 2.) Notably, in stark contrast to Mr. Musket's and Ms. Latterman's affidavits, the June 16 version did <u>not</u> mention or suggest any limitation on Ovion's pursuit of a corporate transaction or a preference for a venture capital transaction. (*Id.*)

Over the next several weeks, the parties exchanged revisions to the engagement letter. (Callister Aff., ¶ 24; Callister Exhibits 3 (June 30 version); Callister Exhibit 4 (July 6 version); Callister Exhibit 5 (July 12 version).) Again, in stark contrast to Mr. Musket's and Ms. Latterman's affidavits, none of these versions (or the written correspondence between the parties) mentioned or suggested any limitation on Ovion's pursuit of a corporate transaction or a preference for a venture capital transaction. (*Id.*)

On July 13, 2004, Mr. Musket sent an email to Mr. Callister stating: "Changes [in the July 12 version] are acceptable. . . . Since we are in agreement please sign where indicated,

initial each page and fax a copy to me with a hard copy in the mail.  I will countersign yours when I receive it and do the same." (Callister Aff., ¶ 25; Callister Exhibit 6.)  Mr. Callister sent a signed contract to Mr. Musket on July 5, 2004.  (Callister Aff., ¶ 25.)  Mr. Musket, however, did not return a countersigned copy.  (*Id.*, ¶ 27.)

Rather, Mr. Musket asked to revise the agreement.   (Callister Aff., ¶¶ 27-28.)   In particular, Schedule B, as Mr. Callister sent it with the signed contract on July 15, had three sections where contacts were listed by name (in addition to identifying "All existing Ovion Investors" without listing them by name).   (Callister Aff., ¶ 26; Callister Exhibit 7 at MRA20898-99.)  The three sections were:

> (1) "OVION VC Contacts – 3% Placement Fee to MRA"
>
> (2) "OVION VC Contacts – Placement Fee to be negotiated"
>
> (3) "OVION NON 'VC Contacts' – No Placement Fee to MRA"

(*Id.*)  In the third section for "OVION NON 'VC Contacts' – No Placement Fee to MRA," Ovion listed a number of contacts which were not venture capital firms.  (Callister Aff., ¶ 26; Callister Exhibit 7 at MRA20899.)  The list of OVION NON VC Contacts include three corporations: Olympus, Storz, and Cytyc.  (*Id.*)

During a telephone conversation on July 20, 2004, Mr. Musket proposed, among other things, that Ovion and MRA negotiate a fee for the venture capital firms listed in the second section of Schedule B ("OVION VC Contacts – Placement Fee to be negotiated"), thereby eliminating the second section.  (Callister Aff., ¶¶ 27-28.)  In addition, Mr. Musket proposed that the third section ("OVION NON 'VC Contacts' – No Placement Fee to MRA") be eliminated and that the parties should negotiate terms addressing under what circumstances MRA could receive compensation in the event of a transaction involving Ovion's contacts that were not venture capitalists.  (*Id.*)

After some final revisions, the executed Engagement Letter provided the following:

(1) a revised Schedule B limited to Ovion's current investors and OVION VC Contacts;

(2) new section 3(c) regarding a "Success Fee" for "a Placement other than a Placement involving a corporate partner;" and

(3) new section 3(d) regarding an "Advisory Fee" for a "Corporate Transaction" such as a merger and acquisition.

(Callister Aff., ¶¶ 28-29; Callister Exhibits 9-11.)  In short, the "Success Fee" and "Advisory Fee" provisions were added at the same time that Schedule B was revised by removing the section for Ovion's non-venture capital contacts.  Neither the "Success Fee" provision nor the "Advisory Fee" provision was limited to "MRA Contacts" or "OVION VC Contacts."  (Callister Exhibit 11; Defs.' State. Facts (Docket No. 49), Exhibit A.)

In summary, the language of the final agreement expressly contemplates both venture capital transactions and corporate transactions.  (*Id.*)  In stark contrast to Mr. Musket's and Ms. Latterman's affidavits, nothing in the express language of the Engagement Letter, its negotiation history, or the correspondence between the parties even suggests a limitation on pursuit of a corporate transaction or a preference for a venture capital transaction.  Moreover, as discussed in the Introduction above, MRA purports to be a sophisticated party with decades of experience with contract negotiations generally and contracts such as the Engagement Letter specifically.  It is utterly implausible that, if MRA had extracted promises from Ovion to limit its pursuit of potential corporate partners, and if MRA deemed those limitations to be essential to its representation of Ovion, MRA then would execute a written agreement with no such limitations.  No reasonable jury could find for MRA on its version of events.

## 2. Alleged Limitations On Ovion's Use Of MRA's Services Or "Work Product"

As to the second category of alleged oral agreements, MRA asserts that, before MRA and Ovion executed the Engagement Letter, the parties orally agreed to limitations on Ovion's use of MRA's services in pursuit of a corporate partner.  Specifically, MRA contends:

> MRA executed the Engagement Letter based on the following agreements and understandings with Ovion: * * *
>
> - Ovion would not use MRA's research, presentation materials, or other work product to solicit or negotiate with potential corporate partners. * * *
> - Ovion would compensate MRA, commensurate with standard industry practice, to the extent that Ovion used MRA's research, presentation materials, or other work product to consummate a transaction with a corporate partner.

(Defs.' State. Facts, Exhibit C (MRA Suppl. Interrog. Resp.), at 2-3 (third and fifth bullet points).)  As "evidence" of these alleged oral agreements and understandings, MRA relies exclusively on the uncorroborated affidavits of Mr. Musket and Ms. Latterman.  Again, MRA's contentions (and the allegations of Mr. Musket and Ms. Latterman) are utterly implausible.

First, as with the first category of alleged oral agreements, nothing in the express language of the Engagement Letter, its negotiation history, or the correspondence between the parties even suggests a limitation on Ovion's use of MRA's services (or work product) in pursuit of a corporate partner.  Indeed, the term "work product" does not appear at all in the Engagement Letter.  A sophisticated party like MRA would not execute an agreement that omitted terms that MRA allegedly deemed essential during negotiations.  Thus, the Engagement Letter itself is compelling evidence that the parties never reached such oral agreements.

Second, MRA's contentions are internally inconsistent.  On the one hand, MRA contends that Ovion agreed that it would not use MRA's work product with potential corporate partners. (Defs.' State. Facts, Exhibit C (MRA Suppl. Interrog. Resp.), at 2-3 (third bullet point).)  On the

11

other hand, MRA contends that Ovion agreed to "compensate MRA, commensurate with standard industry practice" if Ovion used MRA's work product with potential corporate partners. (*Id.* (fifth bullet point).)   Logic dictates that an agreement not to use work product at all is inconsistent with an agreement to compensate for its use.[2]   MRA's contentions are illogical.

Third, the scenario contemplated by MRA is nonsensical.  Before Ovion retained MRA, Ovion had business plans, budgets, forecasts, presentations, and other solicitation materials. (Defs. State. Facts (Docket No. 49), ¶ 8; Exhibit E at 4-5.)  To the extent that MRA edited or revised any of these materials, MRA now claims that these materials constitute MRA's "work product."  (*Id.*.)  In addition, MRA claims that a legal opinion, which was prepared by outside counsel without any input from MRA and which was paid for by Ovion, nevertheless constitutes MRA's "work product" because Ms. Latterman allegedly persuaded Ovion to commission the legal opinion.  (MRA Opp'n (Docket No. 54) at 9; Callister Aff., ¶ 50.)  In the nonsensical scenario contemplated by MRA, Ovion agreed that it would not use any of this "work product" in the event that Ovion solicited a potential corporate partner.  In other words, Ovion would have to build some type of magical "fire wall," keeping all Ovion's materials infected with "MRA virus" on the venture capital side of the fire wall and an entirely separate set of "clean" materials on the corporate side of the fire wall.  The fire wall would have to divide even the consciousness of Mr. Callister and Mr. Tremulis, otherwise they might transfer "MRA virus" from the venture capital side of their minds to the corporate side.  Moreover, the fire wall would have to be impervious even to suggestions.  For example, once Ms. Latterman suggested that Ovion obtain a legal opinion for the venture capital side, Ovion thereafter could not obtain legal opinion for

---

[2] *See also* Latterman Aff., ¶ 13 ("I believed the Agreement between MRA and Ovion required Ovion to inform me before it directly solicited any party using the work product described
(continued . . .)

the corporate side, even an entirely separate opinion, unless Mr. Callister and Mr. Tremulis each could show that the side of his brain that decided to commission a legal opinion for the corporations was not influenced by the other side of his brain, which became infected with "MRA virus" by receiving Ms. Latterman's suggestion to commission a legal opinion for the venture capital side. Anyone with common sense would realize that it would be impossible to keep separate MRA's input to Ovion's solicitation materials.

In short, it is utterly implausible that Ovion orally agreed not to use MRA's "work product" in pursuit of potential corporate partners; or that, if MRA had extracted such an extraordinary concession, MRA then would execute a <u>written</u> contract without such a provision; or that, having made such agreement, the parties nevertheless would agree to a disclosure clause and a compensation scheme (tied to an unspecified "industry standard") for the use of MRA's work product in pursuit of a corporate partner, separate and apart from the detailed "Advisory Fee" provision set forth in Section 3(d) of the Engagement Letter.

> **3.    Alleged Obligations To Inform MRA About The Pursuit Of Corporate Transactions**

As to the third category of alleged oral agreements, MRA asserts that, before MRA and Ovion executed the Engagement Letter, the parties orally agreed that Ovion would give notice to MRA of any discussions with potential corporate partners. Specifically, MRA contends:

> MRA executed the Engagement Letter based on the following agreements and understandings with Ovion: * * *
>
> - Ovion would inform MRA if a corporation offered to acquire, fund, or partner with Ovion to assist in the negotiation and financial analysis of any offer.

---

above."). Why would the parties have an agreement to disclose the use of work product if they had an agreement not to use the work product?

(Defs.' State. Facts, Exhibit C (MRA Suppl. Interrog. Resp.), at 2-3 (fourth bullet point).)  To the extent that MRA contends that the parties had an oral agreement which was not memorialized in the Engagement Letter, MRA's contentions about this alleged oral agreement are just as implausible as MRA's contentions about the other alleged oral agreements.  The same analysis applies.

### a.    The Sworn Affidavits Of Mr. Musket And Ms. Latterman Contradict MRA's New Theory About Schedule B

In an attempt to avoid summary judgment, MRA now asserts that it has found a hook in the Engagement Letter requiring disclosure by Ovion at one particular point in time.  More specifically, MRA contends:  "Under the express language of the Contract, Ovion had an obligation to identify 'parties being actively solicited directly by Ovion' on Schedule B to the Contract at the time of its execution."  (MRA Opp'n (Docket No. 54) at 8 (emphasis added).)

Previously, MRA did not espouse this interpretation of the Engagement Letter.  Schedule B is not mentioned in MRA's First Amended Complaint or in MRA's interrogatory responses, which MRA supplemented twice.  (See Defs.' State. Facts, Exhibit B (First Am. Compl.) and Exhibit C (MRA Suppl. Interrog. Resp.).)

Indeed, MRA's new theory of the contract contradicts its prior contentions and the sworn allegations of Mr. Musket and Ms. Latterman.  More specifically, with respect to Schedule B, the Engagement Letter expressly states:

Schedule B may be updated from time to time by Ovion in its sole discretion.

(Defs.' State. Facts, Exhibit A, § 3(a) (emphasis added).)  Ovion insisted on this language during the negotiation of the Engagement Letter and MRA agreed.  (Callister Aff., ¶ 24.)  In contrast, MRA has always insisted, and Mr. Musket and Ms. Latterman swear in their affidavits, that

Ovion's obligation to "inform" extended throughout MRA's engagement.[3]  Accordingly, in view of Mr. Musket's and Ms. Latterman's sworn affidavits, any obligation for Ovion to disclose the solicitation of corporations cannot be tied to Schedule B, which Ovion had no obligation to update.  This inconsistency is fatal to MRA's attempt to avoid summary judgment.

> **b.**    **Pursuant To The Express Language Of The Engagement Letter, Including Schedule B Itself, The Parties To Be Listed On Schedule B Were Ovion's Venture Capital Contacts**

According to the express language of the Engagement Letter, the "parties" to be listed on Schedule B <u>when the contract was executed</u> were Ovion's venture capital contacts.  On July 21, 2004, the parties revised the Engagement Letter and removed the section in Schedule B for Ovion's non-venture capital contacts, such as corporations.  (Callister Aff., ¶¶ 25-30.)  The only remaining section where parties were listed by name was for Ovion's venture capital contacts. (*Id.*)  At the same time, the parties added Section 3(c) and Section 3(d) to the Engagement Letter to address the issue of Ovion's non-venture capital contacts.  (*Id.*)  The Engagement Letter expressly provides:  "'OVION VC Contacts' shall be those entities designated as 'OVION VC Contacts' on Schedule B of this contract."  (Defs.' State. Facts, Exhibit A, § 3(a).)  In contrast, there is no mention in the Engagement Letter of listing Ovion's non-venture capital contacts on Schedule B.  Moreover, the parties intended Schedule B as a basis for protecting Ovion, not

---

[3] *See, e.g.,* Musket Aff., ¶ 9 ("[I]t was my clear understanding that there would be no active solicitation of corporate investors without notification to MRA."); *id.*, ¶ 12 ("I believed that if Ovion began to actively solicit a corporate partner it had an obligation to disclose it."); Latterman Aff., ¶ 6 ("I believed that Ovion had agreed to immediately notify MRA if they were newly approached by a potential investor including any corporate partners or if they began actively soliciting a party not already identified on the Schedule B . . ."); *id.*, ¶ 13 ("I believed the Agreement between MRA and Ovion required Ovion to inform me before it directly solicited any party using [MRA's] work product . . . .").

MRA, by excluding parties from MRA's list of "MRA Contacts" for which MRA could receive a 7% "Finder's Fee." (*Id.*, §§ 3(a), 3(b).)

   **c. In Any Event, No Corporations Were "Being Actively Solicited Directly By Ovion" When The Engagement Letter Was Executed**

  Even assuming, *arguendo*, that Ovion was required <u>at the time the Engagement Letter was executed</u> to disclose on Schedule B corporations "being actively solicited directly by Ovion," MRA nevertheless does not avoid summary judgment.  As discussed above, the Engagement Letter expressly provides that, after the Engagement Letter was executed, "Schedule B <u>may</u> be updated from time to time by Ovion <u>in its sole discretion</u>." (Defs.' State. Facts, Exhibit A, § 3(a) (emphasis added).)  In other words, Ovion was not obligated to update Schedule B after the Engagement Letter was executed..  And, at the time the Engagement Letter was executed, no corporations were "being actively solicited directly by Ovion" for a placement of Ovion stock or a merger and acquisition.  (Callister Aff., ¶¶ 7-18.)

  Based on some email correspondence attached to an affidavit by MRA's counsel, MRA contends that "Ovion actively pursued financing from AMS before and after it entered into the Contract." (MRA Opp'n at 14-15.)  Specifically, MRA asserts that "Ovion sent [Dr. Keith] Isaacson to solicit AMS at its headquarters in Minnesota during the same time it was finalizing its agreement with MRA." (*Id.* at 6-7.)

  Contrary to MRA's unfounded contentions, Ovion was not soliciting AMS at the time the Engagement Letter was executed.

REDACTED

REDACTED

REDACTED

MRA also contends that Ovion was pursuing other corporations "before and after" the Engagement Letter was executed. (MRA Opp'n at 15.) That allegation is immaterial because no corporation was "being actively solicited directly by Ovion" at the time the Engagement Letter was executed, which is the only relevant time period, even assuming, *arguendo*, that Ovion was obligated to list corporations on Schedule B at that time. As MRA concedes, when Ovion and MRA began discussing a relationship in June, 2004, Ovion informed MRA that "Ovion had established communications with [some] potential corporate partners . . . ." (MRA State. Facts (Docket No. 55), at 12, ¶ 11; Musket Aff. (Docket No. 56), ¶ 9.)

REDACTED

---

[4] Contrary to MRA's unfounded assertions, Ovion did not retain Dr. Isaacson as a "finder," and Ovion did not pay him a finder's fee. (Isaacson Aff., ¶¶ 15-16; Callister Aff., ¶ 33.)

REDACTED

No reasonable jury could find for MRA on this point.

### 4. The Conduct Of MRA, Mr. Musket, And Ms. Latterman Belies Their Allegations

As discussed above, MRA, Mr. Musket, and Ms. Latterman allege that Ovion agreed to certain conditions relating to the pursuit of potential corporate partners (*i.e.*, Ovion would limit its pursuit of corporate partners; Ovion would not use MRA's "work product" to pursue corporate partners; Ovion would compensate MRA according to the prevailing "industry standards" if Ovion used MRA's work product in pursuit of corporate partners; and Ovion would keep MRA informed about Ovion's pursuit of corporate partners.)   In addition, MRA, Mr. Musket, and Ms. Latterman assert that they relied on Ovion's alleged representations when MRA agreed to represent Ovion and that MRA would not have agreed to represent Ovion or would have discontinued its representation but for the promises made by Ovion.[5]

#### a. Under The Circumstances Alleged By MRA, Any Intelligent, Sophisticated Party Would Have Demanded Written Assurances That Ovion Was Not Pursuing A Parallel Corporate Track

The conduct of MRA, Mr. Musket, and Ms. Latterman completely belies their uncorroborated allegations and contentions.   Notably, MRA is not shy about submitting

---

[5] *See, e.g.*, MRA State. Facts (Docket No. 55) at 13, ¶ 12 ("MRA relied upon Tremulis and Callister's representations . . . when it decided to enter into the Contract."); *id.* at 16, ¶ 24 ("MRA would not have begun its representation of Ovion, or may have terminated its representation of Ovion if an acceptable fee could not be negotiated, had MRA known that Ovion was actively pursuing a parallel corporate opportunity."); *id.* at 17, ¶ 26 ("Had Ovion disclosed that it was actively soliciting a corporate acquisition, MRA would not have continued with the engagement without first negotiating an appropriate fee for MRA's services and an appropriate role for MRA to play in a potential corporate transaction."); Musket Aff. (Docket No. 56), ¶ 7 ("Had we known that Ovion intended to actively pursue a corporate transaction on a parallel track during the contract period, we would never have entered into the agreement."); *id.*,
(continued . . .)

documents that it believes might help its case. (*See* Ames Aff.)  Mr. Musket and Ms. Latterman, however, do not submit a single document to corroborate their allegations.  This glaring omission is particularly noteworthy given the extent that Mr. Musket and Ms. Latterman rely on email, a form of <u>written</u> communication.  Indeed, from June, 2004, when MRA began talking to Ovion, through February, 16, 2005, when Ovion informed MRA that Ovion had signed a letter of intent with AMS, Mr. Musket and Ms. Latterman sent more than 230 separate emails to Mr. Callister or Mr. Tremulis or both.  (Carani Aff., ¶ 4.)  During the same time period, Mr. Musket and Ms. Latterman exchanged more than 80 additional emails between themselves. (*Id.*, ¶ 5.)  Given the alleged frequency of communications regarding the issue of corporate transactions and the alleged importance of this issue to MRA, the fact that Mr. Musket and Ms. Latterman cannot identify a single email (or other document) that corroborates their allegations is compelling evidence that no reasonable jury could ignore.

For example, Ms. Latterman alleges: "Sometime in the late fall of 2004, I began to grow suspicious that Ovion was not being completely forthcoming about it intensions with regard to a corporate acquisition."  (Latterman Aff. (Docket No. 57), ¶ 14.)  Similarly, referring to the annual meeting of the American Association of Gynecologic Laproscopists ("AAGL") in November, 2004, Ms. Latterman alleges: "I continued to believe that something more was going on than they were telling me so I asked David Musket to follow up with Tremulis and Callister on their plans for meeting with corporations when he arrived at the AAGL the next day." (*Id.*)  In turn, Mr. Musket alleges:

> I specifically inquired if there had been any corporate activity during the AAGL meeting.  Ovion's responses provided no indication that anything other than general informational meetings had taken place or were being scheduled.  I

¶¶ 9, 13; Latterman Aff. (Docket No. 57), ¶ 10; *id.*, ¶ 13 ("I would not have permitted Ovion to share my materials with a party not listed on either Schedule A or Schedule B.").

> remember expressing some surprise to them that this could be the case given the "buzz" that seemed to be growing about their product as evidenced by the illustrious group of investigators that were attending this dinner. This query was just shrugged off with no potential explanation offered.

(Musket Aff. (Docket No. 56), ¶ 19.)  According to Ms. Latterman's and Mr. Musket's accounts, Ovion, which allegedly agreed not to pursue corporations absent a "lightning strike," was in the midst of a figurative lightning storm, and MRA was "suspicious" that Ovion was actively soliciting corporate partners.

Under the circumstances alleged by MRA, any intelligent, sophisticated party would be certain to confirm in writing that Ovion was not actively pursing corporate partners in parallel with the venture capitalists.  Likewise, under such circumstances, any intelligent, sophisticated party would have reminded Ovion in writing that it was obligated to update Schedule B with potential corporate partners so that MRA could negotiate an appropriate placement fee, assuming, *arguendo*, that the parties had agreed to proceed in that fashion as MRA contends.  In contrast, Mr. Musket alleges that he simply dropped the matter when Ovion "shrugged off" his "query."

Ms. Latterman also alleges:  "Sometime during the first week of February, 2005, I learned that one of the venture investors we had approached on the Ovion financing . . . had . . . dropped out after a very positive meeting . . . because they had heard that Ovion was pursuing a parallel acquisition track."  (Latterman Aff. (Docket No. 57), ¶ 19.)  Notably, neither Mr. Musket nor Ms. Latterman allege that MRA responded, orally or in writing, by admonishing Ovion for pursuing "a parallel acquisition track" or reminding Ovion its alleged obligation to keep MRA informed by updating Schedule B.  Under the circumstances alleged by MRA, any intelligent, sophisticated party would have promptly demanded a written confirmation from Ovion that it was not pursuing a "parallel track."  The fact that MRA did not do so, orally or in writing, speaks

21

volumes.   MRA's uncorroborated story does not add up.   No reasonable jury could find otherwise.

> **b.     MRA Is Unsuccessful In Its Thinly Veiled Attempt To Neutralize Evidence Refuting Its Allegations**

As discussed above, the fact that a sophisticated party like MRA failed to memorialize the alleged oral agreements in the <u>written</u> Engagement Letter and failed to memorialize <u>in writing</u> its alleged suspicions about Ovion secretly pursing a parallel corporate track is compelling evidence that, contrary to MRA's contentions, the Engagement Letter, which imposes no limitations or conditions on the pursuit of corporate transactions, fully reflects the parties' actual agreement.   No limitations on a "parallel" corporate track are found in the Engagement Letter and no documentation of MRA's alleged suspicions exists because, as set forth in Section 3(d) of the Engagement Letter, MRA was fully aware that Ovion intended to pursue a parallel track.   Moreover, the parties had agreed to terms regarding the compensation, if any, that MRA would receive in the event of a corporate transaction.

MRA not only lacks even a shard of corroboration for its story, but the documentation of record refutes MRA's allegations.   The Engagement Letter itself is the most compelling document refuting MRA's allegations, but other documents also exist.   In her affidavit, Ms. Latterman subtly attempts to neutralize some of these documents, specifically an exchange of emails with Jeff Callister and Steve Tremulis.  (Latterman Aff. (Docket No. 57), ¶ 14.)   In Ms. Latterman's affidavit, a quote is cropped from one of the emails.  (*Id.*)   Notably, however, the emails themselves are not attached to Ms. Latterman's affidavit, although MRA submitted plenty of other emails to the Court.   The actual emails, which are reproduced below, are utterly inconsistent with MRA's version of events.

Specifically, on October 21, 2004, Ms. Latterman sent Jeff Callister and Steve Tremulis

the following email, which she copied to Mr. Musket:

| From: | Sue Ann Latterman <sueann@mrave.com> |
|---|---|
| Sent: | Thursday, October 21, 2004 5:29 PM |
| To: | JCevion@aol.com, AutoGX@aol.com |
| Cc: | David Musket (dmusket@mrave.com) |
| Subject: | to do list |

Please send me info on the following:
1.  contacts at Olympus, Storz and AMS
2.  current schedule for the AAGL meeting
3.  When you want to get together to discuss your thoughts on an acquisition...price, timing, etc. Please keep in mind that corporations usually move slower than VCs. It usually takes many many months to come to final terms with a potential corporate buyer. On the other hand, there can be the potential to negotiate some up front money from a corporation to have them show their "honorable intentions" and to keep you from needing to raise money from somewhere else. This is a balancing act in that you don't want to string along the VCs if your real intent is to sell the company sooner than later and yet you have the fiduciary responsibility to yourself and your investors to make the best deal possible. Timing thus is crucial. If you fully believe that Olympus is serious at this time, we should push that forward now. I would be happy to call your contacts there to get a feel for what they are thinking and/or we could do a conference call with them. Please let me know your thoughts.

Thanks
Sue Ann

Sue Ann Latterman, VMD
Musket Research Associates
301 Joyce Way
Mill Valley, CA 94941
O: 415-383-5255
F: 415-383-7900
C: 415-673-4644

(Callister Aff., ¶ 41; Callister Exhibit 13.)  Just a few minutes after receiving her email, Mr.

Callister responded via email and identified Ovion's principal contact at Storz (Craig Traub) and

Ovion's principal contacts at Olympus:

| | |
|---|---|
| **From:** | JCovion@aol.com |
| **Sent:** | Thursday, October 21, 2004 6:33 PM |
| **To:** | sueann@mravc.com |
| **Cc:** | AutoGX@aol.com |
| **Subject:** | Fwd: for your calendars |
| **Attach:** | for your calendars (1 26 KB) msg |

Sue Ann,

Ovion's investigators meeting is Thursday, 7:00 to 10:00 PM. Note: from 8:00 to 10:00PM will focus solely on discussions per the Prehyst study and Pivotal study (i.e., what standard inner uterine pressure? type of inflation catheter? etc., etc...). I am not sure this would be of interest to you. If so, we will reserve a seat for you. At present there will be 12 doctors attending, along with Craig Traub from Storz. The other two lunches are set up for you!!! If others might attend these lunches, let us know now so we can make the appropriate number of seating arrangements

The contacts at Olympus are Thomas Prsecher (s?) PHD, and Paul Abrahm (s?)
Thomas oversee the Gynecology division and Paul is Head of business Dev. Paul is going to get the NDA going ASAP. I'll keep you abreast.

Jeff C

(Callister Aff., ¶ 42; Callister Exhibit 14.)  Mr. Callister explained:  "I did not know why Ms. Latterman asked about our contacts at AMS because we previously had told both Mr. Musket and Ms. Latterman about our phone call with Jim Call [from AMS].  At this point, Mr. Musket probably knew Jim Call better than we did."  (Callister Aff., ¶ 42.)  Neither Mr. Musket nor Ms. Latterman ever followed up with any of Ovion's corporate contacts or asked for any additional information about them.  (*Id.*, ¶ 45.)

Most significantly, neither Mr. Musket nor Ms. Latterman discouraged Ovion from pursuing a transaction with AMS, Storz, or Olympus, or suggested that any of those corporations should be added to Schedule B of the Engagement Letter.  (Callister Aff., ¶ 43.)  Rather, Ms. Latterman stated that Mr. Callister and Mr. Tremulis had a fiduciary duty to pursue the best deal possible:

> [Y]ou have the fiduciary duty to yourself and your investors to make the best deal possible.

(Callister Aff., ¶ 41; Callister Exhibit 13.)  Likewise, neither Mr. Musket nor Ms. Latterman discouraged Ovion from using any of the materials that Ovion was using with the venture capital firms.  (Callister Aff., ¶ 43.)

The entire email exchange is inconsistent with MRA's present characterization of events. For instance, if Ovion was operating in "secret," or if the parties had agreed that Ovion would not pursue a corporation unless "lightning struck," or if the parties had agreed that Ovion was obligated to update Schedule B with any potential corporate partners, or if the parties had agreed that Ovion would not use MRA's "work product" to pursue a corporate transaction, then the email exchange would have been entirely different.

In short, MRA not only lacks any documents to corroborate its story, but the documents of record, beginning with the Engagement Letter itself, contradict MRA's contentions and the uncorroborated allegations of Mr. Musket and Ms. Latterman.  Despite MRA's attempts to create factual disputes to avoid summary judgment, there are no <u>genuine</u> disputes of <u>material</u> fact.  No reasonable jury could find for MRA.

## III.  SUMMARY JUDGMENT SHOULD BE ENTERED AGAINST EACH OF MRA'S CLAIMS

In opposition to Defendants' motion, MRA responded with lengthy affidavits, largely directed to irrelevant subject matter, in an attempt to avoid summary judgment by creating the appearance of factual disputes.  The alleged factual disputes are <u>not</u> "genuine" because MRA has failed to present evidence on which a reasonable jury could find in MRA's favor.  As discussed above, MRA's contentions and the allegations of Mr. Musket and Ms. Latterman are uncorroborated, internally inconsistent, and utterly implausible.  *See, e.g., Morris v. Brandeis University*, 13 Mass. L. Rep. 627, 2001 Mass. Super. LEXIS 518, at *8-11 (Mass. Super. 2001) (summary judgment granted on breach of contract claim where plaintiff's own self-serving

affidavit, "standing alone, [was] unacceptable to defeat summary judgment"). In addition, as discussed below, the alleged factual disputes are not "material" because MRA's causes of action are flawed as a matter of law, particularly in view of the Statute of Frauds.

### A.    MRA's Claims Are Barred By The Statute Of Frauds

"[T]he purpose of the Statute of Frauds is to 'suppress fraud, that is, cooked up claims of agreement, sometimes fathered by wish, sometimes imagined in the light of subsequent events, and sometimes simply conjured up.'" *LJA Corp.*, 1995 Mass. Super. LEXIS 692, at *8. Each of MRA's claims fit squarely within the legislative purpose and therefore are barred by the Statute of Frauds.

With respect to the MRA's claim for breach of contract, MRA asserts that the Statute of Frauds is a "red herring" because the parties have a written agreement and "a writing need not set forth every single term of an agreement in order to satisfy the statute of frauds." (MRA Opp'n at 11.) In other words, MRA contends that, so long as the parties have a written agreement, additional oral agreements on the side do not run afoul of the Statute of Frauds. To the contrary, even the cases cited by MRA state the opposite. *See, e.g., Des Brisay v. Foss*, 162 N.E. 4, 6 (Mass. 1928) ("A memorandum to satisfy the statute of frauds . . . must contain the terms of the contract agreed upon . . ." (emphasis added).).

Relying on the uncorroborated affidavit of Mr. Musket, MRA also asserts that "MRA is more than a finder," intimating that perhaps the Statute of Frauds therefore does not apply. (MRA Opp'n at 2.) To the contrary, the Statute of Frauds applies not only to all brokers and finders but also to anyone else who provides a "service rendered in . . . negotiating the purchase, sale or exchange of a business, its good will, inventory, fixtures or an interest therein . . . ." Mass. Gen'l Laws ch. 259, § 7 (2005); *see also Bay Colony Marketing Co. v. Fruit Salad, Inc.*, 672 N.E.2d 987, 989-91 (Mass. App. Ct. 1996); *Stavaridis v. Dynamic Machine Works, Inc.*, 2

26

Mass. L. Rep. 446, 1994 Mass. Super. LEXIS 738 at *4-10 (Mass. Super. 1994). In any event, MRA was retained as a "nonexclusive finder/advisor" and Mr. Musket describes the Engagement Letter as a "Finder's Agreement." (Callister Ex. 11 at OVN001513.) The Statute of Frauds applies here.

### B.    MRA's Claim For Breach Of Contract

Even assuming, *arguendo*, that MRA's factual allegations were true, nothing that Ovion did or did not do was a breach of the parties' contract as set forth in the Engagement Letter. Any alleged oral agreements are barred by the Statute of Frauds.

### 1.    MRA's New Theory About Schedule B Is Flawed As A Matter Of Law, And In Any Event Ovion Was Not Soliciting AMS When The Engagement Letter Was Executed

As discussed above, MRA now contends, for the first time, that Ovion was obligated to list on Schedule B any corporations "being actively solicited directly by Ovion" at the time the Engagement Letter was executed. (*See supra* § II.B.3.a.) MRA's new theory does not survive summary judgment for at least two separate reasons. First, as discussed in detail above, the "parties" to be listed on Schedule B when the contract was executed were Ovion's venture capital contacts, not Ovion's corporate contacts or other non-venture-capital contacts.[6] (*See supra* § II.B.3.b.) Second, as discussed in detail above, Ovion was not actively soliciting AMS or any other corporation, either directly or through an intermediary, at the time the Engagement Letter was executed. (*See supra* § II.B.3.c.)

---

[6] "The interpretation of a written contract or lease is a question of law, not of fact." *Lexington Ins. Co. v. All Regions Chem. Labs*, 647 N.E.2d 399, 400 (Mass. 1995); *see also Derrig v. Wal-Mart Stores, Inc.*, 942 F. Supp. 49, 53 (D. Mass. 1996) ("The interpretation of a written contract's terms is a question of law, not fact, and is susceptible to determination at summary judgment.") (citing *Lexington Ins. Co. v. All Regions Chem. Labs*, 647 N.E.2d 399, 400 (Mass. 1995)).

### 2.    MRA's New Theory About A Third Contingency Is Flawed As A Matter Of Law, And The Contingency Was Not Realized In Any Event

In an attempt to avoid summary judgment, MRA now argues that a third, hypothetical contingency was theoretically possible. Specifically, MRA now argues that (1) if Ovion had added a corporate partner to Schedule B and (2) if Ovion had switched that corporate partner from Schedule B to Schedule A, then MRA could have received compensation (3) if Ovion's stock were privately placed with that corporate partner. (MRA State. Facts (Docket No. 55) at 5 (Response No. 11).) MRA never advanced this theory of the parties' agreement until MRA was faced with Defendants' motion for summary judgment.

MRA's new theory fails for at least three reasons. First, according to the express language of the Engagement Letter, including Schedule B itself, the "parties" to be listed on Schedule B when the contract was executed were Ovion's venture capital contacts, not Ovion's corporate contacts. (*See supra* §II.B.3.b.) Second, according to the express language of the Engagement Letter, all three steps in MRA's new theory (*i.e.*, add a party to Schedule B, then switch the party from Schedule B to Schedule A, and then place stock with that party) were in Ovion's "sole discretion."[7] Most important, MRA cannot dispute that MRA's new hypothetical contingency was not realized, just like the two contingencies expressly set forth in the

---

[7] In pertinent part, the Engagement Letter provides:

> The potential investors contacted by MRA are subject to acceptance by OVION in its sole and absolute discretion; and OVION is under no obligation to sell any of its capital stock to such parties. . . . (Defs. State. Facts (Docket No. 49), Exhibit A, §2(d)) (emphasis added))

> Schedule B may be updated from time to time by Ovion in its sole discretion . . . . (*id.*, § 3(a) (emphasis added))

> At OVION's sole discretion, it may authorize a switch of an investor listed on Schedule B to Schedule A . . . (*id.*, § 3(b) (emphasis added)).

Engagement Letter.  Therefore, even according to MRA's new flawed theory, MRA is not entitled to compensation, and summary judgment should be entered against MRA's claims.

### C.    MRA's Claim For Breach Of Covenant Of Good Faith And Fair Dealing

Pursuant to a <u>contingency</u> contract, MRA agreed to represent Ovion as a "<u>nonexclusive</u> finder/advisor." (Defs.' State. Facts (Docket No. 49), Exhibit A (emphasis added).)  Section 3(d) in the Engagement Letter set forth the parties understanding regarding MRA's compensation, if any, in the event of a Corporate Transaction.  (*Id.*, § 3(d).)

The Engagement Letter did <u>not</u> limit Ovion's pursuit of corporate partners, did <u>not</u> limit Ovion's use of MRA's services in pursuit of corporate partners, and did <u>not</u> obligate Ovion to inform MRA about Ovion's pursuit of corporate partners.  (*Id.*, §§ 1-8.)  (Moreover, the Engagement Letter expressly provides that, after execution of the Engagement Letter, Ovion was not obligated to update Schedule B. (*See supra* § II.B.3.a.))  Under the guise of the covenant of good faith and fair dealing and in an attempt to circumvent the Statute of Frauds, MRA now invites the Court to re-write the parties' contract and impose duties and obligations on Ovion that are not found in the Engagement Letter.  Even MRA must concede that such an approach is contrary to law.  (MRA Opp'n at 12 n.1 ("[T]he requirement of good faith performance under the implied covenant is ultimately circumscribed by the obligations contained in the agreement . . . [which] keeps the implied covenant from being used to 'create rights and duties not contemplated by the provisions of the contract or the contractual relationship' . . . ").)  Although MRA acknowledges the law, it proceeds contrary to these fundamental principles.

MRA contends that "Ovion agreed to pay MRA fees in exchange for MRA's services. . . . [I]t was essential to the bargain that Ovion not take any action to deny MRA fees by using MRA's services and work product to secretly negotiate a merger with an undisclosed party." (MRA Opp'n at 12-13.)  To the contrary, hoping for a special reward, MRA accepted a special

risk by signing a <u>nonexclusive contingency agreement</u>, including an express provision limiting MRA's right to receive an "Advisory Fee" in the event of a Corporate Transaction to the first 180 days of the engagement. MRA cannot now ask the Court to re-write the parties' contract as though it were not a contingency agreement.

In any event, Ovion did not engage in discussions with AMS until "lightning struck" when Jim Call from AMS telephoned Ovion <u>after the Engagement Letter was executed</u>. (*See supra* § II.B.3.c.) Furthermore, MRA was fully aware that Ovion was pursuing the parallel track of a corporate transaction generally and that Ovion was engaged in discussions with AMS specifically. (*See supra* § II.B.4.)

## D.    MRA's Claims For Promissory Estoppel And Quantum Meruit

As Defendants noted in their opening memorandum, "MRA's claim for promissory estoppel is barred by the Statute of Frauds. *Cox v. Thornton Associates, Inc.*, 8 Mass. L. Rep. 715, 1998 Mass. Super. LEXIS 425 at *7 (Mass. Super. 1998) (Pursuant to ch. 259, § 7, "promissory estoppel offers no relief" where attempted recovery is based on an oral contract.)" (Defs.' Mem. (Docket No. 48) at 14.) Likewise, "MRA's claim for quantum meruit is barred by the Statute of Frauds. *Stavaridis*, 1994 Mass. Super. LEXIS 738 at *14-15 ("Since a claim for quantum meruit is a claim on a contract implied in law, the plain and ordinary language of the statute bars claims for quantum meruit.")." (Defs.' Mem. (Docket No. 48) at 15.) <u>MRA does not even attempt to dispute that the Statute of Frauds bars MRA's claims for promissory estoppel and quantum meruit</u>. (MRA Opp'n at 16-18.) Accordingly, summary judgment should be entered against these claims on this basis alone.

In addition, MRA's claims for promissory estoppel and quantum meruit must fail because the relationship between Ovion and MRA is governed by a written contract. (Defs. Mem. (Docket No. 48) at 13-15.) In opposition, MRA relies on *Palriwala v. Palriwala Corp.*, 834

N.E.2d 1241 (Mass. App. Ct. 2005) for the proposition that a court may award damages in quantum meruit even if the parties have a written contract. MRA's reliance is misplaced. In particular, MRA glosses over the fact that in *Palriwala* the contract claim and the quantum meruit claim were for <u>different services</u>, which is inapposite here. *Id.* at 1247, 1249-50.

### E.    MRA's Claim For Conversion

MRA's cause of action for "conversion" of its services or "work product" must fail because "a cause of action for conversion . . . does not apply to intangible items." *Jayson Assocs. v. UPS Co.*, No. 04-10771-RWZ, 2004 U.S. Dist. LEXIS 13191 at *4 (D. Mass. July 15, 2004); *see also Harvard Apparatus, Inc. v. Cohen*, 130 F. Supp. 2d 161, 164 (D. Mass. 2001) ("This court previously stated that it could not locate any authority to suggest that Massachusetts has expanded the common law tort of conversion beyond its traditional application to chattels.").

MRA argues that its services are not intangible because they were "memorialized in tangible written form." (MRA Opp'n (Docket No. 54) at 18. To the contrary, for purposes of a claim for civil conversion, the concept of an intangible item in tangible form is limited to items such as bonds, bills of exchange, and stock certificates. *See Commonwealth v. Rizzuto*, 1980 WL 4637 at *3 (Mass. Super. May 9, 1980) (citing the example of conversion of a bank passbook, "which not only deprives the depositor of the book but makes it impossible for him to withdraw his balance"). Here, MRA is claiming conversion of intangible items (*i.e.*, MRA's ideas, analysis, services, etc.) rather than the tangible pieces of paper on which some of the intangible items may have been printed, for example. In any event, MRA cannot claim conversion when Ovion had every right to use MRA's services (or work product) for all purposes contemplated in the Engagement Letter, including the pursuit of a Corporate Transaction. (Defs.' State. Facts (Docket No. 49), Exhibit A, § 3(d).)

31

**F.    MRA's Claims For Fraud, Negligent Misrepresentation, And Concealment**

MRA's claims for fraud, negligent misrepresentation, and concealment are nothing more than different names for the alleged oral agreements.  Accordingly, these claims also are barred by the Statute of Frauds.  *See LJA Corp.*, 1995 Mass. Super. LEXIS 692, at *8 ("[T]he purpose of the Statute of Frauds is to 'suppress fraud, that is, cooked up claims of agreement, sometimes fathered by wish, sometimes imagined in the light of subsequent events, and sometimes simply conjured up.'").

Furthermore, MRA's allegations of fraudulent inducement fail as a matter of law.  "False statements of opinion, of conditions to exist in the future, or of matters promissory in nature," do not qualify as representations of material fact.  *Learning Express, Inc. v. Ray-Matt Enters.*, 74 F. Supp. 2d 79, 84-85 (D. Mass. 1999); *see also Petricca v. Simpson*, 862 F. Supp. 13, 16 (D. Mass. 1994); *Steiner v. Unitrode Corp.*, 834 F. Supp. 40, 46 (D. Mass. 1993).

MRA relies entirely on the case of *McEvoy Travel Bureau v. Norton Co.*, 563 N.E.2d 188 (Mass. 2004).  (MRA Opp'n at 13.)  However, contrary to MRA's assertions, *McEvoy* does not "involve[] facts similar to those at issue here."  (*Id.*)  Rather, the present case is distinguishable from *McEvoy*, and instead, analogous to *Turner v. Johnson & Johnson*, 809 F.2d 90 (1st Cir. 1986) (discussed at length in *McEvoy,* 563 N.E.2d  at 192-194).   The court in *McEvoy* distinguished *Turner* on "at least two important respects."  *McEvoy*, 563 N.E.2d at 193.  For both reasons, *Turner* is applicable here, not *McEvoy*.[8]

_____

[8] First, "in *Turner*, the alleged fraud took place during negotiations prior to the signing of the contract."  *McEvoy*, 563 N.E.2d at 193.  Similarly, in the present case, MRA contends that the alleged fraud took place during negotiations before execution of the contract.  (*See* MRA Opp'n at 14 ("MRA entered into the Contract based on Ovion's statements …").)  The *Turner* court expressed concern that "representations made during the 'give-and-take of negotiations,' before any final commitment or agreement is made, might be raised to contradict what is finally and unequivocally agreed upon in the final version of the contract," a concern which is directly
(continued . . .)

The court in *Turner* held:

> [W]here both parties were experienced in business and the contract was fully negotiated and voluntarily signed, plaintiffs may not raise as fraudulent any prior oral assertion inconsistent with a contract provision that specifically addressed the particular point at issue.

*Turner*, 809 F.2d at 97.  Accordingly, MRA's claims for fraud, negligent misrepresentation, and concealment must fail as a matter of law.

### G.    MRA's Claim For Violation Of Mass. Gen. L. Ch. 93A

As a final catch all, MRA contends that Ovion violated Chapter 93A.  In view of the express terms of the Engagement Letter and Ovion's rights and obligations therein, nothing that Ovion did or did not do raises to the level of a violation of Chapter 93A, even assuming, *arguendo*, that MRA's allegations are true.  In order to violate Chapter 93A, the alleged conduct must "attain a level of rascality that would raise an eyebrow of someone inured to the rough and tumble of the world of commerce."  *Cheswell, Inc. v. Premier Homes and Land Corp.*, 319 F. Supp. 2d 135, 142 (D. Mass. 2004) (quoting *Levings v. Forbes & Wallace, Inc.*, 396 N.E.2d 149, 153 (Mass. App. Ct. 1979).

In any event, MRA's contentions and the allegations of Mr. Musket and Ms. Latterman are uncorroborated and utterly implausible.  (*See supra* § II.)  No reasonable jury could find for MRA on the basis of such "evidence."

---

applicable here.  *McEvoy*, 563 N.E.2d at 193; *Turner*, 809 F.2d at 96.  Furthermore, unlike *McEvoy*, and like *Turner*, MRA does not allege that to induce it to sign, Ovion "pointed to a particular provision of the final contract and fraudulently promised that it would not invoke the provision."  *See McEvoy*, 563 N.E.2d at 193; MRA Opp'n at 14-15.

Second, and most important, as the Court in *McEvoy* stated, "the jury could have found in [*McEvoy*] that the termination provision in the . . . contract was not mentioned during negotiations, but rather had been unilaterally inserted by [the defendant]."  *McEvoy*, 563 N.E.2d at 193.  MRA does not and cannot allege that any clause in the Engagement Letter, especially Section 3(d) regarding a Corporate Transaction, was "unilaterally inserted" by Ovion.  (MRA Opp'n at 13-15.)

## IV.    CONCLUSION

For the reasons set forth herein, Defendants respectfully request entry of summary judgment against each of the counts asserted by Plaintiff in the First Amended Complaint.

Respectfully submitted,

Dated: March 3, 2006                    By  _/s/ Leland G. Hansen _____
                                        Leland G. Hansen
                                        Christopher V. Carani
                                        McANDREWS, HELD & MALLOY, LTD.
                                        500 W. Madison Street, 34th Floor
                                        Chicago, Illinois 60661
                                        (312) 775-8000 (telephone)
                                        (312) 775-8100 (facsimile)

                                        Dale A. Malone (BBO #552376)
                                        BANNER & WITCOFF, LTD.
                                        28 State Street, 28th Floor
                                        Boston, Massachusetts   02109
                                        (617) 720-9600 (telephone)
                                        (617) 720-9601 (facsimile)

                                        *Attorneys for Defendant and Counterclaimant
                                        Ovion, Inc. and Defendants William S. Tremulis
                                        and Jeffrey P. Callister.*