UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

```
                        )
MUSKET RESEARCH ASSOCIATES,  )
INC.,                   )
      Plaintiff,        )
                        )
         v.             )        05-CV-10416-MEL
                        )
OVION, INC., WILLIAM S.  )
TREMULIS, and JEFFREY P.  )
CALLISER,               )
      Defendants.       )
                        )
```

MEMORANDUM AND ORDER

LASKER, D. J.

Ovion, Inc., William S. Tremulis, and Jeffrey P. Calliser (collectively, "Ovion") move for summary judgment dismissing all counts of the complaint.

I. Background

Ovion, founded by defendants Tremulis and Callister, is a company focused on minimally invasive alternatives to surgical sterilization. Plaintiff Musket Research Associates, Inc. ("MRA") specializes in securing venture capital financing for emerging health care companies. It was created in 1991 by David Musket ("Musket"), who remains the President and Chief Executive Officer. Sue Ann Latterman ("Latterman") is MRA's primary employee on the west coast. Since its founding, MRA has assisted approximately forty clients under contracts substantially similar

1

to that with Ovion.   (Musket Aff. ¶4.)

On July 21, 2004, Ovion retained MRA as "a nonexclusive finder/advisor in connection with a proposed private placement of Convertible Preferred Stock of Ovion, Inc.".   (Engagement Letter §1.)   Pursuant to the Engagement Letter which constituted the parties' contract, MRA agreed to provide the following services:

> (i) analyze the financial performance and projections of the Company and provide advice regarding the appropriate valuation range for the new equity capital; (ii) assist in the development of presentation materials for investor solicitations; (iii) contact qualified investors and, if acceptable to you or your representative, send the necessary documents ourselves or through your office...(iv) after appropriate screening, set up and accompany you to meetings with interested parties as often as scheduling allows; and (v) manage ongoing discussions and coordinate the closings with the investors solicited, or caused to be solicited by MRA.

(Engagement Letter §2(a).)

Under the terms of the contract, MRA's compensation would depend upon the realization of certain contingencies. Specifically, MRA would be entitled to compensation in the case of: (1) a private placement of Ovion stock with "MRA Contacts", meaning parties solicited or caused to be solicited by MRA, or with "Ovion VC Contacts", meaning parties so designated by Ovion on Schedule B of the contract; or (2) a "Corporate Transaction",

2

meaning a merger, acquisition, or private placement of Ovion
stock with a corporate partner, consummated "during the term of"
and before "the 180th day following the date" of the Engagement
Letter. (Engagement Letter §§3(a), 3(d).) The Engagement Letter
expressly provided that "MRA shall receive no fees for any entity
that is not either an MRA Contact or an Ovion VC Contact."
(Engagement Letter §3(a).) The Engagement Letter also
specifically contemplated that a Corporate Transaction was a
possible contingency. (Engagement Letter §3(d).) The Engagement
Letter nowhere restricted or limited whether or to what extent
Ovion could use MRA's services or work product for purposes of a
Corporate Transaction. Finally, the Engagement Letter expressly
provided that Ovion had an obligation to identify "parties being
actively solicited directly by Ovion" no later than the date of
execution of the Engagement Letter on a Schedule B to the
contract. (Engagement Letter §3(b).) Schedule B consisted of a
list of parties for whom MRA was not eligible to receive fees, as
well as parties for whom MRA had pre-negotiated a partial fee
should an investment be consummated. Schedule B could be
"updated from time to time by Ovion in its sole discretion."
(Engagement Letter §3(a).)

        Neither of the contingencies contemplated in the
Engagement Letter as a basis for payment to MRA was realized: no
MRA Contact or Ovion VC Contact invested in Ovion, nor did Ovion

3

consummate a Corporate Transaction during the term of the agreement or before the 180th day following the date of the Engagement Letter.  However, Ovion was eventually acquired by American Medical Systems, Inc. ("AMS") on July 7, 2005.

On March 7, 2005, MRA filed this suit, alleging that Ovion violated the Engagement Letter by misleading MRA about its pursuit of corporate transactions and by using MRA's work product to solicit and negotiate an agreement with AMS.  The complaint alleges nine causes of action: (1) breach of contract; (2) breach of the covenant of good faith and fair dealing; (3) promissory estoppel; (4) quantum meruit; (5) conversion; (6) fraud; (7) negligent misrepresentation; (8) concealment; and (9) violation of M.G.L. c. 93A.

## II. MRA's Allegations

MRA alleges two related theories of liability: (1) Ovion breached commitments to MRA, made before the execution of the Engagement Letter and repeated throughout the contract period, regarding its pursuit of corporate partners; and (2) Ovion's failure to disclose its active solicitation of AMS constituted a breach of §3(b) of the Engagement Letter, under which "a complete listing" of "parties being actively solicited directly by Ovion" was to be provided to MRA by Ovion "not later than the signing of this contract".

MRA alleges that throughout the parties' pre-contract

4

discussions, Ovion repeatedly told MRA that it wanted to pursue
venture financing and was not interested in a corporate
acquisition.  (Latterman Aff. ¶7.)  For example, Latterman states
that on June 8, 2004, Tremulis and Callister assured her "that
they wanted to do a venture financing because they wanted to grow
the company themselves and increase its net worth."  (Latterman
Aff. ¶9.)  Musket asserts that on June 16, 2004, he asked
Tremulis and Callister "point blank" whether they were interested
in pursing a corporate transaction, and both affirmed "that they
wanted to obtain venture financing so that they could keep
control of the company, and see Ovion through clinical trials
before ceding control to another corporation."  (Musket Aff. ¶9,
Latterman Aff. ¶10.)  At that meeting, Musket said that he did
not want MRA to be used as a "stalking horse" for a corporate
transaction.  (Latterman Aff. ¶10.)  Tremulis and Callister
responded that they had previously established communications
with a small number of potential corporate partners as a "backup
plan" when Ovion had been unable to attract venture financing,
but that they wanted to use the funds from such financing to
build the business before any corporate transaction.  (Musket
Aff. ¶9.)  Musket states that he recommended that communications
with corporate partners cease during the period of financing, and
it was his "clear understanding that there would be no active
solicitation of corporate investors without notification to MRA."

(Musket Aff. ¶9.)  Callister allegedly assured MRA that a
corporate acquisition would only happen if "lightening struck",
meaning a company approached Ovion with "a deal too good to be
refused."  (Musket Aff. ¶9.)

　　　　After the signing of the Engagement Letter on July 22,
2004, Latterman "understood that Ovion had listed all potential
investors on the Schedule B with which [sic] Ovion considered to
be actively interested in Ovion.  This would include corporations
considering an investment or acquisition.  I believed that Ovion
had agreed to immediately notify MRA if they were newly
approached by a potential investor including any corporate
partners or if they began actively soliciting a party not already
identified on the Schedule B."  (Latterman Aff. ¶11.)  Following
the contract's execution, in a series of meetings and
conversations through February 2005, Ovion continued to assure
MRA that it was committed to venture financing and not interested
in pursuing a corporate transaction.  (Musket Aff. ¶¶ 18-20,
Latterman Aff. ¶¶14-18.)  However, MRA contends that despite
Ovion's representations to the contrary, Ovion was secretly and
actively soliciting AMS as a corporate partner both before and
after it signed the Engagement Letter with MRA, in violation of
the terms of that contract.

### III. Analysis

　　　　The question to be decided is whether, after reviewing

the evidence in the light most favorable to MRA, any genuine
issues of material fact remain in dispute.  On a study of the
materials submitted by the parties on this motion, I conclude
that no reasonable juror could find in favor of the plaintiff.
See, e.g., Morris v. Brandeis Univ., 13 Mass. L. Rep. 627 (Mass.
Super. 2001)(granting summary judgment on breach of contract
claim where plaintiff's own self-serving affidavit, standing
alone, was insufficient to defeat summary judgment).  The terms
alleged by MRA are simply not to be found in the language of the
Engagement Letter.  Accordingly, for the reasons articulated more
fully below, Ovion's motion for summary judgment is GRANTED.

## A. Limitations on Ovion's Pursuit of Corporate Transactions

The Engagement Letter, which established the
obligations of the parties, is the governing contract and the
heart of this case.  MRA and Ovion agreed to the terms of the
Engagement Letter following weeks of detailed negotiations.
(Musket Aff. ¶10.)  The issue of a Corporate Transaction was not
overlooked or ignored during the negotiation period.  Indeed,
Ovion and MRA specifically provided, in §3(d), for: (1) an
"Advisory Fee" of $125,000 minus fees payable under §3(a) in the
event of a "Corporate Transaction" consummated during the first
90 days of the engagement, or (2) an "Advisory Fee" of $225,000
minus fees payable under §3(a) in the event of a "Corporate
Transaction" consummated during the second 90 days of the

engagement.  As of the 180th day following the signing of the
Engagement Letter, MRA was no longer entitled to any compensation
in the event of a Corporate Transaction.

The language of the Engagement Letter allowed Ovion to
pursue both venture capital financing and corporate transactions.
(Engagement Letter §3(d).)  Nothing in the contract limited
whether, or under what circumstances, Ovion could pursue a
Corporate Transaction, nor does it specify whether or to what
extent MRA's services could be used in pursuit of a Corporate
Transaction.  Moreover, the Engagement Letter nowhere suggests
that venture capital financing is or is not preferred over a
Corporate Transaction.

MRA contends that it executed the Engagement Letter
based on the understanding that Ovion favored venture financing
and would not pursue corporate partners unless good faith
attempts at securing venture capital failed; that Ovion would not
use MRA as a "stalking horse" for a Corporate Transaction; that
Ovion would not use MRA's services or work product to solicit
potential corporate partners; and that Ovion would give notice to
MRA if it pursued a Corporate Transaction.  However, the
affidavits of Musket and Latterman fail to support the
proposition that following extended negotiations between
sophisticated parties, in which MRA communicated that it would
not represent Ovion unless such conditions were met, MRA would

8

then execute a written agreement with no such provisions.

Musket and Latterman assert that, prior to signing the Engagement Letter and throughout the time of the engagement, they understood that Ovion was not interested in pursuing a corporate transaction. (Musket Aff. ¶¶9, 20-22; Latterman Aff. ¶¶7-11.) However, the allegations made in each affidavit are corroborated only by the other affidavit, and are substantially contradicted by the record evidence discussed below.

Most importantly, the Engagement Letter explicitly addresses the possibility of a Corporate Transaction and neither limits Ovion's pursuit of such opportunities nor expresses a preference for venture funding. (Engagement Letter §3(d).) Moreover, the documentation of negotiations in the weeks immediately preceding the execution of the Engagement Letter contradict MRA's allegations. Following the meeting on June 16, 2004, at which the parties agreed to negotiate a written contract, MRA sent Ovion a draft purporting to set forth their agreement. In contrast to the representations made in the Musket and Latterman affidavits, MRA's own June 16 draft did not mention or suggest any limitations on Ovion's pursuit of a Corporate Transaction or a preference for venture capital funding. The parties continued to exchange proposed revisions on June 30, July 6, and July 12, 2004, and none of these versions of the Engagement Letter mentions or suggests any limitation on Ovion's

solicitation of corporate partners or a disposition favoring
venture capital transactions.

Furthermore, after initially accepting the revised July
12 draft as an acceptable final version, Musket asked to revise
the agreement. Specifically, Schedule B had contained three
sections where Ovion contacts were listed by name: (1) "Ovion VC
[Venture Capital] Contacts - 3% Placement Fee to MRA"; (2) "Ovion
VC Contacts - Placement Fee to be negotiated"; and (3) "Ovion Non
VC Contacts - No Placement Fee to MRA". In the third section,
Ovion Non VC Contacts, Ovion had listed a number of contacts that
were not venture capital firms. During a phone conversation on
July 20, 2004, Musket proposed that the parties negotiate a fee
for the venture capital firms listed in the second section, for
which a placement fee was to be negotiated, thereby eliminating
the need for that section. Musket further proposed that the
third section for Ovion Non VC Contacts be eliminated, and that
the parties instead negotiate specific terms addressing under
what circumstances MRA could receive compensation in the event of
a transaction involving Ovion's non-venture capitalist contacts.
As a result of revisions based on these proposals, the final
executed version of the Engagement Letter provided: (1) as
outlined in §3(b), a Schedule B limited to Ovion's current
investors and Ovion VC Contacts; (2) a new §3(c) regarding a
"Success Fee" for "a Placement other than a Placement involving a

10

corporate partner"; and (3) a new §3(d) regarding an "Advisory Fee" for a "Corporate Transaction".

In sum, the language of the final version of the Engagement Letter expressly contemplates both venture capital and corporate transactions. In contrast to the assertions of the Musket and Latterman affidavits, nothing in the text of the contract, its negotiation history, or the correspondence between the parties limited Ovion's pursuit of corporate transactions or expressed a preference for venture capital funding. Moreover, it is altogether implausible that a sophisticated party such as MRA, having secured promises from Ovion to limit its pursuit of corporate partners as an essential component of its representation of Ovion, would have entered into a written agreement without any such limitations. Finally, even if MRA's assertions were plausible, the text of the Engagement Letter, of course, controls. For these reasons, no reasonable juror could find in favor of MRA based on the evidence presented.

*B. Limitations on Ovion's Use of MRA's Services and Work Product*

MRA contends that prior to execution of the Engagement Letter, the parties orally agreed to limitations on Ovion's use of MRA's services in pursuit of a corporate partner. Latterman asserts that Musket made clear during negotiations with Ovion that MRA did not wish to be used as a "stalking horse" for a corporate transaction, and that accordingly Ovion was not to use

11

MRA's research or work product to solicit or negotiate with
potential corporate partners. (Latterman Aff., ¶10.) However,
nothing in the language of the Engagement Letter or the
correspondence between the parties imposes or even suggests a
limitation on Ovion's use of MRA's services or work product.
Again one must conclude that no reasonable juror could believe
that MRA, an acknowledged sophisticated party, would obtain a
promise or understanding from Ovion not to use MRA's work product
in pursuit of a corporate transaction, but then draft and sign a
written agreement lacking such a provision.

*C. Ovion's Obligation to Inform MRA About Corporate Transactions*

        Latterman asserts that before execution of the
Engagement Letter, the parties agreed that Ovion would inform MRA
if a corporation offered to acquire or enter a partnership with
Ovion. (Latterman Aff., ¶11.) MRA contends that the express
language of the contract bears out this arrangement, because
pursuant to §3(b), Ovion had an obligation to identify on
Schedule B parties being actively solicited directly by Ovion at
the time of the Engagement Letter's execution. This argument
fails for two reasons.

        First, reviewing the drafting history and language of
the Engagement Letter leads to the conclusion that the parties to
be listed on Schedule B when the contract was executed were
Ovion's venture capital contacts. On July 21, 2004, the parties

12

revised the Engagement Letter by removing the section in Schedule B for Ovion's non-venture capital contacts, including corporations, and by adding §§3(c) and 3(d) to the body of the Engagement Letter to address the issue of Ovion's non-venture capital contacts. As a result, the final version of the Engagement Letter specifies in §3(a) that "'Ovion VC [venture capital] Contacts' shall be those entities designated as 'Ovion VC Contacts' on Schedule B of this Contract." The Engagement Letter nowhere mentions listing Ovion's non-venture capital contacts on Schedule B.

Second, the Engagement Letter provides that "Schedule B may be updated from time to time by Ovion <u>in its sole discretion</u>". (Engagement Letter §3(a), emphasis added.) As a result, Ovion's obligation to inform did not extend throughout MRA's engagement, but was applicable only at the time of the Engagement Letter's execution. Even if Ovion was required, when the Engagement Letter was executed, to disclose on Schedule B corporations that were being actively solicited directly by Ovion, MRA lacks evidence that corporations were being actively solicited directly by Ovion at that time.

MRA contends that Ovion actively pursued financing from AMS both before and after the execution of the Engagement Letter. In support of this assertion, MRA points to email correspondence which it contends indicates that Dr. Keith Isaacson ("Isaacson")

13

was sent by Ovion to AMS headquarters in July 2004 to solicit AMS while the Engagement Letter with MRA was being finalized. However, the affidavits of Isaacson, Callister, and Jim Call ("Call"), the executive vice president of AMS, effectively rebut such contentions.

Isaacson attests that, although he had been retained by Ovion as a consultant and member of its scientific advisory board:

> I visited AMS at their invitation.  AMS compensated me for my time and expenses.  I did not visit AMS on behalf of or at the request of Ovion....Ovion had nothing to do with my invitation to visit AMS.

(Isaacson Aff. ¶6.)  Call concurs that:

> Dr. Isaacson visited AMS at our invitation and request. Ovion was not involved in any way with our invitation to Dr. Isaacson or his visit to AMS, other than the fact that Ovion became a topic of conversation during our discussions.  We had a written agreement with Dr. Isaacson...to compensate him for his time and expenses associated with his visit to AMS.

(Call Aff. ¶8.)  Moreover, Ovion was not on the agenda for Isaacson's visit to AMS.  Isaacson and AMS discussed Ovion only when AMS raised the topic of transcervical sterilization, because Ovion was developing a potentially applicable product.  MRA has presented no evidence which challenges this recollection of Isaacson's meeting with AMS.

Following Isaacson's visit to AMS headquarters, AMS

14

held internal discussions during the week of August 9, 2004 that
led to the decision to pursue transcervical sterilization. (Call
Aff. ¶9.)  On Sunday, August 15, 2004, Isaacson sent an email to
Call and another AMS executive to follow up on his visit to AMS.
(Isaacson Aff. ¶13.)  In that email, Isaacson stated that Ovion
was trying to raise funds for clinical trials, that he had been
"barraged with calls from VCs [venture capitalists]", but that he
"had been encouraging Ovion to partner with an office based
company like AMS".  Isaacson encouraged AMS to contact Callister
and Tremulis if AMS had an interest in Ovion, but stated that if
AMS was not interested in Ovion, "please let me know and I will
not bring it up again."  Call replied by indicating that AMS
would contact Ovion the next day.  Isaacson then sent an email to
Callister and Tremulis, fowarding the email from Call, and
stating: "Now can I have my 10%?".  MRA asserts that this email
exchange, and specifically Isaacson's request for his "10%,"
indicates that Isaacson was acting as a finder for Ovion and that
he was seeking to recover a finder's fee for his solicitation of
AMS on behalf of Ovion.  However, Issacson's affidavit attests
that the 10% statement was a reference to a joke from a round of
golf that he had played with Callister, that he was not asking
for a finder's fee, and that he never received any finder's fee
nor had any expectation of receiving a finder's fee. (Isaacson
Aff. ¶¶15-16.)  Although the tone of an email can be difficult to

15

interpret, Isaacson's explanation is entirely credible.  There is
no indication that he had any agreement with Ovion to act as a
finder.  Were Isaacson entitled to a fee, he presumably would
have made a more formal request for that fee, and done so after
AMS had actually contacted Ovion to discuss possible
collaborations.  Accordingly, there is insufficient evidence on
which to find that Ovion was actively soliciting AMS at the time
the Engagement Letter was executed.

*D. MRA's Causes of Action*

    Even assuming that MRA's factual contentions were true,
the alleged factual disputes are not material because, since the
statute of frauds applies, MRA's claims are flawed as a matter of
law.

    As to MRA's breach of contract claim, MRA asserts that
Ovion failed to list AMS on Schedule B to the contract and was
actively soliciting AMS at the time the Engagement Letter was
signed.  However, the analysis above establishes that the parties
to be listed on Schedule B when the Engagement Letter was
executed were Ovion's venture capital contacts, not Ovion's
corporate contacts, and that Ovion was not actively soliciting
AMS at the time of execution.

    MRA also contends that Ovion breached certain oral
agreements about the use of MRA work product and Ovion's pursuit
of corporate transactions.  However, MRA has produced no evidence

16

of a writing detailing such oral agreements.

As to MRA's claim for a breach of the implied covenant of good faith and fair dealing, MRA argues that Ovion breached the implied covenant by secretly soliciting AMS using MRA's work product, and by misleading MRA about its pursuit of corporate partners.  MRA is correct that a party may be found to have breached an implied covenant of good faith and fair dealing absent a breach of the express terms of the contract.  <u>Speakman v. Allmerica Financial Life Ins. & Annuity Co.</u>, 367 F.Supp.2d 122, 132 (D. Mass. 2005) ("A party may breach the covenant of good faith and fair dealing implicit in every contract without breaching any express term of that contract.").  Nevertheless, as outlined at length above, MRA has failed to submit evidence to demonstrate that Ovion breached the implied covenant of good faith by misleading MRA as to its intent to pursue a corporate transaction or by secretly soliciting AMS using MRA's work product.  "[T]he requirement of good faith performance under the implied covenant is ultimately circumscribed by the obligations actually contained in the agreement...[which] keeps the implied covenant from being used to 'create rights and duties not contemplated by the provisions of the contract or the contractual relationship'."  <u>Chokel v. Genzyme Corp.</u>, 17 Mass. L. Rptr. 83, at *9 (Mass. Super. Nov. 12, 2003).  Accordingly, no reasonable juror could find, based on MRA's evidence and the implications of

the terms of the Engagement Letter, that Ovion acted in bad faith
or wrongfully prevented MRA from reaping the fruits of its
bargain.

   MRA's claim for conversion of its work product fails as
a matter of law because "a cause of action for conversion...does
not apply to intangible items." <u>Jayson Assocs. v. UPS Co.</u>, 2004
U.S. Dist. LEXIS 13191 at *4 (D. Mass. July 15, 2004); <u>see also</u>
<u>Harvard Apparatus, Inc. v. Cohen</u>, 130 F.Supp.2d 161, 164 (D.
Mass. 2001)("This court previously stated that it could not
locate any authority to suggest that Massachusetts has expanded
the common law tort of conversion beyond its traditional
application to chattels."). MRA asserts that its work product is
not "intangible" because it includes written documents. This
argument is without merit because, for the purpose of a claim of
conversion, the concept of an "intangible" in tangible form is
limited to items such as bonds, bills of exchange, and stock
certifications. <u>See</u> <u>Commonwealth v. Rizzuto</u>, 1980 WL 4637 at *3
(Mass. Super. May 9, 1980)(citing the example of conversion of a
bank passbook, "which not only deprives the depositor of the book
but makes it impossible for him to withdraw his balance"). In
the case at hand, MRA is claiming conversion of its ideas,
analysis, and services, rather then the tangible pieces of paper
on which such intangible ideas were recorded. Moreover, MRA
cannot successfully claim conversion because, pursuant to the

Engagement Letter, Ovion's right to use MRA's services and work product was in no way circumscribed.

MRA also contends that Ovion fraudulently induced MRA to enter into the Engagement Letter. MRA argues that it entered into the contract based on Ovion's purported commitment to venture financing rather than a corporate transaction, and Ovion's assurances that it would disclose all parties that it was actively soliciting at the time of execution. In support of these assertions, MRA relies upon on <u>McEvoy Travel Bureau v. Norton Co.</u>, 408 Mass. 704 (2004). In <u>McEvoy</u>, the court held that statements by the defendant that it did not intend to enforce a contractual termination provision, and that the termination clause had been included only upon the insistence of its attorneys, could form the basis of a fraud claim despite the fact that those statements were contradicted by the express language of the contract.

However, <u>McEvoy</u> is distinguishable and, in any event, the decision in <u>Turner v. Johnson & Johnson</u>, 809 F.2d 90 (1st Cir. 1986) is more instructive and relevant to the instant case. In <u>Turner</u>, the plaintiff claimed that it was induced into selling its thermometer business at far below its value based on misrepresentations made by Johnson & Johnson during the negotiation process. At one point during the negotiations Johnson & Johnson represented that it would promote the sale of

19

thermometers; however, the final written contract stated that
Johnson & Johnson was not obligated to use its best efforts to
market the thermometer.  In <u>Turner</u>, as in the instant case, the
alleged fraud occurred during extended contract negotiations
between sophisticated parties.  In contrast, in <u>McEvoy</u> the
misrepresentations were made immediately prior to the signing of
the contract, when the defendant pointed to a particular
provision of the final contract and promised not to invoke that
clause.  Moreover, as in the present case, the <u>Turner</u> contract
represented the parties' complete and final understanding
following lengthy and detailed negotiations and the exchange of
multiple written drafts prior to the contract's execution.  In
contrast, in <u>McEvoy</u> the termination provision was not discussed
during negotiations and was inserted unilaterally by the
defendant.

        Thus, turning to <u>Turner</u> for guidance, in striking a
proper balance between contractual certainty and protecting
innocent parties from fraud:

                a contractual provision flatly contradictory
                to prior oral assurances should cause most
                people – and particularly experienced,
                knowledgeable businesspeople – to pause.
                Moreover, if a jury is allowed to ignore
                contract provisions directly at odds with
                oral representations allegedly made during
                negotiations, the language of a contract
                simply would not matter anymore....Contracts
                would become no more than presumptive
                statements of the parties' intentions,
                instead of legally enforceable agreements.

                                20

Turner, 809 F.2d at 96.  The First Circuit therefore concluded
that:

> where both parties were experienced in
> business and the contract was fully
> negotiated and voluntarily signed, plaintiffs
> may not raise as fraudulent any prior oral
> assertion inconsistent with a contract
> provision that specifically addressed the
> particular point at issue.

Id. at 97.  In the case at hand, following extensive

negotiations, the parties executed a contract pursuant to which

Ovion could pursue a corporate transaction and was obliged to

disclose only corporate parties being actively solicited at the

time of execution.  Accordingly, MRA's claims for fraud,

negligent misrepresentation, and concealment, based on alleged

oral understandings contrary to these provisions, fail as a

matter of law.

    MRA further contends that Ovion violated Chapter 93A of

the Massachusetts General Laws.  In order to violate Chapter 93A,

the alleged conduct must rise to "a level of rascality that would

raise an eyebrow of someone inured to the rough and tumble world

of commerce."  Cheswell, Inc. v. Premier Homes and Land Corp.,

319 F.Supp.2d 135, 142 (D. Mass. 2004).  "[T]he mere breach of a

contract, without more, does not amount to a c. 93A violation."

Madan v. Royal Indem Co., 532 N.E.2d 1214, 1217 (Mass. App. Ct.

1999).  As discussed above, MRA's assertions about Ovion's

misbehavior are unsupported by the record and the terms of the

contract between the parties.  Even assuming that MRA's
allegations were true, given the express language of the
Engagement Letter, MRA cannot establish a claim for a violation
of c. 93A.  None of Ovion's actions constitute the type of
egregious behavior required to find unfair business practices.

Finally, MRA's quasi-contract claims for promissory
estoppel and quantum meruit fail as a matter of law, because the
parties have executed a valid written contract.  Okmyansky v.
Herbalife Int'l of America, Inc., 415 F.3d 154, 162 (1st Cir.
2005)("The plaintiff concedes the existence of a valid express
contract between the parties – and the existence of such a
contract bars the application of the equitable doctrines that he
belatedly invokes."); Boswell v. Zephyr Lines, Inc., 606 N.E.2d
1336, 1342 (Mass. 1993)("Recovery in quantum meruit presupposes
that no valid contract covers the subject matter of a dispute.
Where such a contract exists, the law need not create a quantum
meruit right to receive compensation for services rendered.").

<u>IV. Conclusion</u>

Accordingly, for the reasons discussed above, Ovion's
motion for summary judgment is GRANTED.

It is so ordered.


Dated:      May 15, 2006
            Boston, Massachusetts      /s/ Morris E. Lasker
                                            U.S.D.J.

22

Exhibit A

# MRA

MUSKET RESEARCH ASSOCIATES INC.

July 21, 2004

**CONFIDENTIAL**

Jeff Callister
President
Ovion Inc
1900 O'Farrell Street
San Mateo, CA 94403

Dear Jeff:

This letter will confirm the agreement under which Musket Research Associates, Inc ("MRA") is engaged by Ovion Inc., or any affiliate of Ovion, Inc. (collectively "OVION" or the "Company") to assist the Company as described below

### 1. Engagement

OVION hereby engages and retains Musket Research Associates, Inc as a nonexclusive finder/advisor in connection with a proposed private placement of Convertible Preferred Stock of Ovion Inc., including any other debt or equity instrument arising out of this financing effort (the "Placement"), which involves investors solicited by MRA during that effort The specific services to be provided by MRA and fees to be received will be:

### 2. Services

(a) MRA shall (i) analyze the financial performance and projections of the Company and provide advice regarding the appropriate valuation range for the new equity capital; (ii) assist in the development of presentation materials for investor solicitations; (iii) contact qualified investors and, if acceptable to you or your representative, send the necessary documents ourselves or through your office. Documents sent by the Company at MRA's request should be accompanied by a cover letter and/or business card from MRA, or, if these are not available, a specific reference to our introduction; (iv) after appropriate screening, set up and accompany you to meetings with interested parties as often as scheduling allows; and (v) manage ongoing discussions and coordinate the closings with the investors solicited, or caused to be solicited by MRA.

(b) MRA acknowledges that the offering will be made pursuant to the private offering exemption from registration under Section 4(2) of the Securities Act of 1933 and Rule 506 promulgated thereunder, and that OVION securities are to be offered and sold only to "accredited investors" (as defined in the SEC's Regulation D) who also satisfy any applicable securities laws Before each closing, OVION will validate these "accredited investors" via a customary suitability questionnaire, copies of which will be provided to MRA upon request.

(c) Prior to sending any descriptive materials to potential investors, MRA will provide OVION a list of these investors so that OVION can make the appropriate securities law filings, if any, in such jurisdictions. MRA will send materials previously approved by OVION when cleared to do so by an OVION representative and will not be responsible for assuring that such jurisdictional

125 CAMBRIDGEPARK DRIVE - 1ST FLOOR - CAMBRIDGE, MA 02140  617-441-8800 FAX 617-441-0855

MRA20844

filings have been made beforehand. MRA will not make any general solicitation in connection with this financing and will conduct its obligations hereunder in a manner consistent with the requirements of Rule 506.

(d) The potential investors contacted by MRA are subject to acceptance by OVION in its sole and absolute discretion, and OVION is under no obligation to sell any of its capital stock to such parties. MRA shall be deemed to be an independent contractor and shall have no right, power or authority to create any obligations on behalf of OVION

## 3. Cash Fees

(a) OVION agrees to pay MRA Finder's Fees of seven percent (7%) of the aggregate cash proceeds received by OVION from the Placement to parties solicited by or caused to be solicited by MRA ("MRA Contacts"). "MRA Contacts" shall be those entitles set forth on Schedule A of this contract, as updated from time to time, and accepted, as evidenced solely by a countersignature thereto on Schedule A, by the Company OVION agrees to pay MRA an additional fee of three percent (3%) of the aggregate cash proceeds received by OVION from the Placement to "OVION VC Contacts" and two (2%) of the aggregate cash proceeds received by OVION from the Placement to US Venture Partners. "OVION VC Contacts" shall be those entities designated as "OVION VC Contact" on Schedule B of this contract. Schedule B may be updated from time to time by Ovion in its sole discretion; provided, however, that once an entity is designated as an "OVION VC Contact" on schedule B, such designation may not be removed without the consent of MRA MRA shall receive no fees for any entity that is not either an MRA Contact or an Ovion VC Contact.

(b) MRA Contacts shall not include (i) current OVION investors and (ii) parties being actively solicited directly by OVION. A complete listing of these two exclusion groups will be provided to MRA by OVION as soon as possible but not later than the signing of this contract and will be attached hereto as Schedule B At OVION's sole discretion, it may authorize a switch of an investor listed on Schedule B to Schedule A, carrying with it the obligation to pay the fees outlined in Section 3(a) above or a mutually agreeable amount to be specifically listed on both Schedules A and B.

(c) If, during the term of this Agreement, OVION consummates a Placement other than a Placement involving a corporate partner, and the aggregate fees payable to MRA pursuant to Section 3(a) are less than $225,000, then OVION shall pay to MRA a "Success Fee" equal to $225,000 less any fees payable to MRA pursuant to Section 3(a).

(d) If, during the term of this Agreement, OVION consummates a merger, acquisition or Placement involving a corporate partner (a "Corporate Transaction") within 90 days of the date hereof and the aggregate fees payable to MRA pursuant to Section 3(a) are less than $125,000, then OVION shall pay MRA an "Advisory Fee" equal to $125,000 less any fees payable to MRA pursuant to Section 3(a). If, during the term of this Agreement, OVION consummates a Corporate Transaction between the 90th and the 180th day following the date hereof and the aggregate fees payable to MRA pursuant to Section 3(a) are less than $225,000, then OVION shall pay MRA an "Advisory Fee" equal to $225,000 less any fees payable to MRA pursuant to Section 3(a) This Advisory Fee will be payable at the time of the initial closing of whatever financial event OVION does consummate.

MRA20845

(e)  OVION will be obligated to pay MRA the same cash fees outlined in Sections 3(a) and 3(b) on any debt or equity related financing entered into with an MRA Contact within the earlier of eighteen (18) months following the final closing of the current Placement or within eighteen (18) months after the termination of this contract

(f)  All payments due to MRA will be made within 10 days of the closing of the financing for which they are payable. Cash or equity will be made out directly to Musket Research Associates, Inc. unless otherwise specified

(g)  The Company will inform MRA immediately if, during the term of this agreement, it engages any additional finders on this Placement, including in such notice a complete description of any fee agreement with such additional finder. If, during the term of this agreement, the Company agrees to pay finders fees in excess of those described in this contract, the fees payable to MRA will be increased to the same level, at the sole discretion of MRA

### 4. Expenses

Whether or not the financing contemplated herein is consummated, the Company will reimburse MRA for its reasonable out-of-pocket expenses incurred from this financing, provided such expenses have been approved in advance by OVION, such approval to not be unreasonably withheld. An initial non-refundable payment of $10,000 as an advance against these expenses will be paid to MRA upon the execution of this contract. OVION-approved expenses incurred by MRA prior to closing will be submitted for reimbursement by OVION and should be paid within two weeks of receipt.

### 5. Equity Participation/ Fee Substitution

MRA will be allowed, in its sole discretion, to substitute not less than 25% of the cash fees owed to it by OVION, as per Section 3 above for equity or debt instruments in OVION, in whatever form and at whatever value as was paid by the investors contacted by MRA and for which the fees are payable; provided that MRA shall be bound be similar terms and conditions as such investors and provided further that such issuance to MRA or its designee(s) shall comply with applicable state securities laws and shall not preclude OVION's reliance on Rule 506 with respect to the financing. MRA hereby represents that it is an "accredited investor" as defined by Regulation D.

### 6. Press Releases

OVION will list MRA as participating placement agent in any description of this financing it issues directly (i.e., press release) and will use its own discretion to list MRA similarly in any further communications to the investment community regarding this financing.

### 7. Termination

This engagement may be terminated by OVION or MRA at any time without cause, upon 10 days written notice to that effect by the other party. However, MRA shall be entitled to the fees described in Sections 3, 4, and 5 above, in the event that, at any time prior to the expiration of 18 months after either the termination of this agreement or the final closing of the current Placement,

MRA20846

whichever is applicable, a loan, credit facility, or other investment is consummated by OVION with an MRA Contact at the time of termination

**8. Indemnification**

The Company agrees to indemnify MRA under the terms set forth in Exhibit 1, which is included herein by reference

Sincerely,

David B. Musket    7/22/04

David B. Musket
President
Musket Research Associates

Agreed and Accepted:

Jeff Callister         Date  7/29/04
President
Ovion Inc.

MRA20847